ALAN GOLDMAN,

      Plaintiff

            v.

MCCONNELL VALDES, LLC;
ANTONIO A. ARIAS-LARCADA, his wife
MRS. ARIAS, and the Conjugal Partnership
composed by them;
JOSE IRIZARRY-CASTRO;
JOHN DOE; MARY DOE
UNKNOWN INSURANCE COMPANY;

      Defendants

CIVIL NO.:  24cv01136(SCC)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S VARIOUS MOTIONS
REQUESTING RELIEF FROM COURT ORDER REGARDING PHYSICAL AND
MENTAL EXAMINATION (DKTS. NO. 57, 62 AND 63)**

**TO THE HONORABLE COURT:**

    **NOW APPEAR** co-defendants Antonio Arias Larcada, his wife Maria Beale, and

the Conjugal Partnership constituted between them, and McConnell Valdés, LLC., through

their undersigned counsel, and very respectfully state and pray as follows:

    **I.**    **Introduction:**

    In the present case, plaintiff Alan Goldman is suing the appearing defendants, his

former attorneys, for allegedly failing to competently defend his in a lawsuit filed against

him by the buyer of a property he owned in Puerto Rico, which he refused to sell to after

signing a purchase agreement.  Because Mr. Goldman's Amended Complaint alleges that

his former lawyers failed to raise his cognitive impairment as a defense to the suit, both his

physical and mental state are at issue in this case. Accordingly, on August 27, 2024, the appearing defendants filed a Motion (Dkt. No. 34) pursuant to Fed.R.Civ.P. 35 requesting that he be ordered to submit to a mental and physical examination by Dr. José A. Franceschini, a local psychiatrist. Mr. Goldman did not oppose the defendants' Motion, and on September 18, 2024, the Court granted it, ordering the plaintiff to "submit to a mental and physical examination" at Dr. Franceschini's office on October 21 and 23, 2024. Dkt. No. 45.

Two weeks after the Court granted defendants' Motion, on October 1, 2024, plaintiff's counsel emailed the undersigned advising that his client "will not be able to travel to San Juan for the examination" ordered by the Court. Ten days later, on October 10, 2024, the plaintiff filed a "Motion Requesting Relief" (Dkt. No. 47), wherein he asked the Court to set aside or modify its prior Order, alleging that he was unable to travel to Puerto Rico for the examination due to unspecified medical conditions. On October 16, 2024, the appearing defendants filed their Opposition (Dkt. No. 49), which was subsequently joined by the co-defendants (Dkts. No. 50, 51). Despite the existence of the Court's Order at Dkt. No. 45, the plaintiff did not appear for the mental and physical examination on October 20, 2024. See, "Informative Motion", Dkt. No 55.

On November 4, 2024, the plaintiff filed a "Second Motion Requesting Relief from Court Order Regarding Physical and mental Examination". In it, the plaintiff reiterated his prior request to be relieved from the Court's Order at Dkt. No. 45, now making reference to a litany of physical and mental conditions which he supposedly suffers but failing to attach any medical evidence (opinion or otherwise) to support his claims of medical hardship. Subsequently, on November 12, 2024, and without requesting leave of Court,

the plaintiff filed two additional motions: (1) a "Response to Defendants' Opposition to Plaintiff's Motion Requesting Relief (Dkt. No. 62); and (2) a "Motion under Seal in Support of Plaintiff's Response to Defendants' Opposition to Plaintiff's Motion Requesting Relief (Dkt. No. 63).

As more fully set forth below, the appearing defendants respectfully oppose these latest motions and request that the Court once again order the plaintiff to appear in person for a full physical and psychiatric examination by Dr. Franceschini.

## II.    Argument:

### A. Summary:

Mr. Goldman's various requests for relief from the Court's Rule 35 Order go against the well-settled rule that, barring extraordinary circumstances, a plaintiff whose physical and/or mental condition is at issue must travel to his chosen forum for a medical examination by the defendant's expert. [1]  His latest motions do not cite any caselaw contrary to the general rule relied upon by the defendants. Rather, the plaintiff recites a litany of medical conditions he supposedly suffers from, arguing that, given his precarious health, travel to Puerto Rico for the Rule 35 examination is unnecessary and would pose an undue burden for him.  He therefore requests that the examination be performed remotely, via "telemedicine".

Mr. Goldman's claim that a physical examination is unnecessary and irrelevant in this case is belied by the allegations of the complaint and the standards for a psychiatric

---

[1] See, 71 A.L.R.2d 973, 980; Blount v. Wake Elec. Membership Corp., 162 F.R.D. 102, 107 (E.D. N.C. 1993); Rainey v. Wal-Mart Stores, Inc., 139 F.R.D. 94, 95 (N.D. Tex. 1991); Landry v. Green Bay & Western R.R. Co., 121 F.R.D. 400, 401 (E.D. Wis. 1988); Baird v. Quality Foods, 47 F.R.D. 212, 213 (E.D. La. 1969); see also, Warren v. Weber & Heidenthaler, Inc., 134 F.Supp. 524 (D.Mass. 1955); Pierce v. Brovig, 16 F.R.D. 569 (S.D.N.Y. 1954); Gale v. National Tranp. Corp., 7 F.R.D. 237 (S.D.N.Y. 1946).

evaluation established by the American Psychiatric Association, which make clear that the physical component of mental disorders is an essential element of any psychiatric evaluation.

Further, the plaintiff's latest motions remain devoid of any concrete evidence to establish that travel to Puerto Rico poses an undue health burden for him.  The litany of medical conditions they refer to is unsupported by any actual medical records and/or a medical opinion from one of his treating physicians.  His claim that travel to and from Puerto Rico for two or three days would somehow interfere with his ability to run his multi-million-dollar business is similarly unsupported.

For all these reasons, the plaintiff should be once again commanded to appear in person for the medical examination previously ordered by the Court.

**B.  The Plaintiff's Physical Condition <u>is</u> in Controversy:**

The plaintiff argues in his motions that his physical condition is "not in controversy" and that the physical examination to be conducted is "devoid of any meaningful purpose" and "designed to harass" the plaintiff.  The defendants respectfully disagree.  The allegations of the Second Amended Complaint place both the plaintiff's physical and emotional health in controversy.  Moreover, given his numerous health issues, the defendants need to thoroughly examine him in order to determine to what extent, if any, his physical ailments have impacted his mental state, and whether his alleged mental damages are related to any actions or omissions of the defendants.

The plaintiff's Verified Second Amended Complaint contains various allegations concerning his physical state.  His main claim is that the defendants committed legal malpractice by failing to raise his alleged diminished cognitive capacity as a defense to

the suit against him. According to his Complaint, however, the plaintiff's "possible declined mental abilities" are *inexorably intertwined with his physical ailments*. Thus, for example, in paragraph 50, the plaintiff alleges that "[d]uring the relevant time, Mr. Goldman mentioned to his lawyers from McConnell Valdés, including Mr. Arias, that Mr. Goldman may be suffering some diminished mental capacity, due to Mr. Goldman's **repeated transient ischemic attacks ("TIA"), seizures and health conditions**, that may have caused Mr. Goldman to be confused, disoriented and with limited cognitive capability." Dkt. #27 at par. 50 (emphasis added).

There can therefore be no doubt that the allegations of the Plaintiff's Complaint place his physical condition in question. His claim that he suffered repeated "transient ischemic attacks ("TIA"), seizures and health conditions", thereby affecting his cognitive abilities, is central to his allegations that the defendants negligently failed to raise these issues while defending him in court. Accordingly, under Rule 35, the defendants are entitled to perform a psychiatric evaluation, which includes a physical examination, in order to determine whether, and to what extent, Mr. Goldman's "TIAs, seizures and [other] health conditions" affected his cognitive functions at the time he entered into the disputed contract to sell his property, and whether the defendants should have raised such alleged cognitive impairments as a defense to the breach of contract suit in which the represented him.

Moreover, given these allegations, and the plaintiff's claim for damages for "mental and emotional suffering" (see, e.g., Dkt. # 27 at paragraphs 96, 97, 114, 121, 125, 128 and prayer for relief), there is clearly an issue as to whether and to what extent such alleged "mental and emotional suffering" is related to the plaintiff's alleged

physical ailments, as opposed to the defendants' alleged actions and omissions.  The

defendants are entitled to examine the plaintiff in order to distinguish between "mental

and emotional suffering" allegedly caused by their conduct and "mental and emotional

suffering" caused by the plaintiff's physical health conditions.

Contrary to the plaintiff's protestations, the defendants' insistence upon an in-

person physical examination is not designed to harass him, but rather to allow the

defendants a fair opportunity to rebut his allegations.  The plaintiff has chosen to file

suit in this jurisdiction, and his physical and mental health are at the heart of his claims.

Basic fairness demands that the defendants be permitted to defend themselves by

evaluating the validity of the plaintiff's allegations via a thorough and complete

examination by a psychiatric professional.

## C.  The Plaintiff's Claims of Inability to Travel to Puerto Rico are Unsupported by Medical Evidence:

The Plaintiff's first "Motion Requesting Relief" was deficient because it failed to

provide any detail whatsoever as to why travel to Puerto Rico would constitute an undue

health hardship for him.  Both his "Second Motion" and his other filings are equally

deficient.

The plaintiff argues in his "Second Motion" that he has an "extensive health

history" which "underscores his medically compromised state, marked by immune

sensitivity and heightened susceptibility to airborne pathogens."  Dkt. No. 57 at p. 2.

According to plaintiff, "[t]raveling from Vermont to Puerto Rico would expose him to

prolonged public transit environments" which would "necessitate multiple flights and

involve crowded confined spaces, thereby contravening [his] medically certified need to

avoid exposure to infectious environments." <u>Id</u>. He also argues that "due to [his] ongoing and complex medical complications, as well his continuous need for medical appointments, the stress of extensive travel…raises substantial and immediate health concerns", since the "proposed week-long stay in Puerto Rico presents a very real risk to [his] life, exacerbating the impact on his already vulnerable health." <u>Id</u>. at p. 4.

Plaintiff's "Motion under Seal" (Dkt. No. 63) adds another element. He now states that he has been diagnosed with Lyme Disease, and that travel to Puerto Rico will pose a risk to his weakened immune system and exacerbate his symptoms. Accordingly, he reiterates his request that the Court "limit any travel requirements, considering plaintiff's recent Lyme disease diagnosis, senior age, pre-existing conditions, weakened immune system" and order instead that Dr. Franceschini's evaluation be conducted remotely, by "telepsychiatry".

The problem with all of this is that the plaintiff has submitted no expert opinion by a medical professional to support any of these claims of medical hardship. The "Chronological Record of Dates and Notes" which is attached to the "Second Motion" as "Exhibit A" merely summarizes a series of past and future medical visits, most of which were for screening purposes.[2] Nowhere in this document is there any actual medical

---

[2]The "Chronological Record" merely summarizes a series of medical appointments, spanning from early June of this year until the present time. It begins with a medical visit on June 5, 2024, wherein it was noted that plaintiff had a history of skin and bladder cancer. His complaints appeared to be limited to "hoarseness" as well as memory and visual impairment, although there is no indication as to the severity of these complaints. Screening for prostate cancer, lung cancer, colon cancer, Lyme disease, and aortic abdominal aneurysm was ordered. His blood pressure was 140/90, within normal limits. According to the "Chronological Record", on June 7, 2024, the plaintiff underwent MRI and CAT Scan, and his "neck pain" and "memory impairment" were addressed. On June 20, 2024, the plaintiff had a telemedicine appointment, which addressed his straining on urination, unspecified hypothyroidism, Type 2 diabetes without complication or long-term use of insulin, cervical spondylosis, cervical stenosis, shortness of breath, sleep apnea, hyperlipidemia, transient ischemic attack and colon cancer screening. On June 28, 2024, his pulmonary function was tested. On July 16, 2024, he saw a physician for his "memory impairment", who attributed it to "age-related ischemic changes" in the plaintiff's brain. On July 17, 2024, he had a telemedicine phone call to address his elevated PSA (prostate specific antigen). He had another

opinion that would even suggest that the plaintiff is unable to travel to Puerto Rico. As can be gleaned from the "Chronological Record", although the plaintiff has a history of skin and bladder cancer, and has recently complained to his doctors of hoarseness, neck pain and memory problems, none of these conditions is necessarily incapacitating or prevents Mr. Goldman from traveling. Similarly, his recent Lyme Disease diagnosis does not *per se* mandate that he eschew air travel.

More importantly, no physician has certified that a visit to Puerto Rico for two or three days will place the plaintiff's health at risk, as he claims. The only "medical certificate" in the record suggesting, for unspecified reasons, that the plaintiff "should not travel out of the country", remains Nurse Practitioner Amy E. Renner's letter of October 10, 2024 (Dkt. No. 47). Despite the plaintiff's claims in his "Response" (Dkt. No. 62), Nurse Renner's "medical opinion" cannot be treated as the equivalent of a recommendation from one of the plaintiff's treating physicians. Moreover, her letter is utterly devoid of any factual detail, nor does it contain any description whatsoever of any medical condition suffered by Mr. Goldman or any specific explanation as to how it might affect his ability to travel "out of the country". Even if Ms. Renner were qualified to opine as to these matters, which is denied, the Court is not required to accept opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

---

CAT Scan on July 25, 2024, screening for lung cancer. Further follow up visits occurred on August 8th and 16th, 2024, addressing the same past issues. Similarly, he saw another physician for follow up on September 5, 2024. On October 8, 2024, he had another MRI screening for aortic abdominal aneurysm, and on October 10, 2024, he saw the nurse practitioner, Amy Renner, who signed the letter he submitted to the Court. On October 14, 2024, he saw a "Care Manager" and a physician for some apparent skin growth issues. On October 17, 2024, he saw another physician, presumably a urologist, for his elevated PSA. He was scheduled for a cystoscopy and prostate MRI.

In sum, no physician has suggested on this record, as plaintiff alleges, that he suffers from "immune sensitivity and heightened susceptibility to airborne pathogens" which would counsel against travel to Puerto Rico. No physician has claimed that the plaintiff "needs to avoid exposure to infectious environments." No physician has asserted that "due to [plaintiff's] ongoing and complex medical complications, as well his continuous need for medical appointments, the stress of extensive travel…raises substantial and immediate health concerns", or that the "proposed week-long stay in Puerto Rico presents a very real risk to [plaintiff's] life, exacerbating the impact on his already vulnerable health." Whether or not these claims are true, they are wholly unsupported by medical opinion or other valid evidence, and hence cannot serve as the basis for the Court to exempt the plaintiff from the usual rigors of litigation, particularly where he has chosen to place his health condition in controversy by filing a lawsuit in a forum far from home.

**D. The Rule 35 Examination Cannot be Performed Remotely:**

Plaintiff's "Second Motion" and "Supplemental Motion" suggest that the Rule 35 examination ordered by the Court be performed remotely, via "telemedicine". As set forth below, in this particular case, such arrangements would be wholly insufficient and contrary to established protocol.

Psychiatrists are trained physicians, and their initial evaluation of a patient's psychiatric health ordinarily includes a basic physical examination. Physical illness may have a direct bearing on a patient's mental diagnoses, particularly with respect to cognitive disorders, such as the ones alleged by the plaintiff in this case. In addition, physical illness may affect (or be affected by) the management of a mental disorder.

Thus, an assessment of a patient's physical condition, including his or her medical history, is an essential component of any initial psychiatric evaluation.

Accordingly, the American Psychiatric Association ("ASA") has developed diagnostic standards for mental disorders which consider, among other factors, a patient's physical health.  Historically, mental disorders were divided into those that were termed "organic" (caused by physical factors) versus those that were "nonorganic" (purely of the mind; also referred to as "functional" or "psychogenic"), terms that were included in the APA's Diagnostic and Statistical Manual of Mental Disorders up through the third edition, published in 1987 ("DSM-III-R").  In 1994, the terminology was updated in the DSM-IV because the dichotomy between "organic and "nonorganic" misleadingly implied that nonorganic disorders have no biological basis and that mental disorders have no physical basis.  Thus, the DSM-IV replaced the "mental disorder" versus "physical disorder" dichotomy with a "mental disorder" vs "general medical condition" dichotomy.

In 2022, the APA released the Fifth Edition of the Manual (DSM-5-TR), which replaced the term "general medical condition" with the term "another medical condition" to "emphasize the fact that mental disorders are medical conditions and that mental disorders can be precipitated by other medical conditions."  DSM-5-TR at p. 26.  The latest edition of the Manual makes clear that these terms "should not be taken to imply that there is any fundamental distinction between mental disorders and other medical conditions, that mental disorders are unrelated to physical or biological factors or processes, or that other medical conditions are unrelated to behavioral or psychosocial factors or processes."  Id. at p. 27.

In other words, the APA recognizes that the modern practice of psychiatry must consider the mind and the body as interrelated elements of the whole that cannot be neatly separated into two distinct spheres. Thus, the APA has developed practice guidelines which suggest that a psychiatrist must <u>always</u> consider a patient's physical health as part of any assessment of mental illness. The APA's "Practice Guidelines for the Psychiatric Evaluation of Adults" were developed, among other reasons, "to improve the identification of psychiatric disorders…[and] ***other medical conditions (that could affect the accuracy of psychiatric diagnosis)***". <u>See</u>, APA Practice Guidelines, available at <u>http://psychiatryonline.org/doi/book/10.1176/</u> (emphasis added). These guidelines suggest that a psychiatrist must initially perform an "assessment of medical health" via a review of the patient's medical history as well as a physical examination. <u>Id</u>. APA Guidelines therefore suggest that the initial psychiatric evaluation of an adult patient should include a review of the following systems:

-Constitutional symptoms (e.g. fever, weight loss)

-Eyes

-Ears, Nose, Mouth, Throat

-Cardiovascular

-Respiratory

-Gastrointestinal

-Genitourinary

-Musculoskeletal

-Integumentary (skin and/or breast)

-Neurological

-Endocrine

-Hematologic/Lymphatic

-Allergic/immunological

APA Guidelines further suggest that the initial psychiatric evaluation include assessment of the following, among others:

-General appearance and nutritional status

-Coordination and gait

-Involuntary movements or abnormalities of motor tone

-Sight and hearing

-Speech, including fluency and articulation

Thus, the APA Guidelines suggest that, at least initially, assessment of these "medical health" factors should be performed in person.

During the COVID-19 pandemic, there was an increased use of "telemedicine" and "telepsychiatry" to treat patients remotely. A recent study showed that during the pandemic telemedicine was more often used for existing patients, rather than for first-time patients, and for patients requiring long-term treatment, rather than short term. See, Cortez et al., "Changes in short-term, long-term, and preventive care delivery in US office based and telemedicine visits during the COVID-19 pandemic." Journal of the American Medical Association Health Forum 2, e211529-1211529 (2021).

Although telepsychiatry may be advantageous in the long-term treatment of certain patients, offering convenient, affordable and readily accessible mental health services, it is clinically inappropriate for the type of one-time evaluation that must be conducted in this case. Thus, in a remote setting such as that suggested by plaintiff,

"[o]nly a partial mental status exam is possible, evaluations of gait and peripheral movements are rarely done, and a full assessment of grooming is impossible when you cannot smell the patient or he or she may be appropriately dressed in lounge-ware." Tendler, A., "Telepsychiatry:  To Be or Not to Be, That is the Question", Psychiatric Times (June 16, 2020).  "Any psychiatrist conducting a virtual evaluation may evaluate the chief complaint but neglect issues that the patient does not have clinical or cognitive insight of, such as substance use, psychosis, obsessive-compulsive and related disorders, eating disorders, cognitive disorders, etc."  Id.  "Movement disorders and other adverse effects may me unnoticeable on the screen yet evident in the office setting."  Id.  In short, with telepsychiatry, the clinician "will not get the opportunity to observe much of what psychiatrists are trained to rely on."  Id.

For all of these reasons, the remote "telepsychiatry" evaluation suggested by plaintiff would be inadequate and inappropriate in this case.

### E.  The Rule 35 examination would not cause Plaintiff financial hardship:

The plaintiff alleges, without more, that "[a]s a high level executive responsible for substantial real estate operations", his "absence due to extended travel would significantly disrupt his business."  Dkt. No. 57 at p. 5.  According to the plaintiff, "[g]iven his crucial role in managing a multi-million-dollar firm, time-sensitive projects, and government meetings, and extended examination in Puerto Rico threatens considerable financial repercussions, potentially costing the firm significant opportunities.  Id.

Yet, as with his protestations of medical hardship, the plaintiff submits no hard evidence to support these statements.  It is indeed difficult to imagine that a two- or three-

day trip to Puerto Rico would have such nefarious financial consequences as he claims, particularly given the availability of the modern means of communication such as email, telephone and videoconferencing which are used daily to manage businesses worldwide. It also begs the question: if Mr. Goldman's health is, as he claims, so precarious that he cannot leave his home, why is his physical presence in Vermont such an imperative to run his real estate business? Does he not already manage his "time-sensitive projects" and "government meetings" remotely? Can he not continue to do so from Puerto Rico for a few days?

### F. Conclusion:

In sum, Mr. Goldman's various motions for relief from the Court's Rule 35 Order fall short of the required showing to depart from the well-settled rule that a plaintiff whose physical and/or mental condition is at issue must travel to his chosen forum for a medical examination by the defendant's expert. Mr. Goldman's claim that a physical examination is unnecessary and irrelevant in this case is belied by the allegations of the complaint and the standards for a psychiatric evaluation established by the American Psychiatric Association, which make clear that the physical component of mental disorders is an essential element of any psychiatric evaluation.

In addition, the plaintiff's motions remain devoid of any concrete evidence to establish that travel to Puerto Rico poses an undue health burden for him. The litany of medical conditions they refer to is unsupported by any actual medical records and/or a medical opinion from one of his treating physicians. His claim that travel to Puerto Rico for two days would somehow interfere with his ability to run his multi-million-dollar business is similarly unsupported.

For all these reasons, the plaintiff should be once again commanded to appear in person for the medical examination previously ordered by the Court.

WHEREFORE, it is respectfully requested that the Honorable Court deny the plaintiff's motions as Dkt. Nos. 47, 57, 62 and 63 and consequently order the plaintiff to appear in person in Puerto Rico before Dr. José A. Franceschini for a Rule 35 examination at a time and place to be determined by agreement of the parties.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico this 14th day of November, 2024.

**I HEREBY CERTIFY** that on this 14th day of November, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all the counsel of record.

S/MANUEL SAN JUAN
MANUEL SAN JUAN
USDC-PR No.: 204706
P.O. Box 9023587
San Juan, Puerto Rico 00902-3587
Tel.:(787)723-6637 / (787) 723-6669
E-mail: sanjuanm@microjuris.com