IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ALAN GOLDMAN | * | CIVIL NO.: 24CV01136 |
| | * | |
| Plaintiff | * | |
| | * | |
| V | * | |
| | * | |
| McCONNELL VALDES, LLC; | * | |
| ANTONIO A. ARIAS-LARCADA, ET AL | * | |
| | * | |
| Defendants | * | |

**PLAINTIFF'S ANSWERS TO DEFENDANTS' ANTONIO ARIAS, MARIA BEALE
AND McCONNELL VALDES, LLC'S FIRST SET OF INTERROGATORIES**

TO:     **DEFENDANTS, ANTONIO ARIAS, MARIA BEALE,
McCONNELL VALDES, LLC
c/o: Manuel San Juan, Esq.**

FROM:   **PLAINTIFF, ALAN GOLDMAN
c/o: Francisco M. López-Romo, Esq.**

### GENERAL STATEMENT

The Plaintiff does not intend to disclose information that is a privilege or is otherwise immune from discovery. Disclosure of any information by the attorney-client privilege, work product doctrine, or any other applicable privilege, except pursuant to a specific written agreement covering such information, shall be deemed inadvertent. Inadvertent disclosure of any such information shall not constitute a wavier or prejudice of any privilege or any other ground for objecting to discovery with respect to any such information nor shall such inadvertent disclosure waive or prejudice the right of Plaintiff to object to the use of any such information during this or any subsequent proceeding.

Plaintiff reserves the right to modify, amend, and/or supplement these responses. Plaintiff's response to any of the Requests shall not constitute an admission by it that the information is property discoverable, or admissible at trial, or at any evidentiary hearing, and shall not constitute a wavier of any objection which might otherwise be made to the disclosure of such information.

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

Plaintiff will produce responsive, non-privilege, and non-objectionable documents, to the extent such documents exist and are in Plaintiff's possession, custody, or control, to counsel for Plaintiff. Plaintiff reserves his right not to produce responsive documents which have been previously produced, or otherwise made available to the Plaintiff.

Plaintiff submits these responses without conceding the relevance or materiality of the subject matter of any document or information which may be produced or identified, and without prejudice to Plaintiff's right to object to further discovery, or to object to the admissibility of any proof on the subject matter of any discovery or any document. Plaintiff reserves the right to change or supplement any response that may subsequent appear to be incomplete or incorrect. The Plaintiff reserves the right to object at such a later time that any document produced, or response given hereunder is protected by the attorney-client privilege, the work product doctrine, or as trial preparation material, and that the production or response was inadvertent.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Requests: (a) to the extent that they seek information or the production or identification of documents not in the possession, custody, or control of Plaintiff within the meaning of the Federal Rules of Civil Procedure, Rules of Evidence; (b) on the grounds that the Requests are overly broad, unreasonable, unduly burdensome, improper, and the scope is not limited to documents in Plaintiff's possession; and, (c) that the Requests are not reasonably calculated to lead to the discovery of admissible evidence and seek information that is not relevant to the claims and defenses in this action.

2. Plaintiff objects to the Requests to the extent that they seek information or the identification and production of documents that constitute, contain, or represent confidential, trade secret, or other proprietary and commercially sensitive information of Plaintiff.

3. Plaintiff objects to the Requests to the extent they seek information, or the production or identification of documents protected by the attorney-client privilege, by the work product doctrine, or by any other privilege.

4. Plaintiff objects to the Requests to the extent they seek information or the production or identification of documents, without providing any time limitation in the Requests, as being overly broad in scope and time.

5. To the extent the Requests, or their definitions and instructions, seek to impose upon Plaintiff any duties or requirements in excess of those specified in the Federal Rules of Civil Procedure or applicable law, Plaintiff objects to them.

6. Plaintiff objects to each Request to the extent it is repetitive and/or substantially overlaps with other Requests or with discovery previously served by Defendant. When a response is equally responsive to more than one Request, Plaintiff reserves its right to respond only once.

7. Each of the foregoing general objections is expressly incorporated by reference into each of the specific responses of Plaintiff to the Requests.

## ANSWERS

1. Identify every witness you intend to call to testify during the trial of this case. For each witness mentioned, give a detailed summary of what said person will testify, identifying the facts and documents that will support said testimony and state how the person acquired the knowledge of each fact and document. State separately for each person's full name, home and postal address, the identity of the facts as to which said person has, or claims to have, personal knowledge and how it was acquired by said person.

*Response:*
- **Tato Orizondo and Uva Rodríguez**: Property managers introduced by Antonio Arias and his wife.
  - o Héctor Orizondo / Uva Rodríguez: 8039 Via Playera; Camino Del Mar; Tao Baja, PR 00949
  - o Tato's Phone: 787-409-2020
  - o Pages: 3282 - 3911 and 4,129 - 4,390
  - o Uva's Phone: 787-397-6264
  - o Pages: 3,912 - 4,128 and 4,391 - 4,604
  - o Narrative: Were hired to do contract work and management for the property, came as recommendation and negotiation from Mr. Arias and his wife Maria Beale,

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

as it was stated that Tato and Uva are the "very good close friends" of Arias and his wife.

- **Rey Ríos Castro CPA**
  - Po Box 2852; Guaynabo, Puerto Rico 00970; (787)399-2265; cparrc@gmail.com; http://WWW.reyrioscpa.com
  - Narrative: Accountant in Puerto Rico, managed financial aspects of the property closing.

- **Aida Colón:**
  - Street C, #116F Urb. Costa DE Oro.; Dorado, Puerto Rico 00646
  - (787) 796-3172; unique_properties@yahoo.com
  - https://www.uniquepropertiespr.com/contact/
  - Narrative: Real estate broker during the summer of 2020
  - Pages: 4,709 - 4,822 and 5,177 - 5,353

- **René Pérez (from Calle 13):** Famous musicians do not currently have physical addresses, need to research further.
  - Narrative: Potential buyer who reviewed property plans but withdrew for political reasons.

  **Mr. Joshua Levey:** 10 THE ESTS # URB THE DORADO PR 00646-3002 (DORADO COUNTY) (646) 678-1994

  - Narrative: DBHOA past president and board member; commented on the fairness of the deal Mr. Goldman signed.

- **Peter Schiff:**
  - Phone: 203.4514560
  - Narrative: Stock trader who advised against signing the deal after-the-fact; telephone conversations, board member of HOA.

- **Hiram Albino:**
  - Hiram R. Albino Collazo Ph. D.; Real Estate Broker Lic # C-17383; 787-674-6255; hiramalbino@yahoo.com; www.luxuryestatespr.com
  - Phone: 787-674-6255
  - Narrative: Real estate broker in Dorado.
  - Pages: 4,970- 5,048 and 5,364 - 5,386

- **Isabel and Juan Albors:** 3 Dorado Beach Estates, Dorado PR 00649
  - Neighbors
  - Phone: Home: 787-626-4818 Cell:787-392-1814
  - Narrative: Former neighbors in Dorado Beach Estates, familiar with HOA issues affecting Mr. Goldman.

- **Bad Bunny** Dorado beach East 22 million Inside Bad Bunny's PUERTO RICO Home I $22 Million
  - Do not currently have the correct address, but he lives in the flood plain below the estates in what is called Dorado Beach East.

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

- **Lieutenant Diego Colon**: Dorado Beach Police Dept.
  - Email: dcolon@doradobeach.com
  - Narrative:   Head of security at Dorado Beach Hotel and the town of Dorado; aware of security breaches on Mr. Goldman's property.

- **Jeffrey Cleven**: HK Law attorney who attended meetings with Antonio Arias and others, regarding strategic discussions. ATTORNEY CLIENT PRIVILEGE Holland & Knight LLP Holland & Knight LLP
  - 10 Saint James Avenue, 11th Floor | Boston, MA 02116
    Phone 617.854.1469 | Fax 617.523.6850
    jcleven@hklaw.com | www.hklaw.com

- **Jeremy Sternberg**: HK Law attorney involved in strategy meetings with Mr. Arias. Holland & Knight LLP
  10 St. James Avenue, 11th Floor | Boston, Massachusetts 02116
  Phone 617.854.1476 | Fax 617.523.6850
  jeremy.sternberg@hklaw.com | www.hklaw.com

  - Phone: 617-854-1476

- **Eric Russell (Owner Ridgeline Construction)**:
  - Phone: 802-272-9818, 2040 route 214 North Montpelier VT 05666
  - Narrative:   Sent by Mr. Goldman to Puerto Rico to work on property repairs. Ericruss045@gmail.com

- **Peter Kackel**: Managing Partner Centre Place Newton, MA 02459, 617-283-4051
  - Phone: (617)-283-4051
  - Narrative:   Close friend and business partner, witness to Mr. Goldman's medical and mental state in 2020.

- **Jack Franks**: Avanru Development Group Ltd.
  - Narrative:   Old Friend, real estate developer, aware of Mr. Goldman's health issues during 2020.
  - (877)-410-5499 Ext. 1
  - (802)-249-2900 Mobile
  - www.avanrudevelopment.com

- **David Putter**: Attorney and close friend; aware of Mr. Goldman's health issues and advised on signing the property deal.
  - Phone: (807)-793-2989
  - **David Seth Putter** Photo 6 Towne St, Montpelier, **VT** 05602. MAIN LOCATION.
  - Narrative:   Attorney and close friend; aware of Mr. Goldman's health issues and advised on signing the property deal.  Prior attorney who is no longer practicing.
  - *NOTE: there was a scrivener's error in initial disclosures which stated this man as "Davis [sic] Putter" the correct name is "David Seth Putter".*

- **Judith Fisher - Life Partner of David Seth Putter (see above):**

Narrative:   Attorney and partner of David Putter; consulted on the decision to sell the property. (802)-475-3005 1166 Arnold Bay Road, Panton, VT 05491

- **Doug Zorzi**: 70 Judson Drive Montpelier, VT 05602 (802)-793-0995
  - Narrative: Partner in a business venture that influenced Mr. Goldman's decision to sell; aware of Mr. Goldman's health issues in 2020. 70 Judson

- **Dr. James Stone**: 73 Main Street Montpelier VT 05602 (802)-223-2633
  - Narrative: Psychiatrist treating Mr. Goldman, knowledgeable about his mental and medical conditions.

- **Dr. Flinn**: 130 Fisher Road Berlin Vt 05602 (802)-225-7000
  - Contact information in the medical records.
  - Narrative:   General practitioner currently treating Mr. Goldman for ongoing health issues.

- **Michael Baginski**: 567 Rowell Hill Road Berlin Vt 05602 802-223-6514
  - Narrative:   Longtime friend familiar with Mr. Goldman's medical issues.

- **Dr. Stuart Goldman**:   Narrative: Brother and advisor on medical decisions, aware of Mr. Goldman's health history.

- **Rebecca Goldman**: Narrative:  Sister and executrix of the estate, familiar with family and estate matters.

- **Mark Goldman**: Brother of Mr. Goldman, involved in discussions concerning the case and past legal advice.

- **Foster Cooperstein**:
  - The Law Office of Foster Jay Cooperstein - Newton Centre, MA; 16 Madoc St Newton Centre, MA 02459;  (617) 965-2343.  (617) 965-0761   https://www.coopersteinlaw.com
  - Narrative: Former attorney who questioned Mr. Goldman's mental fitness to proceed with estate matters.

- **Luke Martin - Appraiser:**
  - **Martin Appraisal Service, 140 Three Mile Bridge Road Montpelier, VT 05601, Direct Phone 802-229-4807, Email larry@mas-vt.com**
  - **Narrative:**   Did the appraisal for Goldman Apartment complex "Northwood", which is owned without mortgage, loan could not be completed due to bookkeeping issues.
  - Pages: 6,283 - 6,301

- **Theresa Murray (Broker)**
  - **Office: 802-223-6300;  Cell: 802-595-9991;  theresa@vtclassicproperties.com;  Coldwell Banker Classic Properties;  2641 US Route 2, East Montpelier, VT 05651;  P.O. Box 22;  East Montpelier, VT 05651**

- ○ Narrative: Represented the buyer on the sale of Brook Road Plainfield Vermont, sold at a loss due to the duress caused by Arias
- ○ Pages: 6,227 - 6,282

- **Hildy Jones:**
  - ○ https://aoa.vermont.gov/sites/aoa/files/financial-services/BudgetPresentation_Taxes_FY2020_final2.pdf
  - ○ Tax Compliance Officer for the State of Vermont, her information is confidential under law.
  - ○ Narrative: Retired Vermont State Tax Collector witnessed Mr. Goldman's confusion during 2020.
  - ○ Pages: 6,129 - 6,169 and 6,783 - 6,836

- **Karen Davis (Abacus Bookkeeping):**
  - ○ Abacus Bookkeeping and Tax Services; 338 River Street, Suite 1; Montpelier, VT 05602;        (802) 225-8907 Fax: (802) 225-8991 karen@abacusvt.com
  - ○ https://www.abacusvt.com/custom2.php
  - ○ Narrative: Bookkeeper who did Mr. Goldmans taxes and observed Mr. Goldman's declining ability to manage finances.

- **Joanie Keating (Broker)**
  - ○ **joaniek@vtregroup.com**
  - ○ **Direct:(802) 793-7043**
  - ○ **Office:(802) 244-5155**
  - ○ **https://www.vtregroup.com/waterbury/joan-keating-sabin/cid-3014876**
  - ○ Narrative: Worked on sale of Brook Road Property in Plainfield VT. Which was eventually sold, at a significant loss, to raise money to remit to the Court as instructed by Arias, because according to Arias there was no way that specific performance would be a remedy forcing the sale of the subject property if the deposit was remitted to the Court.
  - ○ Pages: 6,170 - 6,226

- **Regan J. Howard |** Vice President Community National Bank
  316 North Main Street Barre VT  05641
  (802) 479-7710 (p)
  (802) 793-7225 (c)
  rhoward@communitynationalbank.com

  - ○ Narrative:  Loan Officer for Goldman real estate portfolio, from family of Howard Market, her life partner is Patrick Malone (the competing real estate developer).
  - ○ Pages: 6,009 - 6,032

- **Kathy Morse, |** Commercial Loan Assistant Community National Bank
  316 N Main Street
  Barre VT 05641-4105
  Ph: 802-479-7706
  Fax: 802-476-1185

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

kmorse@communitynationalbank.com

- o  Narrative: Assistant to Jennifer Howard,
- o  Pages: 6,033 - 6,128

- **Patrick Malone** (Competing Real Estate Developer & Financier)
  - o  122 Gallison Hill Road
  - o  Montpelier VT 05602
  - o  802.223.9954
  - o  Narrative:  Competing Real estate developer in Central Vermont.
  - o  Pages: 5,955 - 6,008 and 6,555 - 6,614

- **Francisco Ramos, Esq.** Martínez-Álvarez, Menéndez Cortada & Lefranc Romero, PSC 701 Ponce de León Ave., Suite 407 San Juan, PR 00907 Phone: 787-721-1140 Fax: 787-721-7866 Email: fjramos@martilaw.com
  - o  Narrative: Represented the manager of the HOA.

- **Law Office of Marc D. Nemeth** 1011 North Main Street, Suite 29 White River Junction, VT 05001 Phone: 802-763-2227
  - o  Narrative: Local Attorney in Vermont, used for consultations.

- **The Bacardí Family**
  - o  Close family friends of the Goldman family.
  - o  The current address and phone etc. are with other family members.

- **Frankie Castro**
  Barrio Breña, Calle Palma Real 12, Buzón 12, Vega Alta, PR 00692
  - o  Contractor (house manager) who has done work on the Goldman Estate since Frankie was 18 years of age, (many decades).

- **Félix Castro**
  Calle Estación 1B, PMB 213, Vega Alta, PR 00692
  - o  Frankie Castro's brother who did landscaping for the Goldman Estate for many decades.

- **María A. González**
  HC 33 Box 4480, Dorado, PR 00646-3002
  - o  Narrative:  Maid and Housekeeper for Mr. Goldman for over a decade.

- **Juan Botello**
  208 Calle del Cristo, San Juan, PR 00901
  Phone: +1 787-723-9987
  - o  Narrative:  Is the son of the famed artist Botello, who now owns the famed Botello gallery in Old San Juan.  The entire Goldman family are the biggest fans of the father and have purchased dozens and dozens of sculptures and other pieces from Botello.  He has sold and resold many of the pieces for the Goldman Family.  He is an old family friend.

- **Goldman Antonetti & Córdova**, LLC 250 Muñoz Rivera Avenue, Suite 1500 San Juan, PR 00918 Website: www.gaclaw.com
  - o Narrative:  Represented Goldman Family regarding home, Antonetti was Monte Goldman's business attorney.  The firm represented the siblings of Goldman during the home sale. Alan Goldman called and talked with them, mistaking them for another attorney, and they were informed of all the ongoings, at the end of the conversation it was explained he was the wrong attorney.

- **José "Pachi" García-Cosculluela**, ARQ NCARB AIA Jota Arquitectura Phone: Office: 787-240-6000   Cell:   787-501-2606   Email:   Office:   info@jotapr.com   Personal: leo@jotapr.com Website: jotapr.com
  - o Pages: 4,968 & 4,969
  - o Narrative: Architect consulted on the property.

- **Marianne Gibbons -** Managing Director, Client Services Mass General Development Office 125 Nashua Street, Suite 540 Boston, MA 02114 Phone: 617-726-7829 Fax: 617-724-2469 Email: mgibbons2@partners.org
  - o Narrative:  Director of gifts at Mass General Hospital, was assistant of Goldman family good friend former director, Goldman family has donated significant capital to Mass General Hospital.

- **Martinal Real Estate Attn:** Dorado Beach Property Owners 701 Ave. Ponce de León, Suite 309 San Juan, PR 00911 Contact: **Dennise Morales**
  - o **Dennise Morales Soler;** MBA Property Manager Classic Resort Management 701 Ponce de León, Suite 309 San Juan, PR 00907
    - ▪ Phone: 787-796-5017
  - o Narrative:  Manager of Dorado Beach Estates HOA.

- **Dr. Douglas Dahl**, MD Urologic Oncologist | Urologic Surgeon Chief, Division of Urologic Oncology Clinical Co-Director, The Claire and John Bertucci Center for Genitourinary Cancers Associated Urologist 165 Cambridge St., 7th Floor Boston, MA 02114 Phone: 857-238-3838
  - o Also see Medical Records previously provided
  - o Narrative: Medical doctor, see medical reports.

- **Dr. Carmen J. (CJ) Cividanes-Lago** EdM, DPhil, CPsychol Consultant in Developmental Psychology, Education, and Human Resources Executive Director, Association of Private Colleges and Universities of Puerto Rico (ACUP) 54 Paseo Covadonga Freiría Building, Suite #214 San Juan, PR 00901-2635 Cell: 787-448-9659 Phone: 787-724-3334 Fax: 787-796-4937 / 787-729-1616 Email: cjcividanes@gmail.com / also husband **Evon Lago**
  - ▪ Pages: 4,647 - 4,671 and 5,113 - 5,118
  - ▪ Narrative: Close family friend, daughter of Tino Cividanes, whose mother passed away (deceased) just prior to the scheduled closing with JM Grzan.  CJ also took photos of the property and provided various liaison with govt. & assistance as Goldman was not present.  Illustration of close family ties:  Goldman's parents (Jews) were declared the G-parents of Evon Jr. (Roman Catholics), Cividanes are Goldman's oldest and closest friends. Family

friend, aware of Mr. Goldman's medical issues; served as the closing agent for Mr. Goldman's property transaction amidst personal loss.

- **David M. Seerman -** Sales Manager Dorado Beach 120 Road 693 Dorado, Puerto Rico
  - Narrative:   Head of sales of marketing, came from Macao, toured home and suggested marketing the home as petite Sucasa; was planning to rent the home at $25k/night; Arias was repeatedly informed of Goldman's desire to keep his family home and retire in Dorado.

- **Carolyn Earle (Earle & Freeman PLC)**
  - Earle & Freeman, PLC  107 State Street, P.O. Box 1385, Montpelier, VT 05601 (802) 225-6495
  - Narrative: Handles estate planning for Goldman.
  - Pages: 5,675 - 5,684

- **Robbin Freeman (Earl and Freeman Attys)**
  - Earle & Freeman, PLC  107 State Street, P.O. Box 1385, Montpelier, VT 05601 (802) 225-6495
  - Narrative: Handles real estate end of estate planning.

- **Gerald M. Kleis (former subject property insurance agent)**
  - **Cond Gallardo, San Juan, Puerto Rico 00923**
  - **787-722-7241**
  - Narrative:   Claimed to be the broker in the sale, he was the interpleader who caused extreme legal bills despite only seeking $31k in commissions, not owed.  Kleis was Goldman's insurance agent for the insurance covering the subject property.
  - *Pages: 5,354 - 5,363*

- **Ana C. Dumar Orlowska (Real Estate Broker)**
  - PMB 378, Dorado, PR  00646   (787) 671-2751
  - https://www.homes.com/real-estate-agents/ana-dumar/x3qqs1p/
  - Narrative:  Originally hired to market Goldman family home in 2014; when Alan Goldman purchased the home from the family estate of his deceased parents. Was consulted about the home, and there was a falling out on July 4th; this concerned showing the home to Super-Star Rene Perez, this is when Aida Colon took over.
  - *Pages: 4,672 - 4,708 and 5,063 - 5,066*

- **Jackie Sierra**
  - **787-960-2330**
  - Narrative: Previous Next-Door neighbor assisted with home, see page numbers; she sold her home to Mr. Ozuna for $3.85 Million after the hurricane and before COVID.
  - Pages: 4,605 - 4,611 and 4,619 - 4,620 and 4,622 - 4624 and 4627; 4630 - 4632; 4635 & 4636 - 4638; 4641

Judge Daniel P. Richardson, Tarrant, Gillies, Richardson & Shems
44 East State St, P.O. Box 1440, Montpelier, Vt. 05601-1440, (802) 223-1112 ext. 105

drichardson@tgrvt.com, www.tgrvt.com
**Narrative: Former** Personal Attorney and Real Estate / Planning Attorney is now a Vermont Superior Court Judge.    Former attorney who discussed Mr. Goldman's cognitive health during 2016-2020.

- o   Pages: 5,857 - 5,954 and 6,482 - 6,554

- **Lillian Mateo Santos,** Ferraiuoli LLC, PO Box 195168 San Juan, PR 00919-5168 221 Ponce de León Avenue, Suite 500 San Juan, PR 00917 Phone: 787-766-7000 Fax: 787-766-7001 Direct: 787-777-1357 Email: lmateo@ferraiuoli.com
  - o   Narrative: worked on issues with Goldman neighbor below the property and new construction of that home.  Lillian has given advice regarding the malpractice and had suggested calling the senior named partners of the McConnell Valdes to avoid a public argument, however, obviously Arias insisted on the current litigation.

- **Jenyfer García-Soto,** Ferraiuoli LLC, PO Box 195168 San Juan, PR 00919-5168 221 Ponce de León Avenue, Suite 500 San Juan, PR 00917 Phone: 787-766-7000 Fax: 787-766-7001 Direct: 787-777-1393 Email: jgarcia@ferraiuoli.com
  - o   The second attorney that took over when Lillian left Ferraiuoli.

- **Yanmarie Rotger-De la Portilla** Legal Assistant Ferraiuoli LLC PO Box 195168 San Juan, PR 00919-5168 221 Ponce de León Avenue, Suite 500 San Juan, PR 00917 Phone: 787-766-7000 Fax: 787-766-7001 Direct: 787-777-1343 Email: yrotger@ferraiuoli.com
  - o   Narrative:   worked on issues with Goldman neighbor below the property and new construction of that home.

- **Jeremy Sternberg | Holland & Knight,** Partner, Holland & Knight LLP
  10 St. James Avenue, 11th Floor | Boston, Massachusetts 02116
  Phone 617.854.1476 | Fax 617.523.6850
  jeremy.sternberg@hklaw.com | www.hklaw.com

- **Jeffrey Cleven | Holland & Knight,** Partner, Holland & Knight LLP
  10 Saint James Avenue, 11th Floor | Boston, MA 02116
  Phone 617.854.1469 | Fax 617.523.6850
  jcleven@hklaw.com | www.hklaw.com

  **NARRATIVE:** Hired law firm Holland & Knight as recommendation from Mark Goldman (elder Brother of Plaintiff Goldman), HKlaw.com assisted with hiring Morell Cartagena Dapena, HKlaw.com continues as consulting attorneys with various legal actions related to the MALPRACTICE of McConnell Valdes (Arias).

- **Edgar (Eggie) Edgardo Cartagena,** MORELL  CARTAGENA  DAPENA

  Direct dial: (787) 723-8755 | Mobile: (787) 399-1863
  Fax: (787) 723-8763 | edgardo.cartagena@mbcdlaw.com, www.mbcdlaw.com
  PO Box 13399, San Juan PR  00908
  Plaza 273 Ponce, 273 Ponce de León Ave.  Suite 700, San Juan PR  00917-1934

  **NARRATIVE:**  Hired to take on Arias's malpractice, recommended by HKlaw.com

- **Iván Lladó**, Morell, Cartagena Dapena
  Direct dial: (787) 723-8753 | Mobile: (787) 243-4445
  Fax: (787) 723-8763 | ivan.llado@mbcdlaw.com
  PO Box 13399, San Juan, P.R. 00908
  Plaza 273, Suite 700, 273 Ponce de León Ave., San Juan, P.R. 00917

  **NARRATIVE:** Hired to take on Arias's malpractice, recommended by HKlaw.com

- **Antonio A. Arias   (DEFENDANT for Legal MALPRACTICE), Capital Member**
  270 Muñoz Rivera Ave. San Juan, Puerto Rico 00918, T (787) 250-5604 M (787)
  405-867, Aaa@mcvpr.com

  **Antonio Arias**: Former attorney representing Mr. Goldman, and Mr. Arias's his
  wife.
  o   Phone: 787-250-5604
  o   Bate Stamped Pages: 1 - 1,548 and 2,013 - 2,792
  o   Narrative: Was lead council in Goldman's Case.

- **Patricia George Iguina,** Vice Chair, Real Estate & Finance
  270 Muñoz Rivera Ave. San Juan, Puerto Rico 00918, pgi@mcvpr.com
  T (787) 250-5809 M (787) 599-3239
  Narrative: Real Estate expert that reviewed case and was part of the dream team to
  help Goldman

- **José Castro, Associate**: Assistant to Antonio Arias; currently clerks for the federal court. 270
  Muñoz Rivera Ave. San Juan, Puerto Rico 00918
  o   Office Phone: 787-948-3550 Cell Phone:787-948-3550
  o   Bate Stamped Pages: 1,549 - 2,012 and 2,793 - 3,281
  o   Email: jic@mcvpr.com
  o   Narrative: was Arias's primary assistant in case, drafted much, and filed all Court
    documents

2. State whether you, any of the persons identified in your previous answer, or any other person,
   has given any kind of statement, whether written or not, whether under oath or not, regarding
   the facts alleged in the Verified Second Amended Complaint and in the Answer to the Second
   Verified Amended Complaint, the Defendants' Counterclaim and the Answer to
   Counterclaim. If the answer is in the affirmative, list each and every person who has given
   such a statement, the date(s) in which the statement was given, and the forum, if any, in which
   it was given, and provide copy of such statement.

   *Response: At this stage, we have not identified any statements made under oath or affirmation that directly
   relate to the matter at hand. To the extent that any other statements exist, they may be privileged or confidential,
   and a comprehensive review of these potential privileges has not yet been completed. As far as we are aware, no
   public statements have been made, as all conversations surrounding this matter have been conducted in a private,
   secure setting under the bounds of contractual or attorney-client privilege.*

*At present we have no statements made under oath or affirmation which are directly applicable hereto. Any other statements may in fact be privileged statements and/or documents decisions on privileged statements have yet to be calculated regarding trial on the facts of the matter. To the best of our knowledge no statements have been made in a public forum as any conversations regarding this matter have been held in private under contractual or attorney client privilege.*

3. Prior to answering these interrogatories, did you conduct a diligent search of your books, records and papers those of your companies, partnerships, business entities, agents and employees? If the answer is in the affirmative, produce a list of each and every person who participated in said search and inquiry, and indicate the positions held by them, as well as the dates in which each position was held, and the date of birth of each individual.

   **Response:** *Currently, due to time constraints and specific medical issues, this request cannot be fulfilled, as an exhaustive search of all books and records was not conducted prior to answers.*

   *No, due to time limitations at present, and medical issues presenting themselves.*

4. Provide a narrative description of each and every medical and/or psychological condition you have ever suffered over the course of your lifetime, specifying the medical and/or psychological conditions which you believe you had at the time you signed the "Option to Purchase Agreement" on October 23, 2020, as well as each and every medical and/or psychological condition which you understand was caused by the actions and/or omissions of the defendants, as alleged in the Verified Second Amended Complaint. In addition, indicate whether you have ever been hospitalized for any such medical and/or psychological condition, and produce copies of any and all hospital, medical, psychiatric and/or psychological records which relate of refer to any such medical and/or psychological conditions.

   **Response:** *This query is repetitive, excessively broad, and unreasonably burdensome, given the extensive medical records that Mr. Goldman has already provided. Mr. Goldman, a 66-year-old individual with a range of preexisting conditions, has disclosed his comprehensive medical records, which sufficiently address this interrogatory and more. The voluminous documentation, organized with Bates numbering across multiple files, provides hundreds of pages of detailed information. For additional specifics, these comprehensive records should be consulted. Mr. Goldman recalls that at the time the "Option to Purchase Agreement" was signed on October 23, 2020, he had been suffering from profound isolation due to the COVID-19 pandemic, along with extreme anxiety, depression, and sleep disorders. His conditions included severe dermatological issues, transient ischemic attacks (TIAs), chronic depression, pseudo-bulbar affect, and immense financial pressure due to the pandemic. The negotiation process itself was fraught with undue pressure, as multiple parties actively sought to influence Mr. Goldman, who was experiencing sundowning, vision impairments, and mathematical confusion. Due to his fragile state, he received waivers from Vermont's tax compliance office, and his medical and psychological state prevented any in-person meetings. Further details can be referenced in the medical notes provided by Dr. Stone and corroborated by state medical records.*

   *This is redundant overly burdensome and broad given the plethora of medical records Goldman has provided, as Mr. Goldman has provided complete medical records which substantially answers this interrogation and more. Being a 66 year old man with a host of preexisting conditions, the vastness of the medical history of Mr. Goldman has been previously provided, rendering this question duplicative and redundant to the host of medical records provided in bate numbered format, in multiple files each hundreds of pages in length. To the extent the defendants need to know specifics they are included within the comprehensive medical records provided. Mr.*

*Goldman believes that on October 23, 2020 that the "Option to Purchase Agreement" was signed he was suffering from 7 months of complete and extreme isolation, due to the global pandemic known as COVID-19, severe anxiety, depression, sleep disorders, extreme skin conditions, TIA's, acute depression, pseudobulbar alzeimers see the notes of Dr. Stone, deep stress, extreme duress and stress, financial pressures of the global pandemic, during negotiations with Grzan, he and the neighbor kept Goldman up late in the evenings when a person of his age could suffer sundowning, multiple parties were ganging up on Goldman providing coercions regarding the true value of the property, confusions, trouble with eyesight and trouble with simplistic math, in fact it was a compliance officer with the State of Vermont Hildy Jones who forgave approximately $46,000 in penalties and interest due to the confusion and mental state Goldman was suffering on a daily basis with TIA's, chronic depression, because of the severe depression and isolation I was avoiding all in person visits, the State of Vermont was requiring any person that had interactions of any type with others they must go into 15 day isolation lockdown, as a cancer survivor with just one kidney Goldman was under constant and sometimes irrational fear and frustration to the point he was looking into a dialysis machine in case of kidney failure. Goldman was suffering bouts of paranoia, extreme fear, all of which was further exacerbated by the fact the persons negotiating for the property are approximately half the age of Mr. Goldman and were essentially taking extreme advantage of an elderly man who was suffering the extreme isolation and fear associated with a National, International and local State of Emergency. All of these psychological and physical ailments were described in painful detail to Mr. Arias and attorneys at McConnell Valdes, especially the confusion and coercion placed upon Goldman during a panic attack as bizarre happenings were offers on the home were disappearing at an alarming rate, the blueprints for the home were being withheld from Goldman, as a means of extorting Goldman to sign over the subject property. Goldman was additionally suffering from PTSD.*

5.  List each and every medication, drug, or other substance that you were taking as needed as of October 23, 2020, as well as each and every medication, drug, or other substance that you took or are taking to address any medical and/or psychological condition which you understand was caused by the actions and/or omissions of the defendants, as alleged in the Verified Second Amended Complaint, specifying for each one the dosage, the condition for which you take or took it, and whether it was prescribed by a particular physician (identifying such physician by name and address).

    **Response:** *All prescribed medications are documented within the substantial medical history provided to the defendants. All healthcare providers, including physicians, assistants, and nurse practitioners, are listed in the medical records. Additionally, Mr. Goldman occasionally self-medicated with products containing THC-containing marijuana products to manage pain and isolation, as documented in the medical records.*

    *To the extent any drugs were prescribed by Medical Doctors they are included in the detailed and comprehensive medical information packages already provided. All physicians, assistants, nurses and nurse practitioners are listed within the comprehensive medical histories provided. In addition, Goldman was self-medicating as many do regularly with alcohol, in Goldman's case due to a single kidney he was part-taking in marijuana products containing THC to assist in dulling pain and isolation.*

6.  State whether or not you have ever been declared incompetent by a physician and/or court, and if so, provide all details, including the date, physician(s), court(s), reason(s) for such declaration of incompetency and identify any Guardian, Legal Representative, Tutor or other person designated to manage your affairs.

    **Response:** *Mr. Goldman has never been declared legally incompetent by any physician or court.*

    *Goldman has never been declared incompetent by a Physician or Court.*

7.  List all corporations, partnerships or other legal entities owned by you, including but not limited to any corporation or partnership in which you have any majority or minority interest whatsoever. Include the dates and State of incorporation and produce any documents which evidence same.

    **Response:** *This request is overly broad and burdensome, as Mr. Goldman has managed multiple personal and family businesses since his teenage years. Over the past decade, he has operated a sole proprietorship in real estate and the primary entity, ABG Corporation, incorporated in Vermont, as well as two Vermont LLCs: Route 217 LLC, which owned a motel sold under financial strain caused by erroneous legal advice and undue pressure, and Harbor Island LLC (that holds one of his two residences). No specific documents responsive to this request exist; however, all pertinent public records are accessible via the Vermont Secretary of State's office.*

    *Overly broad and burdensome, Goldman is a 66-year-old man that has been involved in family and personal businesses since his teens. To the extent necessary Goldman submits that over the past approximately 10 years he has continued to operate both a sole proprietorship in real estate and a main corporation known as ABG Corporation incorporated in Vermont, also having several LLCs also in Vermont with the names: Route 217 LLC (owned a hotel in Waitsfield that was sold as a result of raising money due to erroneous legal advice and undo pressures by Mr. Arias) and Harbor Island LLC both of which are also Vermont legal entities. As to "documents" that evidence the same, there are no responsive documents necessary, as any information regarding these legal entities is available publicly from the Vermont Secretary of State.*

8.  List all real estate holdings held by you or any legal entity in which you have or had a majority interest, between January of 2020 and the present date. If any such real estate was bought, sold or leased during this period, state the date of purchase, sale or lease, identify the seller, buyer, lessor and/or lessee, and provide all closing documents.

    **Response:** *The primary and additional properties owned by Mr. Goldman include: 1014 Terrace Street, 26 Terrace Street, 7 Court Street, 6-8 Hillside Ave, a former motel (Route 217 LLC), 3172 Brook Road, 3171 Brook Road, 61 School Street, 79 School Street, 151 School Street (all in Plainfield), 57 acres on Route 214, 190 Northwood Drive, and 20240 Route 214, East Montpelier, Vermont.*

    *Primary home 1014 Terrace Street; and 26 Terrace Street, 7 Court Street; 6-8 Hillside Ave all within Montpelier Vermont; Motel in Waitsfield Route 217 LLC as referenced in 7 above and divested according to terms as referenced and known by Arias; 3172 Brook Road and 3171 Brook Road (divested under pressure by Mr. Arias to place money in escrow with the Court), 61 School Street purchased June of 2023, 79 School Street, 151 School Street, all in Plainfield; 57 acres on 214; 190 Northwood Drive, 20240 Route214, East Montpelier Vermont.*

9.  List and state the location of all personal property owned by you and/or any legal entity in which you have a majority interest, including automobiles, boats, aircraft, tractors, snowplows, farm equipment, construction equipment, furniture, art, and any other item.

    **Response:** *This request is burdensome. However, Mr. Goldman provides the following list of his major assets: a 2015 GMC Sierra truck, a 2012 and 2002 Cadillac SRX (non-operational), a classic Mercedes, a kayak, a canoe, and basic carpentry tools. In addition, he owns artwork, including original pieces by Botello and Moya, two quad 4-wheelers, and two outdated laptop computers. I have four digital camera with tripods, for my hobby taking photos of wildlife. I also have a large screen TV, with $4,000 speakers, misc. music devices including kongo drum set.*

*This is overly broad and burdensome, to the extent to demonstrate cooperation with the question as posed, as of present I own a 2015 GMC Sierra short-bed pickup truck as my daily driver, I own a 2012 and a 2002 Cadillac SRX, my father's classic Mercedes, all three are non-operable. I own a kayak, and a canoe located at Harbor Island. I have no aircraft. I own a Kubota 80horse tractor approximately 10 years old, with associated implements. I own basic tools of carpentry, plumbing and electrical for managing real estate. I have basic furniture in my primary and secondary homes. I own some original Botellos, Moya and some collectible sculptures and various prints. I also own two quad style 4-wheelers, that are 10 and 14 years old. I own a couple of laptop computers, one 5 years old and another 7 years plus one does not even have a hard drive. I have four digital cameras with tripods, for my hobby of taking photos of wildlife. I also have a large screen TV, with $4,000 speakers, misc. music devices including a kongo drum set.*

10. Provide a list of any and all transactions in which you have provided anyone with anyone with a Power of Attorney, describing in detail the circumstances that led you to do so, and identifying the person or persons to whom you provided such Power of Attorney.

    **Response:** *In Vermont's complex real estate environment, it is common for Mr. Goldman to issue Limited Power of Attorney (LPOA) for specific transactions due to title search requirements that necessitate legal oversight, and closings as Vermont Attorneys handle closings and not title companies. I have granted LPOAs to accountants and attorneys as needed for business purposes in the regular course of business practices.*

    *Overly broad and burdensome as a real estate developer it is common practice to provide a LPOA for real estate closing in Vermont, due to the complexities of real estate title searches which are exclusively handled by attorneys and not title companies. In the general course of business I have given LPOA's to my accountants and various attorneys in the general course of business.*

11. List any and all lawsuits, specifying the case number and court in which it was filed, in which you or any legal entity in which you have a majority interest have been named as a plaintiff or defendant over the past ten (10) years.

    **Response:** *This request is burdensome given the volume of small claims and collection actions filed in the past decade. Managing approximately 70 rental units, Mr. Goldman encounters regular, small-scale litigation, rendering this query excessively detailed, burdensome and not likely or designed to lead to discoverable information to be introduced at trial in this matter.*

    *As the owner and operator of approximately 70 rental units this question is overly broad and burdensome with the decade time frame provided, as a landlord to many residential units, small claims litigations and other collection activities make this query unreasonable and unfair to respond in the detail required.*

12. Produce copy of your Federal, State and Commonwealth of Puerto Rico income tax returns, as well as those of any legal entity in which you have a majority interest, corresponding to the years 2020, 2021, 2022, 2023 and 2024.

    **Response:** *This question is improper and burdensome, particularly as it requests information for future tax years, not currently due, demonstrating further evidence of legal malpractice by defendants. Mr. Goldman's tax documents are managed in accordance with standard filing deadlines, and not all recent filings are complete or amended.*

*The question as stated is improper as several years are not completed or are indeed of amendments, it is demonstrated that this improper question is presented for harassment purposes, for example, the query requests 2024 tax year, which is not even due to the IRS until 15 April 2025, and with the common extensions it will not even remotely be ready until September of 2025.*

13. Produce copy of all non-privileged personal and/or business phone, text and electronic mail records from January of 2020 until the present referring to or relating to any of the matters subject of the Verified Second Amended Complaint, including but not limited to any communications between you and any of the defendants, any members of your family (particularly your siblings and children), Tato and/or Uva Orizondo, Carmen Cividanes, Rey López, Aida Colón, Peter Schiff, Hiram Albino, Mr. and Mrs. Juan Albors, Diego Colón, Eric Russell, Peter Hackel, Jack Franks, Judge Dan Richardson, Davis Putter, Judith Fisher, and any other person or entity.

**Response:** *This query is irrelevant to discoverable information. Mr. Goldman has only one child, not "children," and he does not own a cellular phone, eliminating the possibility of text message records. Communications with his brother, Mark, may touch on personal and case-related topics, making them inseparable. Only one or two brief conversations with Peter Schiff have occurred, and Mr. Goldman is unfamiliar with any "Davis Putter."*

*The question is overly broad and unduly burdensome and is likely not to lead to any discoverable information usable at trial in this matter. For the record I have only a single child, I do not have "children" in the plural sense as listed. Furthermore, in order to lessen the intended discovery, I freely disclose I do not possess, and I have never owned a cellular phone therefore I have no cellular device to possess any "text messages". My communications with my siblings are private and confidential, to the extent my brother Mark has been involved in these ongoing relationships, I cannot separate the conversations with him that pertain to this matter as to those that pertain to regular sibling communications. I have had just one or two brief phone conversations with Peter Schiff. I know of no person named "Davis Putter" [sic]. The statement "any other person or entity" is overly broad and burdensome and not likely to lead to any discoverable information in this matter.*

14. List all payments made to the Dorado beach Homeowners Association ("DBHOA") or any other related entity between January of 2020 and when you sold the Property subject of the Verified Second Amended Complaint, in 2023. Produce any correspondence, emails, canceled checks or other documents evidencing such payment.

**Response:** *This query is unduly broad. Mr. Goldman's financial contributions to the Dorado Beach Estates Homeowners Association (DBHOA) were equal to all residents, and all related payments are documented in the closing records already available to the defense.*

*This statement is overly broad and burdensome, furthermore I do not understand what is meant by "any other related entity". DBHOA was the homeowner's association at Dorado Beach Estates, I had homeowner's dues in equal amounts to all other residents, final payments and other fees and/or costs were already in the possession of the defense as they were included in the closing documents.*

15. Describe in detail all repairs, maintenance, construction, demolition and/or other work performed on the Property subject of the Verified Second Amended Complaint, between 2020 and when it was sold in 2023. Produce all documents, receipts, invoices and cancelled checks related to all such work performed.

*Response: All maintenance work details have been shared. Contractors were recommended by Mr. and Mrs. Arias and were known as her "good friends," Tato and Uva Orizondo.*

*The defendants are already in possession of a detailed list of all improvements and as admitted to by Mr. and Mrs. Arias the onsite managers were chosen by them and referred to as Mrs. Arias's "good friends", Tato and Uva Orizando.*

16. Describe the terms of payment to Mr. Eric Russell and/or Ridgeline Construction for his/its services related to work on the Property subject of the Verified Second Amended Complaint, including whether Mr. Russell is or was employed by you or any legal entity owned by you. Describe in detail all work performed by Mr. Russell and/or Ridgeline Construction in relation to such property, and produce all documents, receipts, invoices and cancelled checks related to all work performed, travel, meals and lodging in Puerto Rico.

*Response: This question is burdensome, especially regarding Mr. Russell's off-hour meals and accommodation. Mr. Russell, the owner of Ridgeline Construction, was hired as an independent contractor. Any additional documents or details regarding his work will be provided on a rolling basis or are already in the possession of the defense.*

*This is overly broad and burdensome, especially related to what meals and other personal accommodations that Mr. Russell engaged for himself off the work hours, wherein he was at all times accompanied by Tato Orizondo or Uva, as Mr. Russell does not speak any Spanish at all. As to employment this term is used improperly, Mr. Russell is the owner of Ridgeline Construction, which was hired as a contractor, as Ridgeline is the independently owned company of Mr. Russell, I have no ownership in Mr. Russell's company, nor do I have any direct say or even indirect say in what Mr. Russell does with his personal life, accommodations or food. Mr. Russell and his company are long time contractors for myself and my companies, I will produce documentation and further explanations regarding Mr. Russell's work on a rolling basis.*

17. Describe the terms of payment Tato Orizondo and/or Uva Orizondo and/or any legal entity owned by them for their/its services related to the Property subject of the Verified Second Amended Complaint. Describe in detail all work performed by Mr. and Mrs. Orizondo in relation to such property, and produce all documents, receipts, invoices and cancelled checks related to all work performed.

*Response: Work performed by Tato and Uva Orizondo is documented in the comprehensive list of repairs provided. Additional documents can be shared if the defense finds deficiencies after reviewing the detailed records already disclosed.*

*The work performed by Tato and Uva Orizondo are well detailed in the comprehensive lists of work performed on the property, to the extent additional documents or receipts are needed, after the defense first examines the already disclosed documentation it may come back and report in a second set of interrogatories what information it may find is deficient in the detailed listings and comprehensive overview of work performed as already provided in disclosures.*

18. Produce all contact information and a detailed summary of their proposed testimony, including any documents which support it, for each of the following individuals: Doug Zorzi, Michael Baginski, Dr. Stuart Goldman, Hildy Jones, Karen Davis, Foster Cooperstein, Dr. John Stone, and Dr. Finn (First Name Unknown).

**Response:** *Information has already been disclosed regarding potential witnesses. As discovery unfolds, Plaintiff will continue to update this response as more clarity is gained.*

*This information has already been provided in disclosures and list of witnesses who may have information on this cause. The proposed testimony of each witness listed is at present not determined as we are still enthralled in the nascent stages of discovery, as we whittle down what issues must be tied to the trier of fact it will become clearer as to the proposed testimony if any for each listed individual, therefore we shall update this answer in the due course of litigation in this matter.*

19. Describe in detail any advice sought, requested, solicited or obtained regarding real estate prices to determine and fix the sales price of the Property subject of the Verified Second Amended Complaint in 2020.

**Response:** *A "fixed" sales price was never established, as Mr. Goldman faced resistance to obtaining true property valuations. Brokers seemed to conspire against his interests, and new information suggests that Mrs. Arias's connections may have contributed to misleading information on property values in Dorado Beach Estates.*

*There was not "fixed" sales price to the property, I attempted several times to ascertain the true value of the real estate located at Dorado Beach Estates, yet it would appear a concerted effort was underway to undermine my ability to ascertain the true value of the property, as multiple brokers seemed to work against my interests. Given the information developed during the course of representation by Mr. Arias, it was discovered that Ms. Beale (his wife) is also a broker who may have had her hand in the conspiracy to deny me the correct information regarding the values of the properties located at Dorado Beach Estates, Dorado.*

20. As to your allegations at paragraph 20 of the Verified Second Amended Complaint that the defendants advised you to "aggressively litigate" the suit filed against you by Teal Peak Capital, LLC, based on the allegedly "inadequate" and "completely wrong" theory that "specific performance" is not an "equitable remedy" under Puerto Rico law, describe in precise detail exactly what legal advice you understand you should have received which would have been right and adequate, indicate precisely what you understand was the consequence, if any, of you receiving such "inadequate" and "completely wrong" legal advice, and describe in detail how you understand that the receipt of such right and adequate legal advice would have changed, if at all, the outcome of the case filed against you by Teal Peak Capital, LLC.

**Response:** *In words of law professors José Efraín Hernánez and Ramón Antonio Guzmán Rivera, "Any advice aimed at denying the existence, in the Puerto Rico legal system, **of the rule of specific performance with contractual obligations is totally incorrect.** This clearly emerges from art. 1060, which opens Book IV of the Civil Code of Puerto Rico of 2020 (CcivPR). There it is established:*

*The obligation is the legal bond of a patrimonial nature by virtue of which the debtor has the duty to perform a benefit that consists of giving, doing or not doing something for the benefit of the creditor, who, in turn, **has a right to credit to demand compliance.***

*This general rule is better specified, in the obligations to give (e.g. the obligation to deliver something to transfer ownership), in art. 1073 of the CcivPR:*

*If what must be delivered is a specific thing, the creditor, regardless of his right to compensation for late payment, may compel the debtor to make the delivery. If the thing is generic, you can request that the obligation be fulfilled at the expense of the debtor.*

*However, it is in the articles that establish the* **essential requirements for payment or compliance***, where the rule is established most forcefully. These requirements are* **integrity** *(art. 1117),* **identity** *(art. 1118) and* **indivisibility** *(art. 1119). Let us look more closely at the* **identity** *requirement, which is the one that most clearly guides the rule of* **"specific performance"***:*

*The debtor of one thing cannot force his creditor to receive a different thing, even if it is of equal or greater value than what is owed. In obligations to do, one fact cannot be substituted for another against the will of the creditor.*

*That is to say: the debtor, in the obligation* **to give** *(for example: deliver a house) cannot demand that the creditor receive another one, even if it is of higher quality. The debtor may also not require, when the obligation is* **to do** *(for example: perform a service), that the creditor admit,* **against his will,** *another fact that could constitute compliance.*

*The rule of specific performance is not only the prevailing one in Puerto Rico, but also in the legal systems of the tradition of European continental law (Civil Law). On this matter, the Pan-Hispanic Dictionary of Legal Spanish says under the word compliance with obligations:* **"Exact and complete execution of the performance owed by the debtor.** *They produce the extinction of the obligatory bond and consist of the payment of what is due." (emphasis added)*

*It is worth clarifying that the term* **specific performance** *constitutes grammatically, in the terminology of European continental law, a kind of redundancy, given that compliance, to be such, must be specific, as has been demonstrated when previously explaining the three payment or compliance requirements, given that the payment, if it does not comply with* **the identity requirement***, cannot be considered a payment well made.*

*For its part, art. 1158 states:* **The person who in any way contravenes the tenor of his obligation must compensate for the damage and prejudice caused.**

*This means that when the debtor defaults, whether totally or partially,* **he must respond***, that is, he must pay for his noncompliance. As established in art. 1253:*

*In contracts with reciprocal benefits, one of the parties may refuse to comply while the other does not fulfill his/her consideration or offers to fulfill it.*

*The exception does not apply if the counter-consideration owed by the plaintiff must be fulfilled after the provision that is the responsibility of the "excepcionante".*

*If the counter-consideration is partially or defectively fulfilled, the "excepcionante" may reduce his/her obligations in proportion to what the plaintiff continues to owe.*

*Both the purchase and sale contracts* **(exchanging a thing for money)**[1] *and the professional services contract* **(exchanging services for money)**[2] *are contracts with reciprocal obligations.*

---

[1] See, the art. 1274

[2] See, the art. 1381

*On the other hand, article 1255 establishes the power of the creditor when the debtor has not fulfilled what is incumbent upon him/her; although it also empowers the debtor, in section (f) to claim damages for non-compliance: Implicit in contracts with reciprocal obligations is the power to terminate the contract extrajudicially for lack of compliance with a main obligation, in accordance with the following rules:*

    *(a)    the defaulting party must be in default.*

    *(b)    the defaulting party must be required, under threat of terminating the contract in whole or in part, to comply with his/her obligation, including damages ("moratorio").*

    *(c)    partially fulfilled obligations are not resolved and remain firm.*

    *(d)    the resolution takes effect at the time the requirement expires.*

    *(e)    the resolution produces the effect provided for in this Code for the fulfilled resolution condition; and*

    *(f)    compliance and compensation for damages may be claimed.*

*These rules apply, as pertinent, even to cases of supervening and non-culpable impossibility of compliance.*

*There is no doubt, therefore, that there is, in the Puerto Rican system, the rule that contracts must be fulfilled and, for compliance to be such, it must be specific, that is, comply with the identity requirement of the payment.*

21. As to your allegations at paragraphs 30 of your Verified Second Amended Complaint, to the effect that the defendants failed to refer in the Proposed Pretrial Order to your allegedly "declined mental abilities" or "possible mental state of confusion", describe in detail precisely which factual and legal references you understand should have been included in the Proposed Pretrial Order with respect to your alleged "declined mental abilities" or "possible mental state of confusion", indicate exactly what you understand was the consequence, if any, of the defendants' failure to include such references in the Proposed Pretrial Order, and describe in detail exactly how you understand that the inclusion of such references would have changed, if at all, the outcome of the case filed against you by Teal Peak Capital, LLC.

**Response:** *In words of law professors José Efraín Hernánez and Ramón Antonio Guzmán Rivera: For a vice of consent to be established, the injured party does not have to suffer mental incapacity. In fact, if you suffer from it, it would not be a vice but rather **an absence of consent**. Only people with capacity are those who can suffer from vices of the will. In the case of dolus, says art. 292 says that it is the circumstance in which a person grants a business that, if he/she had not suffered, would not have carried out the business. In order to determine which fraud dolus was suffered, we must focus on the person who has consented.*

*At the time of entering into the option agreement, Mr. Goldman did not have an attorney to advise him. There is no doubt that, had he received the advice, and consequently been aware of the abysmal difference between the price at which he was selling and the real price of what he was selling, he would not have consented to the sale, and it would never have been perfected.*

*The art. 285 of the CcivPR lists the defects of the will that can occur in the granting of the legal transaction. It says these are errors, dolus, violence and intimidation. The first two affect the **intelligence** that must exist at the time of consent. The last two affect **freedom**.*

*The art. 286 establishes what the consequences of tainted consent are:*

*The legal transaction involving a defect in the will is **voidable** if the defect was decisive for its granting.*

*The cause of fraud dolus, violence or intimidation is subject to compensation for the resulting damages.*

*In the case of error, the party invoking it must repay the expenses incurred by the party that did not make the error.*

*Proof of the existence of the defect and its character rests with the person who alleges it. (emphasis added)*
*The statement in this last paragraph exists without prejudice to the rule established in art. 1258 (a),* **which activates a presumption of defect (fraud/dolus), when the difference in price exceeds fifty percent (50%) of the market value of the thing sold.**

*But what happened in the present case is not limited to the fact that the seller consented without having received adequate professional assistance. It happens that, by not carrying out the necessary value studies and complying with the requirements of the contracts in the CcivPR, he vitiated and consented to a sale of less than fifty percent (50%) of its market value. Consequently: the seller, if he had been correctly advised, would not have agreed to sell at the price at which he sold. In addition, the disproportion of the price paid and the good acquired, even when there is no defect in consent, means that the contract lacks an* **adequate cause***, as will be explained later.*

*The invalidity of the contract lies in this dramatic difference in the price, as regulated in article 1258:*

*The annulment or revision of an onerous contract may be requested if one of the parties maliciously takes advantage of the need, inexperience, cultural condition, economic dependence or advanced age of the other, and therefore, has a disproportionate and unjustified capital advantage, in accordance with the following rules:*

*(a) the calculation must be made according to the values at the time of the execution of the contract and the disproportion must exist at the time of the claim. The disproportion makes use of being presumed to take advantage of if it exceeds one half the value of the obligation.*

*(b) the action can only be brought by the injured party or his/her heirs.*
*(c) the plaintiff may demand the annulment or equitable readjustment of the benefits, but the action for annulment becomes an action for readjustment, if this is offered by the defendant; and*
*(d) the equitable readjustment must be carried out in consideration of the contractual type and its cause, to eliminate the imbalance of benefits.*

*The expression* **"takes malicious advantage of need, inexperience, cultural condition, economic dependence"** *has been qualified precisely because the defendants"; argument is that Mr. Goldman was in financial troubles. If this argument is considered true, what the defendants are doing is nothing other than presenting Mr. Goldman as a contracting party who was susceptible to malicious use. So much so that the sale is finally carried out, through transaction, at a sum above what was originally agreed. This is the real reason and not the supposed steps taken by the defendants, who were already out of the lawsuit when the settlement was carried out.*

*Long before the approval of the CcivPR, the TSPR had already been designing a doctrine - which was taken, in turn, from the Spanish doctrine - of the need for the existence of equivalence or proportionality in the considerations of contractual obligations. This does not mean that there must be arithmetic accuracy; but there must be unjustified or without caused disproportion.*

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

*In Utility Consulting Services, Inc. v. Municipality of San Juan[3], the TSPR ruled in favor of the Municipality of San Juan because there had been very little effort made by the plaintiff on behalf of the Municipality for it to have to become so impoverished. In La Costa Sampedro v. La the Costa Bolívar[4], the Court dismantled the businesses that were being questioned and concluded that there was no disproportionate difference in the sale of the Swiss Dairy. In López de Victoria v. Rodríguez[5], when examining the fees charged by the lawyer, stated that "the cost of the services, [they were] within limits that did not [exceed] the imaginary line that separates perfectly legal high fees, and those that operate as abuse and oppression of a privileged class against the consumer of services." (emphasis added). And in Senior the Marías v. Registrar[6], the Court determined that, when the property was sold at half its market price, the parties had entered into a mixed business that was, in part, a sale and, in part, a donation. There are many more examples, but they are unnecessary.*

*The CcivPR was influenced by this doctrine of proportionality of counter obligations. In the new code, not only are rules as clear as those of articles 1258, but a principle of proportionality can be deduced from all its patrimonial rules.*

*These legislative and jurisprudential principles are what prohibit that sale, in the plaintiff's case, from being carried out for a ridiculously disproportionate value. In this case, in our opinion, the disproportion is so large that not only is the contract ineffective due to rescission (economic injury) but also due to nullity, since there is practically a non-existence of*
*cause to the legal transaction and the obligations that it generates. This is clearly established in the first sentence of the aforementioned article 1258.*

22. As to your allegations at paragraph 46 of the Verified Second Amended Complaint, to the effect that the defendants "unjustly enriched themselves by misappropriating" $195,893.90 in legal fees and expenses from you, describe in detail your understanding of which services provided to you by the defendants, and which expenses incurred by them on your behalf, were unnecessary and without cause. By the same token, describe in detail your understanding of which services provided by the defendants, if any, and which expenses incurred by them on your behalf, if any, were necessary and appropriate in order to defend your interests in the lawsuit filed against you by Teal Peak Capital, LLC.

**Response:** *Mr. Arias's services were counterproductive, spending exorbitant sums over minor claims, further illustrating Mr. Arias's inefficiency and mismanagement and overall malpractice.*

*It is quite evident that the services provided by Mr. Arias were entirely unnecessary and lacked any legal foundation, designed to bring about resolution in the favor of Goldman. In fact, the services as rendered included 10's of thousands of dollars fighting Mr. Kleish a man who happened to possess a broker's license and who filed as an interpleader in the litigation he only was seeking approximately $30k yet the billing and costs and fees by Mr. Arias far exceeded the paltry sum sought by Kliesh tipping the scales of logic in a way which makes it illogical to believe it is better to spend more money than a person is even seeking attempting to deny them what it is they seek as a legal premise that due to Kliesh's de facto extortion the parties were not ready to close on the date indicated.*

23. As to your allegations at paragraphs 65 of your Verified Second Amended Complaint, to the effect that the defendants inadequately gathered essential information, failed to perform

---

[3] 115 DPR 088 (1984)
[4] 112 DPR 9 (1982)
[5] 113 DPR 265 (1982)
[6] 113 DPR 675 (1982)

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, María Beale, and McConnell Valdés, LLC's Interrogatories

reasonable legal research, and failed to take into consideration the applicable statutes and case law, leading them to incur in legal malpractice, describe in detail precisely what information you understand should have been gathered but was not, what legal research should have been performed but was not, and what statutes and case law should have been taken into consideration but were not; indicate precisely what you understand was the consequence, if any, of the defendants' allegedly inadequate gathering of essential information, failure to perform reasonable legal research, and failure to take into consideration the applicable statutes and case law; and describe in detail how you understand that the proper use of such information, research, statutes and caselaw would have changed, if at all, the outcome of the case filed against you by Teal Peak Capital, LLC.

**Response:** *In words of law professors José Efraín Hernández and Ramón Antonio Guzmán Rivera: "To react to this question, the first thing that must be said is that on November 28, 2020, the new Civil Code approved on June 1 and that same year came into force. The arts. 1812 and 1813 refer, respectively, to the contracts entered and the ongoing contracts agreed upon under the provisions of the repealed Civil Code of 1930. The contract that is the subject of controversy in this litigation was executed on October 23, 2020; but it was not yet executed. Therefore, the applicable norm is that of the first paragraph of article 1812, which establishes:*

*The acts and contracts entered under the regime of the previous legislation and that are valid in accordance with it, have all their effects according to it, with the limitations established in this Code.*

*It is important to keep in mind that the code currently in force is governed by the rules of European continental law (civil or civil law).*

*This is stated in article 1: This law will be called the "Civil Code of Puerto Rico", which, being of civil origin, will be interpreted with attention to the techniques and methodology of Civil Law, to safeguard its character.*

*This article legislatively collects what was decided by the Supreme Court of Puerto Rico in the case of Valle v. Am. Int'l Ins. Co.[7] That is, on October 23, 2020, the date on which the contract was signed, the same principles and rules applied and that they must be applied by virtue of the rules established in the 2020 Code, in accordance with its article 1812.*

*Thus, the defenses available to Mr. Goldman were practically the same in both codes, both in the rules of the validity of consent and in the consequences of breach of contract. (See articles 1077 of the CcivPR of 1930[8] and 1255 of the CcivPR of 2020[9].)*

---

[7] 108 DPR 692 (1979)

[8] The power to resolve obligations is understood to be implicit in reciprocal obligations, if one of the obligated parties does not comply with what is incumbent upon him.
The injured party may choose between demanding compliance or resolution of the obligation, with compensation for damages and payment of interest in both cases. You may also request the resolution, even after having opted for compliance, when this proves impossible.
The court will decree the resolution that is claimed, unless there are justified causes that authorize it to set a deadline.
This is understood without prejudice to the rights of third-party acquirers, in accordance with Articles 1247 and 1250, and the provisions of the Mortgage Law.

[9] The power to resolve obligations is understood to be implicit in reciprocal obligations, in the event that one of the obligated parties does not comply with what is incumbent upon him.
The injured party may choose between demanding compliance or resolution of the obligation, with compensation for damages and payment of interest in both cases. You may also request the resolution, even after having opted for compliance, when this proves impossible.

*The issue of vices of consent was already addressed in the answer to question twenty-one (21). Here it is necessary to examine what should have been the appropriate way to defend Mr. Goldman. We explain it in the numbers below.*

1. **At the outset, it must be stated that the position taken by the plaintiffs is inadmissible, who seem to intimate that they are exempt from responsibility for how much they did.** *But this defense was discarded by the Supreme Court of Puerto Rico, which established that it is not the* **quantitative** *but the* **qualitative** *that must be looked at when examining professional responsibility. In Colón Prieto v. Géigel*[10]*, the Court states it with complete clarity: It is necessary to decide whether these efforts were sufficient. Their efforts should not be evaluated based on quantitative criteria, as the sentencing court seems to insist, but rather by their appropriateness and their results.*

2. **All the diligence carried out, and all the information provided by the plaintiffs to Mr. Goldman, was based on the error that, in Puerto Rico, the rule of "specific performance" of obligations does not prevail;** *Thus, the only thing that Mr. Goldman would eventually have to do for his non-compliance would be to return the sum that the opter had delivered and pay other expenses, but he would not have to fulfill the obligations of delivering the house that was the subject of the contract, nor that of transferring the domain. (See art. 1274 of the CcivPR of 2020).*

3. **This mistake, which gave rise to the entire wrong litigation strategy, is reflected in the message that Mr. Arias sent, on June 8, 2021, to his entire work team:**

**"Team: Patricia and I just briefed Mr. Goldman on the defense strategy moving forward, mainly supported by careful review of both the option agreement and the draft escrow agreement...** *Plaintiff Teal Peak sued because it allegedly validly exercised its right to purchase under the option agreement, the case was ready to close but the seller refused to close and therefore it seeks specific performance. … On Thursday, June 3rd, we offered counsel for Teal Peak the return of the $800,000 deposit plus reimbursement of all true out-of-pocket expenses to make Teal Peak whole and part ways...*

*Moving forward, our litigation defense and counterclaims will be based on the following talking points: ...Fifth, even if the buyer where to show by a preponderance of the evidence that the case was ready to closed and that it was the seller's fault,* **the only remedy it is entitled under the option agreement is the return of the deposit AND (not "or") any other equitable remedies under the law. This is not specific performance. Specific performance is not a remedy available to the buyer. End of discussion. Furthermore, even if there was seller liability, which we dispute, all damages claims are not only illegal, but they are all pure speculation....** *The lawsuit has been filed under the illegal premise that the buyer can force the seller to close the sale. The buyer makes a mistake, the seller can walk away and only needs to return the cash deposit and pay the actual expenses. … 4. We can petition the court for immediate mediation to settle the remainder of what the buyer is entitled to which is an "equitable remedies," in our view, reimbursement of their out-of-pocket expenses and attorneys' fees. 5. Should mediation fail, at the earliest available opportunity, Mr. Goldman shall file a motion for summary judgment, since the only remaining issued to be decided by court is a legal issue which need not go to a jury."*

4. *All of this comes from the defendants' incorrect interpretation of paragraph fifteen (15) of the option agreement executed by the parties: "In the event that the Seller, after exercising the Option granted herein, does not proceed with the closing of the sale of the real property in accordance with the terms and provisions contained herein, the*

---

[10] Colón Prieto v. Géigel, 115 DPR 232, 241 (1984)

*Buyer will be entitled to receive the Option Fee and to seek any equitable remedy under the law." The defendants appear to have interpreted "equitable remedy" as one of the "equity remedies" that exist in some courts in the United States. But, although it has*
already been clear that Mr. Goldman's case should be resolved in accordance with Puerto Rican law, which establishes specific performance, also in North American law is that of specific performance, which is equivalent to the notion of "specific performance."[11] of civil law.

*Art. 1235 of the CcivPR perfectly defines what a preliminary contract is and when it is called an option:*

*By the preliminary contract the parties are obliged to enter a future contract.*

*The preliminary contract is called Option if it attributes to only one of the parties the power to decide on the execution of the future contract.*

*The preliminary contract is not subject to complying with the formalities that the future contract must satisfy.*

*If the requested party refuses to execute the new contract,* **the court may require strict compliance.**

*This article could not state more clearly what was already scientific and jurisprudential doctrine long before the approval of the new code.*

*6. Clinging to that position was what led them to forget to present other grounds that, under the strict interpretation of the law, Mr. Goldman had available. This is the case of consent vitiated by error, which has already been explained; of the need to carry out and present a study with which it could be established that the contract did not meet the* **adequate cause** *requirement, and that Goldman is asking for more than fifty percent (50%) of the value of his property.*

*7.* **The position and strategies based on the fact that, Mr. Goldman was not obligated to specific performance collapsed since Judge Delgado Hernández, in the Memorandum and Order of March 24, 2022, in which he stated**: *"The specific performance meant shares consanguinity with the permanent injunction, which is a creature of equity. Curiously, this decision, to whom the matters were communicated in writing, was supposedly informed orally at the time of Mr. Goldman, who continued to trust that his case was very strong, as the defendants had communicated to him. He was not given a copy of the cited resolution by Judge Delgado Hernández.*

*8.* **The lack of adequate communication with the client, which exhibits non-observance of the 1970 Canons of Professional Ethics of Puerto Rico, is a criterion that can be used to establish financial liability. Specifically, the first two paragraphs of Canon 19 state:**

*The lawyer must always keep his client informed of any important matter that arises in the development of the case that has been entrusted to him.*

---

[11] The term "specific performance" refers to literal performance of one's obligations under a contract. Should a party default on his obligation, a court may issue an order for specific performance, requiring a party to perform a particular action. The action is usually one that has been previously detailed in a contract. Specific performance is an alternative to a court's decision to award damages and it is commonly used as injunctive relief in cases involving real property or the disclosure of confidential information. To explore this concept, consider the following specific performance definition. Tomado del; Legal Dictionary, en: https://legaldictionary.net/specific-performance/, visitada el 7 de noviembre de 2024.

*Whenever the dispute is amenable to a reasonable settlement or compromise, the client should be advised to avoid or terminate litigation, and it is the lawyer's duty to notify his client of any settlement offer made by the other party.*

*In accordance with these ethical standards, Mr. Goldman should not only have been informed of the adverse court ruling but the legislative strategy should have been immediately changed and even discussed with him about the possibility of a settlement.*

24. Indicate whether you have consulted any experts in relation to the allegations of your Verified Second Amended Complaint, and if so, identify them by name, field of expertise, address and telephone number, describe the nature of such consultation and provide a summary of any opinions they have expressed to you in relation to such consultation.

**Response:** *Dr. Ramón Antonio Guzmán Rivera, professor of Civil Law since 1988 at the Pontifical Catholic University of Puerto Rico, advisor and editor of the Commission for the Review and Reform of the Civil Code of Puerto Rico. Doctor in Civil Law from the University of Valladolid (Excellent cum laude); Juris Doctor, Magna Cum Laude, University of Puerto Rico, Specialization Diploma in Constitutional Law and Political Sciences from the Center for*
*Political and Constitutional Studies of Madrid. Admitted to the practice of law and notary practice by the Supreme Court of Puerto Rico. Admitted to the Ecclesiastical Court of the Archdiocese of San Juan de Puerto Rico.*

*Urb. Monte Claro, MP23 Plaza 32, Bayamón, PR 00961-3574*
*Tel. 787-981-8481*
*Email: profesor@guzmanrr.net*
*Regarding answers #20, #21, #23 and #24.*

*The term "specific performance" refers to literal performance of one's obligations under a contract. Should a party default on his obligation, a court may issue an order for specific performance, requiring a party to perform a particular action. The action is usually one that has been previously detailed in a contract. Specific performance is an alternative to a court's decision to award damages and it is commonly used as injunctive relief in cases involving real property or the disclosure of confidential information. To explore this concept, consider the following specific performance definition. Tomado del; Legal Dictionary, en: https://legaldictionary.net/specific-performance/, visitada el 7 de noviembre de 2024.[12]*

---

[12] The court will decree the resolution that is claimed, unless there are justified causes that authorize it to set a deadline. This is understood without prejudice to the rights of third-party acquirers, in accordance with Articles 1247 and 1250, and the provisions of the Mortgage Law.
Colón Prieto v. Géigel, 115 DPR 232, 241 (1984)

Alan Goldman V. McConnell Valdes, LLC, Et Al / 24-Cv-01136-SCC
Plaintiff's Answers to Defendants' Antonio Arias, Maria Beale, and McConnell Valdes, LLC's Interrogatories

And for the record, I do swear and subscribe to this declaration under the penalty of perjury, in

grand Isle, Vt. , this 30th day of January 2025.

ALAN B. GOLDMAN