**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| TEAL PEAK CAPITAL, LLC; | Case No. 3:20-CV-01747 (PAD) |
| *Plaintiff and Counter Defendant,* | |
| And | BREACH OF CONTRACT; SPECIFIC PERFORMANCE OF CONTRACT; REIMBURSEMENT OF FUNDS, COSTS AND EXPENSES |
| JOHN MICHAEL GRZAN AND NAMRATA KHIMANI | |
| *Counter Defendant,* | |
| v. | |
| ALAN BRAM GOLDMAN; | |
| *Defendant and Counter Claimant.* | |

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

To:     **Teal Peak Capital, LLC**

         Adrián Sánchez Pagán, Esq.
         P.O. Box 364428
         San Juan, Puerto Rico 00917
         asanchez@sbsmnlaw.com

From:  **Alan Bram Goldman**

         Antonio A. Arias-Larcada
         McConnell Valdés LLC PO
         Box 364225
         San Juan, Puerto Rico 00936-4225
         270 Ave. Muñoz Rivera
         Hato Rey, PR 0918
         aaa@mcvpr.com

Mr. Alan Bram Goldman ("Mr. Goldman"), pursuant to the Federal Rules of Civil Procedure, submits the following answers and objections to the *First Set of Interrogatories* served on October 13, 2021, by Teal Peak Capital, LLC ("TPC"). Mr. Goldman expressly reserves his right to modify, supplement or amend his responses and objections at any time.

## I.    Mr. Goldman's Responses and Objections to TPC's First Set of Interrogatories

**Interrogatory Number 1:**

State your full name; date of birth; civil status and provide your home address.

**Response to Interrogatory Number 1:**

Alan Bram Goldman, March 26, 1958, single, 1014 Terrace St., Montpelier, VT 05602.

**Interrogatory Number 2:**

Specify the name of all the medications you currently consume on a regular basis, such as daily, weekly or bi-weekly.

**Response to Interrogatory Number 2:**

Mr. Goldman consumes Valium, Trazodone, Ambien, Desonide and Lotion on a regular basis.

Mr. Goldman also smokes Rosin and Marijuana.

**Interrogatory Number 3:**

Identify, by providing the name, phone number and address, all the physicians/doctors that currently treat you for any medical condition, including psychologists or psychiatrists.

**Response to Interrogatory Number 3:**

1. Dr. James Stone
   a. 802-223-2633
   b.  23 Main Street Montpelier, Vermont
2. Dr. Douglas Dahl
   a. 617-726-2000

        b.  Boston, Massachusetts
3.  Dr. Waqar Waheed
        a.  802-862-5759
        b.  89 S. Williams Street Burlington, VT.
4.  Dr. Robert Staszewski
        a.  617-722-4100
        b.  30 Lancaster Street, Suite 400 Boston, Massachusetts

Mr. Goldman found in 2019 that he was having cognitive changes that he could not explain that were greatly affecting his work. In 2020 Mr. Goldman had to contact the State of Vermont and disclose that he was not well and sought relief from penalties and interest on taxes that were not timely filed and paid because Mr. Goldman could not do the bookkeeping, he had done for more than 30 years. The State was very understanding of Mr. Goldman's difficulties, and he was granted relief from being late due to being not well. He began working with Dr. Waheeds office a neurosurgeon at UVM medical center in 2019 to evaluate his cognitive decline. In October of 2020 Mr. Goldman did not do well with a cognitive test to measure decline or impairment and was told that he has a strong chance he may have what his grandmother and mother had, early onset dementia. Most of his challenges are with short term memory and confusion when stressed or late in the day when he is tired and heavily medicated for sleep apnea and stress.

The diagnosis was devastating, and Mr. Goldman needed a few weeks to get back on his feet and fight again to enjoy life as he did when he lost his kidney, much of his bladder and was told to go home and put his affairs in order by the staff at Mass General Hospital in 2002. Mr. Goldman is now a T-4 cancer survivor that has lived almost 20 years. For a long time, the cancer did not come back. He was cancer free. Then in 2016, Mr. Goldman went for his annual cystoscope to check his bladder or prostate for cancer, and the doctors found cancer again. Mr. Goldman had to remove transitional cell cancers again from his bladder by laser. Unfortunately, some cancers had grown

into his prostate, and he had to have some of his prostate resected to remove those tumors as well. Mr. Goldman must go 3 times a year to do a cystoscope evaluation, every year for the rest of his life to make sure any cancer is detected early enough to not be terminal.

**Interrogatory Number 4:**

Identify, by providing the name, phone number and address, the person or persons you consulted with and/or who assisted or counseled you in the process of deciding to sell your property; and the name, phone number and address of the person or persons you consulted with and/or who assisted or counseled you in the process of negotiating the sale of your property to any prospective buyer, such as, but not limited to, Hyung Soon Lee, John Michael Grzan ("Mr. Grzan") and his wife Namrata Khimani ("Dr. Khimani"). This request is limited to the period comprehending 2020 and 2021.

**Response to Interrogatory Number 4:**

Mr. Goldman consulted or was assisted by the following people:

1. Gerald Kleis Pasarell

2. Real Estate Broker Karla Barrera

3. Mr. Adam Long, who is a friend of John Michael Grzan and he introduced him to Mr. Goldman. Adam Long also sent the first draft of the Option to Purchase Agreement.

**Interrogatory Number 5:**

Identify, by providing the name, phone number and address, the person or persons who in 2020 and 2021 contacted you or any of your representatives and expressed interest in your property and/or made an offer to purchase your property.

**Response to Interrogatory Number 5:**

(1) Hyung Soon Lee, through Karla Barrera (smkarla1@gmail.com). Note that in the email through which Hyun Soon Lee retired his offer to purchase the property, it can be appreciated that attorney María del Rosario Fernández-Ginorio (chary@ferraiuoli.com) instructed Karla Barrera to notify Mr. Goldman of Mr. Lee's withdrawal. Also, attorney Camille Rodríguez Franceschini (crodríguez@ferraiouli.com) contacted Karla Barrera concerning the sale of the property to Hyun Soon Lee. (2) René Pérez, through Real Estate Broker Aida Colon (unique_properties@yahoo.com). He decided not to buy after many visits. (3) Tom Miles from Pork King Packing. (4) Also, Gerald Kleis emailed Mr. Goldman several unacceptable offers.

**Interrogatory Number 6:**

Specify how Mr. Grzan gained access to the interior of the house that sits in your property for the purpose of inspecting it prior to the signing of the Option to Purchase Agreement on October 23, 2020.

**Response to Interrogatory Number 6:**

Gerald Kleis Pasarell had the keys to the house, and it was he who showed the house to Mr. Grzan.

**Interrogatory Number 7:**

In paragraph 11 of your Counterclaim (Docket No. 26), you alleged that as a result of hiring Ferraiuoli, LLC in January 2018, said Firm acquired "inside information of the

Property". Expanding and providing all the details, going beyond the allegations in your Counterclaim, specify what "inside information of the Property" did Ferraiuoli, LLC acquired when it represented you in 2018.

**Response to Interrogatory Number 7:**

Ferraiuoli, LLC acquired information as to: Mr. Goldman's intention to fix the home and yard that had been severely damaged from the hurricane of 2017, before selling it to increase its market value, the sentimental value of Mr. Goldman's ancestral home that had been violated by his neighbor cutting down sacred trees destroying Mr. Goldman's back yard, and Mr. Goldman's state of mind and medical conditions which prevented him from going to Puerto Rico. Because of Ferraiouli's knowledge of Mr. Goldman's bad health, Ferraiouli offered and prepared to go to the Dorado Beach Estates annual association meeting on his behalf. Ferraiouli at the last minute did not show leaving Mr. Goldman in a very bad position with his neighbors. Most he had known for decades since this is his ancestral home of more than 30 years. As it was expressed in the Counterclaim, Ferraiouli, LLC also represented Mr. Lee. Mr. Lee suspiciously and suddenly withdrew his more lucrative offer to buy Mr. Goldman's home. Karla Barrera, the broker for Mr. Lee, in an earlier email to Mr. Goldman stated that she had many buyers. Not just Mr. Lee. Yet when Mr. Goldman reached out to her several times to move forward with Mr. Lee's offer, not only did she not respond, but never called Mr. Goldman again about any other buyers. They all just evaporated. Further, Mr. Grzan notified Mr. Goldman, on Friday the 18th of December 2020, that Ferraiouli, LLC had represented him throughout the negotiations to buy the house and before then. From the Trademark Electronic Search System, it can be appreciated that attorney Jean G. Vidal of Ferraiouli, LLC, filed the Teal Peak Capital, LLC trademark on October 10, 2020. At the very least, the appearance of improper conduct by Ferraiouli, LLC is present; at worst, Ferraiouli,

LLC manipulated competing offers to secure a more advantageous offer for Mr. Grzan, his wife, and Teal Peak Capital, LLC. This is so clear that Ferraiuoli, LLC resigned from the case immediately upon facing a motion for disqualification due to the undeniable conflict of interest.

**Interrogatory Number 8:**

State the basis for alleging in paragraph 13 of your Counterclaim (Docket No. 26), that Ferraiuoli LLC was Mr. Grzan and his wife's legal representative during the process of negotiating the Option to Purchase Agreement signed on October 23, 2020.


**Response to Interrogatory Number 8:**

On December 18, 2020, after Mr. Goldman had just received an email that morning from Ferraiouoli attorney Jean G. Vidal representing the Plaintiff concerning the upcoming closing, Mr. Goldman was shocked about this fact that had been kept from him and immediately called Mr. Grzan. Mr. Grzan told Mr. Goldman, via this telephone conversation, that Ferraiouoli, LLC was his legal representation during the process of negotiating the Option to Purchase Agreement signed on October 23, 2020, and the entirety of the negotiations. Mr. Goldman then called attorney Miguel Carbonell to inform him of this revelation. Attorney Miguel Carbonell was shocked to learn of this too and replied: "This is a shit storm!". Mr. Grzan also admitted, via email, that Ferraiuoli, LLC was his legal representation before he even met Mr. Goldman. *See* email titled "reach out" sent by Mr. Grzan included in the link ("I sent you a letter from Ferraiuoli, a law firm that I have had a relationship with long before me and you ever spoke, giving you a heads up that I would need to take legal action to protect my rights if we were unable to close"); *See also* email titled JM Lot 13 contract (dated October 19, 2020) in which Mr. Grzan stated that "I'm following up with my lawyers this morning to have them ready to keep pushing everything forward."

**Interrogatory Number 9:**

Specify what information did Mr. Grzan and his wife obtained from Ferraiuoli, LLC that gave them an "unfair advantage" in the process of negotiating the Option to Purchase Agreement signed on October 23, 2020, as alleged in paragraph 13 of your Counterclaim (Docket No. 26).

**Response to Interrogatory Number 9:**

Mr. Goldman incorporates his answer to Interrogatory Number 7. Further, the mere double representation of Mr. Lee and Mr. Grzan, his wife, and Teal Peak Capital, LLC created an appearance of impropriety and bad faith. Indeed, Ferraiuoli, LLC resigned from the case in minutes as soon as the conflict was raised.

**Interrogatory Number 10:**

Identify the person who provided Mr. Grzan and his wife the "inside information" obtained by Ferraiuoli, LLC while it represented you in 2018 and that gave them an "unfair advantage" in the process of negotiating the Option to Purchase Agreement signed on October 23, 2020.

**Response to Interrogatory Number 10:**

Mr. Goldman objects to Interrogatory Number 10 for vagueness. Mr. Goldman is not sure whether Plaintiff is asking if Ferraiuoli, LLC gave the inside information to Mr. Grzan and his wife in 2018. Subject to and without waiving the foregoing objection, Mr. Goldman is not certain as to when exactly Ferraiuoli, LLC provided the inside information to Mr. Grzan and his wife. Likewise, Ferraiouli, LLC is a firm with a considerable number of attorneys, paralegals, and secretaries who may aid each other in the preparation, litigation, and disposition of a particular case. Thus, as it

currently stands, Mr. Goldman has no way of knowing who exactly from Ferraiouli, LLC provided the inside information. The mere appearance of impropriety which in this case is undeniable is the issue. Mr. Goldman has no inside information on how client and former client information is shared at a law firm. The fact is Mr. Grzan was told by Mr. Goldman that Ferraiuoli, LLC was his law firm before they negotiated the Option to Purchase Agreement and Mr. Grzan did not tell Mr. Goldman that Ferraiuoli, LLC was his firm in this matter.

**<u>Interrogatory Number 11:</u>**

Specify how the relationship between Ferraiuoli, LLC, Mr. Grzan and his wife constituted a "conflict-of-interest", as alleged in paragraph 13 of your Counterclaim (Docket No. 26).

**<u>Response to Interrogatory Number 11:</u>**

Mr. Goldman objects to Interrogatory Number 11 insofar as it calls for opinions or conclusions of law. Mr. Goldman can only be compelled to answer matters of fact, within his knowledge. Likewise, Interrogatory Number 11 requests information which is the work product of Mr. Goldman's attorney. Subject to and without waiving the foregoing objection, Mr. Goldman hereby incorporates his Motion to Disqualify Counsel for Teal Peak Capital, LLC to his response to Interrogatory Number 11. *See* Dkt. No. 24.

**<u>Interrogatory Number 12:</u>** Identify the legal basis, such as the specific American Bar Association's Model Rule of Professional Conduct and/or court case, that supports your contention that that the relationship between Ferraiuoli, LLC, Mr. Grzan and his wife constituted a "conflict-of-interest".

**Response to Interrogatory Number 12:**

Mr. Goldman objects to Interrogatory Number 12 insofar as it calls for opinions or conclusions of law. Mr. Goldman can only be compelled to answer matters of fact, within is knowledge. Likewise, Interrogatory Number 12 requests information which is the work product of Mr. Goldman's attorney. Subject to and without waiving the foregoing objection, Mr. Goldman hereby incorporates his Motion to Disqualify Counsel for Teal Peak Capital, LLC to his response to Interrogatory Number 12. *See* Dkt. No. 24.

**Interrogatory Number 13:**

In response to paragraph 18 of the Amended Complaint (Docket No. 26), you allege that Mr. Grzan and his wife "had devised a scheme to cheat him in the deal." Specify and explain in detail what does this alleged "scheme" consists or consisted of.

**Response to Interrogatory Number 13:**

Mr. Goldman hereby incorporates his Answer to Complaint and Amended Counterclaim and Joinder of Parties. See Dkt. No. 26. Mr. Grzan approached Mr. Goldman in September 2020. Mr. Goldman told Mr. Grzan of the incident that had occurred around June 2017 and the damages he suffered to his home and property object of this litigation. Mr. Goldman disclosed that Ferraiuoli, LLC was his legal representation for the incident and that the builder responsible for this horrible action was Mr. Chipi, who turned out to be the brother of the owner of American Title Insurance Company that Mr. Grzan and attorney Miguel Carbonell chose to hold the deposit. Additionally, Mr. Goldman informed Mr. Grzan of his vulnerability as he was isolated, heavily medicated, and recovering from various medical conditions such as TIA's, cancer again in his bladder and prostate after losing one kidney, losing half a bladder, losing part of his prostate, losing his belly button, PTSD and debilitating skin conditions. Mr. Grzan and Mr. Goldman spoke often about the trees

cut by Mr. Chipi, the damage done to his property and Ferraiouli, LLC representing him. After hours of phone calls and many emails Mr. Grzan did not disclose that Ferraiuoli, LLC was his legal representation all that time.

On or around October 20, 2020, Mr. Goldman received an unsolicited offer from Mr. Lee, who was represented by Ferraiuoli, LLC. Mr. Lee's offer was more lucrative than Mr. Grzan's. Mr. Goldman, in good faith, notified Mr. Grzan of this offer and how Ferraiuoli, LLC was representing the buyer (Mr. Grzan once again concealed that Ferraiouli, LLC also represented him). Mr. Goldman gave Mr. Grzan and his wife the opportunity to match Mr. Lee's offer, which they agreed to. After working on various drafts for most of the day, an agreement was reached and approved by both parties. But Mr. Grzan and his wife sent the offer at 12:18 am, 18 minutes too late which rendered it ineffective. Another example of Mr. Grzan and his wife taking advantage of Mr. Goldman at midnight when he is heavily medicated and not well cognitively. **Two days later**, on October 22, 2020, without any justification whatsoever, Ferraiuoli, LLC withdrew Mr. Lee's lucrative offer. Mr. Goldman reached out to Mr. Lee's broker, to find out what happened. She never responded back even after telling Mr. Goldman in an earlier email that she had many other clients besides Mr. Lee. Only when Mr. Goldman reached out to Ferraiouli, LLC to inquire as to what happened, did Ferraiuoli respond stating their client Mr. Lee no longer had interest in buying the property without any further. As stated in Mr. Goldman's Counterclaim, Mr. Goldman became aware on December 18, 2020 that Ferraiuoli, LLC was also representing Mr. Grzan and Teal Peak Capital, LLC during the negotiations.

Moreover, when Mr. Goldman got the devastating news of his precarious health conditions, he bravely shared the truth with Mr. Grzan who he was speaking with almost every day for months. Mr. Goldman discussed this in detail with Mr. Grzan often and asked many times to please pass on to his wife, Namrata Khimani, who is a doctor what he was going through. He told Mr. Grzan she would deeply understand the challenges Mr. Goldman will be facing with early onset dementia and asked her to please show empathy and be patient with Mr. Goldman for Dr. Khimani knows this is a very difficult and painful road to walk. Dr. Khimani did not chat on any of the phone calls Mr. Goldman had with her husband during the day or evening. It was very odd since they spoke so many times. Mr. Grzan told Mr. Goldman that his wife Dr. Khimani, was not ever available until after 9-10 pm when she was done with work and put her kids to bed. Mr. Goldman kept telling Mr. Grzan that working late at night is tough for he is not well and heavily medicated for sleep apnea and stress. The buyers forced Mr. Goldman to work late at night when he was at a disadvantage due to his health all the time. It seemed to be on purpose to gain an unfair advantage with their knowledge of his medical condition. Contracts designed by the buyers always ended at 12 midnight when Mr. Goldman was heavily medicated and in cognitive decline due to the medication and not being well. This is when the buyers always forced Mr. Goldman to make decisions. Mr. Grzan knew this because Mr. Goldman told him directly numerous times. The stress of being sick and not being able to go anywhere due to Covid-19 deeply affected Mr. Goldman's abilities, but Dr. Khimani simply refused to accommodate him and communicate during the day. Only Mr. Grzan would communicate during normal working hours. All communications with both the buyers involved always took place after 9 pm when Mr. Goldman was in cognitive decline. When Mr. Goldman found out about the loss of all his offers with no real reason, the stress was unbearable. He scrambled all day to figure out what happened. This is when the buyers took

advantage and low balled their own offer while Mr. Goldman was knee deep in great duress to save his time sensitive purchase of Sabin's Pasture. Mr. Goldman in a complete panic and all alone did not know what to do. The days passed and no one would explain what happened to buyer Mr. Lee. Under great duress, stress, heavily medicated and not well from cognitive decline, Mr. Goldman called Gerald Kleis around 11pm for assistance. He refused. In desperation and not well Mr. Goldman sent the email contact at 11:57 pm just 3 minutes before the deadline of the offer from the buyers. In fact, both parties were emailing drafts late at night. It was in this moment of desperation, stress, confusion, duress, not understanding what happened to the more lucrative all cash no contingency offer from Mr. Lee and the buyers agreeing to match the offer but sending it 15 minutes too late rendering it null and void that Mr. Goldman was duped into pushing send entering into the Option to Purchase Agreement.

**Interrogatory Number 14:**

Specify and describe in detail how did Mr. Grzan and/or Mr. Lee were able to manipulate the negotiating process of the purchase of your property, as alleged in paragraph 32 of your Counterclaim (Docket No. 26).

**Response to Interrogatory Number 14:**

Mr. Goldman hereby incorporates his Answer to Complaint and Amended Counterclaim and Joinder of Parties, Dkt. No. 26, and his answer to Interrogatory Number 13. Mr. Grzan approached Mr. Goldman in September 2020. Mr. Goldman told Mr. Grzan of the incident that had occurred around June 2017 and the damages he suffered to his home and property object of this litigation. Mr. Goldman disclosed many times that Ferraiuoli, LLC was his legal representation for the incident. Additionally, Mr. Goldman informed Mr. Grzan of his vulnerability as he was isolated,

heavily medicated, and recovering from various medical conditions such as TIA's cancer again in his bladder and prostate after, a rare auto immune problem requiring emergency surgery to stop the life-threatening infection that destroyed Mr. Goldman's right cheek, losing one kidney, losing half a bladder, losing part of his prostate, losing his belly button, PTSD and various skin conditions. Mr. Grzan did not disclose that Ferraiuoli, LLC was his legal representation. Mr. Grzan and his wife, who is a doctor, knew how sick Mr. Goldman was and how medicated he was. Mr. Goldman explained this to both parties late in the evening when they would always make him work. Usually after 9-10 pm when they knew Mr. Goldman was heavily medicated as he was the night, he signed the agreement under extreme stress and deception.

On or around October 20, 2020, Mr. Goldman received an unsolicited offer from Mr. Lee, who was represented by Ferraiuoli, LLC. Mr. Lee's offer was more lucrative than Mr. Grzan's. Mr. Goldman, in good faith, notified Mr. Grzan of this offer and shared by email the offer with him. Mr. Goldman disclosed that Ferraiuoli, LLC was representing the buyer who had represented him in the past. Mr. Grzan once again concealed that Ferraiouli, LLC also represented him. Mr. Goldman gave Mr. Grzan and his wife the opportunity to match Mr. Lee's offer, which they agreed to. After working on various drafts for most of the day, an agreement was reached and approved by both parties. But Mr. Grzan and his wife sent the offer at 12:18 a.m. 18 minutes too late which rendered it ineffective. Again another example of the Buyers forcing Mr. Goldman to work and make decisions at or after midnight knowing he is now well and heavily medicated. **Two days later**, on October 22, 2020, after Mr. Goldman reached out to Mr. Lee's broker multiple times and received no response, Ferraiuoli, LLC withdrew Mr. Lee's lucrative offer without any explanation. As stated in Mr. Goldman's Counterclaim, Mr. Goldman became aware on December 18, 2020

that Ferraiuoli, LLC was also representing Mr. Grzan and Teal Peak Capital, LLC during the negotiations.

**Interrogatory Number 15:**

State the reasons why the closing of the property did not take place by November 23, 2020.

**Response to Interrogatory Number 15:**

Simply put, the sale of Mr. Goldman's home was not ready to close. On November 5, 2020, Mr. Goldman's insurance agent purporting to be his broker sued him in the Court of First Instance in Puerto Rico alleging that he was owed a commission for the sale of the home even though the home was yet to be sold. Consequently, the home's title was not clean as it had a *lis pendens* registered in Registry of Real Property. Mr. Grzan promised Mr. Goldman that he was going to sort everything with the broker to clean the title. To this day, Mr. Kleis and Mr. Goldman continue to litigate the controversy in the courts. Indeed, Mr. Kleis, the purported broker, recently filed a certiorari petition in the Supreme Court of Puerto Rico requesting the judgment in favor of Mr. Goldman to be reversed.

**Interrogatory Number 16:**

Identify the legal basis (such as jurisprudence or law) that supports your contention that the Option to Purchase Agreement expired on November 23, 2020, notwithstanding the fact that you accepted the $600,000 deposit a day late and have kept the money ever since, together with the initial $200,000 deposit.

**Response to Interrogatory Number 16:**

Mr. Goldman objects to Interrogatory Number 16 as written. Mr. Goldman contends that Mr. Grzan and his wife, and/or Teal Peak Capital, LLC tendered the extension payment on November 24, 2020. This is to say, Mr. Grzan and his wife, and/or Teal Peak Capital, LLC tendered payment late as they had until November 23, 2020 to close the sale of the home. Regardless, Mr. Goldman also noted that the extension period ended on December 23, 2020, and, as such, Mr. Grzan's and his wife, and/or Teal Peak Capital, LLC's exclusive right to purchase extinguished on December 23, 2020.

**Interrogatory Number 17:**

Specify and describe in detail what is or was the "time sensitive project" you were going to fund with "Seller's proceeds" as mentioned in Clause 5 of the Option to Purchase Agreement signed on October 23, 2021.

**Response to Interrogatory Number 17:**

Mr. Goldman objects Interrogatory Number 17 as it requests information outside the scope of discovery. Mr. Goldman's participation in the "time sensitive project" is not relevant to this litigation. Without waiving the foregoing objection, Mr. Goldman states that the time sensitive project is known as "Sabin's Pasture". Sabin's Pasture is a 100-acre parcel in the heart of the Capital City of Montpelier, Vermont and is designated in Montpelier's Masterplan, and zoned accordingly, as a key place for housing to happen in a community with a critical housing shortage. This 100-acre parcel has been the center of much controversy for more than 20 years. Probably the most important undeveloped piece in the downtown of the State Capitol of Vermont. Therefore, The Capitol City and the State have designated all 100 acres known as "Sabin's Pasture"

as "Growth Center" which enables the land to be eligible for Transitional Incremental Financing better known as "TIF", that HUD, the State, and the Local City may use to assist the developer with all the infrastructures servicing the project that meet HUD guidelines for affordable housing, roads, water, sewer, power, storm water management, sidewalks, parks and more. Fifteen acres at the base are in the zone "Riverfront District" zoned for mixed use growth and high-density housing.  With the City's assistance and their TIF consultants, Mr. Goldman's traffic and civil engineers, they are permitting 188 quality, energy efficient senior housing units over a 10-year period in two five-year phases of 74 units each. Mr. Goldman has been working with the State, the City of Montpelier, their planning staff and their TIF consultants, by email, Zoom, and by phone.


**Interrogatory Number 18:**

Identify the person or persons involved or that participate or participated in any manner in the "time sensitive project."

**Response to Interrogatory Number 18:**

Mr. Goldman objects Interrogatory Number 18 as it requests information outside the scope of discovery. The persons involved in the "time sensitive project" is not relevant information to this litigation. Without waiving the foregoing objection, Mr. Goldman states the following:

Sellers: Scott Aja, his sister, and both parents.

Montpelier City Manager: Bill Frazier

Montpelier Planning Director: Mike Miller

Montpelier Development and TIF expert: senior partner David White

Mr. Goldman's partners: Doug Zorzi and his sister.

Traffic engineer: Roger Dickerson

Civil Engineer: DeWolf

Civil Engineer: Stone Environmental

**Interrogatory Number 19:**

Specify the reasons why you have not consigned the $800,000 paid by Mr. Grzan despite repeatedly representing to the Court since at least April 7, 2021 that you are in the process of doing so. See Docket No. 19.

**Response to Interrogatory Number 19:**

Mr. Goldman objects Interrogatory Number 19 as the information requested is of no practical significance. Mr. Goldman consigned the $800,000.00 today. Without waiving the foregoing objection, Mr. Goldman sustains that he wanted to consign the funds sooner but due to Covid -19 he could not. Mr. Goldman truly needed the $800,000 to close on a time sensitive contract that he entered in January of 2020 right before Covid-19 changed the world. He did not have the funds to pay the $800,000.00. The Sellers of the time sensitive project, after several extensions, stated for the record that if Mr. Goldman did not close by November 23, 2020, they would cancel the contract and keep Mr. Goldman's deposit. Never in his wildest dreams/nightmares did he assume a pandemic would prevent him from selling two properties he owned free and clear. Instead, the state of Vermont shut down the entire economy to protect its people. Mr. Goldman was not allowed to sell or show his real estate until August of 2020. In fact, Mr. Goldman has only had seven meals with another human being in almost 2 years due to health reasons and Vermont law. Also, work had to be done on both properties to make them marketable, yet no work was allowed from March of 2020 until August of 2020. Further, there were no workers to do the work: no carpenters, no

plumbers, no electricians. All trades and supply chains were backed up in Vermont as they are in Puerto Rico.

Finally, when the vaccines were available, and Mr. Goldman could try to safely proceed in May of 2021, Mr. Goldman sold one property to a cash buyer. But this was not enough to pay the $800,000.00 needed to return the good faith deposit. When he began working with the second buyer for the second property in late June 2021, Mr. Goldman did not know how backed up the banks and the appraisers were and still are today. It took the buyer 5 months to get his appraisal, State and bank funding for his project and finally close the week of November 8 , 2021 allowing Mr. Goldman to wire the funds to his counsel and deposit them in escrow with the Court.  Plus, this only happened because Mr. Goldman owned the property free and clear and has given the Buyer a $700,000 bridge loan to get the $800,000 to the Court as quickly as he could in a World besieged by Covid-19.

Mr. Goldman also lost two months this summer when the doctors found a 5 cm tumor in his upper left thigh in early May that had to be removed, since it was deemed potentially cancerous. For almost 2 months Mr. Goldman had to wait for surgery at the Mass General Hospital and expected to lose much of the back of his upper thigh. Doctors removed the tumor with little damage to Mr. Goldman's thigh and the tumor was benign. Mr. Goldman had to then spend 30 days off his feet and then keep is leg dry for 3 months. This contributed to Mr. Goldman difficulty in selling his real estate when he was facing Cancer for the fourth time. And delayed his ability to raise the $800,000 needed to return the buyers' deposit.

**Interrogatory Number 20:**

Specify where are the $200,000 and 600,000, respectively, Mr. Grzan paid as security deposit, describing –in detail, by providing names of institutions and/or persons—their

movement from the time the funds were received, deposited, transferred, and liquidated to the present.

**Response to Interrogatory Number 20:**

All funds came from the title insurance company Mr. Grzan chose in Puerto Rico to hold the two sums. All sums were wired late to Mr. Goldman's personal bank account at Community National Bank in Montpelier, Vermont. Next day the funds went to attorney Phil Zalinger's office that represented the sellers who sold Mr. Goldman their 50% ownership of Sabin's Pasture. The deposit put down by Mr. Goldman was returned to his business. The purchase price started at $750,000. But when Covid came and stopped the world, Mr. Goldman had to keep buying more time. Most of the $800,000 was used to close the sale of the property, between closing costs for Mr. Goldman's attorney and additional monies owed to the Aja family for granting three extensions of extra time to close.

**Interrogatory Number 21:**

Specify whether you, or someone on your behalf, wrote or posted reviews of Dr. Khimani in sites such as "Healthgrade" and/or "Vitals".

**Response to Interrogatory Number 21:**

Mr. Goldman, nor anyone on his behalf has written or posted reviews of Dr. Khimani in sites such as "Healthgrade" and/or "Vitals".

**Interrogatory Number 22:**

Identify any expert you or anyone on your behalf has consulted with or

discussed the facts of the case of caption.

**Response to Interrogatory Number 22:**

Mr. Goldman has not consulted with any expert.

**Interrogatory Number 23:**

Regardless of whether a determination has been made, identify any expert you will or may call as a witness during the trial of the case of caption.

**Response to Interrogatory Number 23:**

As it currently stands, no expert has been identified that could be called as a witness during the trial of the case of caption.

**Interrogatory Number 24:**

Regardless of whether a determination has been made, identify all the witnesses you will or may call to testify on your behalf during the trial of the case of caption, providing for each a brief but comprehensive summary of their testimony.

**Response to Interrogatory Number 24:**

The only witness identified that **may** testify is Mr. Goldman's local accountant, Mr. Rey Rios Castro:

   ➢ Po Box 2852 Guaynabo, Puerto Rico 00970

   ➢ (787) 399-2265

   ➢ cparrc@gmail.com

   ➢ http://www.reyrioscpa.com

Mr. Rey Rios Castro may testify on the facts alleged by Mr. Goldman in his Counterclaim and his Motion to Dismiss the Amended Complaint.

**Interrogatory Number 25:**

Specify whether you or someone on your behalf has secured a statement, sworn or unsworn, verified or unverified –in any medium—from any person regarding the facts of the case of caption.

**Response to Interrogatory Number 25:**

Mr. Goldman has not secured a statement, sworn or unsworn, verified or unverified -in any medium- from any person regarding the facts of the case of caption.

**VERIFICATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1716**

I, Alan Bram Goldman of legal age, single, resident of Montpelier, Vermont, hereby state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief and/or pursuant to documents in my possession and my personal involvement in the facts of this case.

_____

**Alan Bram Goldman**

Executed in Montpelier, Vermont, this 12 day of November, 2021.

In San Juan, Puerto Rico, this 12th day of November, 2021.

*Attorney for Alan Bram Goldman*
**McConnell Valdés LLC**
PO Box 364225
San Juan, Puerto Rico 00936-4225
270 Ave. Muñoz Rivera
Hato Rey, PR 0918
T: 787-250-5604

By: s/ Antonio A. Arias-Larcada
Antonio A. Arias-Larcada, Esq.
USDC-PR 204906
aaa@mcvpr.com