IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ALAN GOLDMAN, | * | CIVIL NO.: 24cv01136 |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| McCONNELL VALDÉS, LLC; | * | |
| ANTONIO A. ARIAS-LARCADA, his wife | * | |
| MARIA BEALE, and the Conjugal | * | |
| JOHN DOE; MARY DOE | * | |
| SOMPO INTERNATIONAL INSURANCE | * | |
| COMPANY;  ENDURANCE AMERICAN | * | |
| SPECIALTY INSURANCE COMPANY; | * | |
| AIG INTERNATIONAL COMPANY-PUERTO RICO | * | |
| | * | |
| Defendants | * | |

PLAINTIFF'S MOTION UNDER FED. R. CIV. P. 72(a) TO FILE SPECIFIC
WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER AND TO
SEEK AN ORDER TO SET ASIDE OR MODIFY THE MAGISTRATE JUDGE'S
ORDER [DOCUMENT NUMBER 130]

TO THE HONORABLE COURT:

COMES NOW Plaintiff, Alan Goldman, by and through his undersigned counsel, and pursuant to F. R. Civ.P. 72(a), respectfully moves this Honorable Court to enter an Order to set aside or modify the Order entered by Magistrate Judge Marshal D. Morgan on April 30, 2025 [Document Number 130]. In support thereof, Plaintiff, Goldman respectfully states as follows:

I.  Introduction

1.  The Magistrate Judge's Order compels Plaintiff, Goldman "to appear for the Court-Ordered physical and mental examination to be conducted

by Dr. Franceschini in Puerto Rico during the month of May 2025, on a date and time to be coordinated by the parties and Dr. Franceschini, but not later than May 31, 2025."

2. In this Order, the Magistrate-Judge made the following warning: "Failure to appear as directed may result in the imposition of sanctions, including but not limited to dismissal of the complaint under Fed. R. Civ. P. 37(b)(2)(A) and/or for failure to prosecute under Fed. R. Civ. P. 41(b)."

3. Defendants, Mr. Arias-Larcada, Mrs. Arias and McConnell Valdés LLC, have already notified that Plaintiff, Goldman's physical and mental examination shall take place on May 21st, 2025, and May 23rd, 2025, at Dr. Ruiz Arnau University Hospital's Department of Psychiatry. [Document Number 132]

4. That notice, by itself, is quite disconcerting due to the increased health risks that may result from Plaintiff, Goldman being ordered to appear at said hospital facilities where general medical and surgery services are provided.

5. In said notice, Defendants also notified their intent to take Plaintiff, Goldman's video deposition on May 22nd, 2025.

## II. What are Plaintiff's allegations against Defendants

6. In this Complaint, Plaintiff, Goldman alleged that "This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between

the parties and the amount in controversy exceeds the sum of $500,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1367, regarding Plaintiff Alan Goldman's state law claims under Articles 287, 290, 1163, 1258, 1259, 1260, 1536, 1540, and 1803 of the Puerto Rico Civil Code of 2020, and under Law 121 – 2019 "Ley de la Carta de Derechos y la Política Pública del Gobierno a favor de los Adultos Mayores".

7.  In this Complaint, Plaintiff, Goldman also alleged that "Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) (1) and (2), since the events giving rise to these claims arose in this District."

8.  In the Complaint, at paragraph 6, Plaintiff, Goldman alleged that "…Sompo International and/or Endurance American Specialty Insurance Company issued Policy Number LXY30020811501 (Lawyers Professional Liability Insurance) to cover the damages that were suffered by Mr. Goldman as the result of McConnell Valdés' and Mr. Arias' breach of their respective contractual obligations and duties of care, and/or as the result of McConnell Valdés' and Mr. Arias' joint fault and/or vicarious negligence alleged herein."

9.  In the Complaint, at paragraph 7, Plaintiff, Goldman alleged that "…AIG Insurance Company-Puerto Rico issued Policy Number "015-

001003116-03-000000 (Lawyer's Professional Liability) to cover the damages that were suffered by Mr. Goldman as the result of McConnell Valdés' and Mr. Arias' breach of their respective contractual obligations and duties of care, and/or as the result of McConnell Valdés' and Mr. Arias' joint fault and/or vicarious negligence alleged herein."

10. In the Complaint, under "RELEVANT FACTS" at paragraph 8, Plaintiff, Goldman alleged that: "On October 23, 2020, an "Option to Purchase Agreement" was entered into by Mr. Goldman, as "Seller", and Mr. John Michael Grzan and Mrs. Namrata Khimani, as "Purchaser", for the sale and purchase of a real estate property in Dorado, Puerto Rico."

11. In the Complaint, at paragraph 9, Plaintiff, Goldman alleged that: "Under "Paragraph 15. Default by Seller. Remedies, Purchaser", the "Option to Purchase Agreement" reads as follows:

> "In the event Seller, after exercise of the Option granted herein, fails to proceed with the closing of the sale of the real property pursuant to the terms and provisions contained herein, Purchase[r] shall be entitled to receive back the Option Fee and pursue any equitable remedies under the law."

12. In the Complaint, at paragraph 10, Plaintiff, Goldman alleged that: "On October 23, 2020, Mr. Goldman made two mistakes: First, Mr. Goldman agreed to sell the Property in Dorado, for $3,150,000, although at that time, the Property's market value was well over $6,500,000; and second, Mr. Goldman misunderstood the meaning of

the term "equitable remedies" and mistook the legal consequences of said equitable remedies."

13. In the Complaint, at paragraphs 11, 12 and 13, Plaintiff, Goldman alleged that: "11. In a contract context, the term "mistake" refers to an error associated with either the meaning of the words, laws, or facts within a contract. When a mistake occurs, it causes one or both parties to enter in or to the contract without fully understanding the outcomes or responsibilities implied by the contract. More specifically, a "unilateral mistake" is the mistaken belief that is held by one of the parties and is not shared by the other party to the contract. Simply put, a unilateral mistake occurs when only one of the parties misinterprets the subject matter or meaning of the words." "12. Since only one party holds a mistaken belief, this could give to other party an unfair advantage in the bargaining power that they could hold during the contract formation stage. If a contract is entered into, in or on, the basis of a mistaken belief, it could result in a lawsuit that may provide the mistaken party with various remedies, such as contract rescission or contract reformation." "13. If a unilateral mistake is made during the contracting process, it would, or could be, unfair if only one party understands the true meaning implied by the contract while the other party does not. A court may issue one of the following remedies in order

to correct the unilateral mistake: contract rescission that completely cancels the contract and the parties are restored to the same position they were in before the contract was formed; or, alternatively, contract reformation, when the written agreement is changed in order to reflect the parties' original understanding of the terms of the contract. Usually, this remedy may be granted for unilateral mistakes only in cases where the non-mistaken party was unaware that the other party was mistaken."

14. In the Complaint, at paragraph 15, Plaintiff, Goldman alleged that: "Article 287 of the Puerto Rico Civil Code of 2020 defines the requirements for an error to vitiate the party's willingness. Article 290 of the Puerto Rico Civil Code of 2020 defines what should happen if the one contracting party makes any computation errors."

15. In the Complaint, at paragraph 16, Plaintiff, Goldman alleged that: "In the case of the Option to Purchase Agreement referred to herein-above, the main controversies were: (1) what was the fair market value of the real estate property that was optioned by the parties; and (2) if there was a unilateral mistake, what were the legal consequences under Clause 15 of the contract; and (3) if one party, the Seller, had made a colossal mistake, and whether that error or mistake resulted in Buyer's unjust enrichment."

16. In the Complaint, at paragraph 17, Plaintiff, Goldman alleged that: "Litigation initiated by Buyer ensued, since Mr. Goldman did not execute the deed of sale. On December 24, 2020, Mr. Grzan's and Mrs. Khinami's designated assignee, Teal Peak Capital, LLC, filed <u>Teal Peak Capital, LLC, Plaintiff, vs. Alan Bram Goldman, Defendant</u>, Civil No. 3:20-cv-1747, in the U.S. District Court for the District of Puerto Rico."

17. In the Complaint, at paragraph 18, Plaintiff, Goldman alleged that: "On January 13, 2021, Mr. Goldman retained the services of McConnell Valdés, to represent Mr. Goldman in said civil case. McConnell Valdés' law firm's Capital Member, Mr. Arias, became Mr. Goldman's lead counsel."

18. In the Complaint, at paragraph 19, Plaintiff, Goldman alleged that: "Since the beginning of their relationship, McConnell Valdés, through its agent and capital partner, Mr. Arias, convinced Mr. Goldman that Mr. Goldman had nothing to worry about said case. Mr. Goldman was told that he had not incurred in any mistake by using the term "equitable remedies" that was inserted by him in the final draft of the Option to Purchase Agreement; and that the trial court would never enter any Order, ordering any specific performance against Mr. Goldman."

19. In the Complaint, at paragraph 20, Plaintiff, Goldman alleged that: "McConnell Valdés, through its agent and capital partner, Mr. Arias, reiterated in writing that same legal opinion, that their understanding of the applicable law was that the term "specific performance" is not an "equitable remedy" under Puerto Rico's laws. In fact, the documents quoted herein-below, were electronically transmitted by Mr. Arias, specifically, to confirm that McConnell Valdés, and Mr. Arias were instructing their client, Mr. Goldman, to aggressively litigate that case, under such legal theory, which proved to be, not only inadequate, but completely wrong as a matter of law."

20. In the Complaint, at paragraph 21, Plaintiff, Goldman alleged that: "As the result of said litigation, Mr. Goldman made several payments for McConnell Valdés' and Mr. Arias' legal fees in the total sum of $195,893.90. McConnell Valdés is still attempting to collect an additional sum of $53,000. These legal fees were incurred by Mr. Goldman, while acting under the erroneous legal advice that Buyer, Teal Peak Capital, LLC, would not be able to prevail in that lawsuit, since the trial court would certainly rule that "specific performance" was not an "equitable remedy"."

21. In the Complaint, at paragraph 22, Plaintiff, Goldman alleged that: "On June 8, 2021, Mr. Arias sent an email transmission to Mr. Goldman, that in its pertinent part, reads as follows:

> "Team: Patricia and I just briefed Mr. Goldman on the **defense strategy moving forward mainly supported by careful review of both the option agreement and the draft escrow agreement attempting to contain the Kleis lawsuit from precluding the closing.**
>
> As per the pleadings and the oral presentation given to the court at last week's status conference the plaintiff Teal Peak sued because it allegedly validly exercised its right to purchase under the option agreement, the case was ready to close but the seller refused to close and therefore **it seeks specific performance**. As per the amended complaint Teal Peak **in addition to specific performance seeks damages based on its speculation** that had it purchased the property in December 2020 it would have been ready to be exploited as a rental property by April 2021 for at least $35,000 a month or sold for over $8,000,000…Moving forward our litigation defense and counterclaim will be based on the following talking points: First, the case was not ready for closing in December 2020. Second, Mr. Goldman was not at fault for the case not being ready for closing in December. Third, Mr. Goldman could not deliver clean title because real estate broker Kleis filed a bogus lawsuit for an unearned commission and registered a Lis Pendens lien on the property. Fourth, even if Mr. Goldman could deliver clean title by the closing, he had been deceived by the buyer through dolus vitiating the option agreement. **Fifth, even if the buyer where to show by a preponderance of the evidence that the case was ready to close and it was the seller's fault, the only remedy it is entitled under the option agreement is the return of the deposit AND (not "or") any other equitable remedies under the law. That is not specific performance. Specific performance is not a remedy available to the buyer. End of discussion. Furthermore, even if there was seller liability, which we dispute, all damages claims are not only illegal, they are all pure speculation.** The talking points are supported by the evidence in the case: **First, page 3 of the option agreement negotiated by the parties does not afford the buyer the contractual right to seek specific**

**performance if the seller refuses to sell**. **The lawsuit has been filed under the illegal premise that the buyer can compel the seller to close on the sale. Buyer is wrong, seller can walk away and he need only return the cash deposit and pay real expenses**. Patricia has ordered **a legal research on how the courts have considered "other equitable remedies"** to confirm reimbursement of expenses in addition to the returned deposit satisfies the legal threshold…Thus, in view of the above the case should develop as follows: 1.Mr. Goldman will answer the amended complaint making aggressive use of the talking points by June 11th… **We can petition the court for immediate mediation to settle the remainder of what the buyer is entitled to which is "equitable remedies" in our view, reimbursement of their out-of-pocket expenses and attorney's fees**. Should mediation fail, at the earliest available opportunity Mr. Goldman shall file a motion for summary judgment since the only remaining issue to be decided by the court is a legal issue which need not go to a jury."

22. In the Complaint, at paragraph 23, Plaintiff, Goldman alleged that: "On

February 21, 2022, Mr. Arias sent another email transmission to Mr.

Goldman, that in its pertinent part reads as follows:

"The judge opened by indicating that he had reviewed all the legal briefs and had also done additional research on the issues… The judge then turned to me and **I took my time to argue why there was no likelihood for the plaintiffs to prevail on the merits of the case due to the three pillars of our case**. **First, the contract clearly and with specificity reads in the default clause that the buyer shall the entitled to the return of the security deposit and any other equitable remedies. If the security deposit is returned the vague and not specific additional remedies can only involve some additional monetary compensation for lost interest or inconvenience but not specific performance**. Given that the defendant had already returned the security deposit which is held by the court in escrow the case is mostly moot. **I stressed to the court that the seller did no [sic] draft the option agreement and was not represented by counsel and would have never agreed to specific performance upon his default**…"

23. In the Complaint, at paragraph 24, Plaintiff, Goldman alleged that: "Relying on Mr. Arias' wrong advice and incorrect assurances, that Mr. Goldman could not be ordered by the trial court to sign any deed of purchase and sale of the property, Mr. Goldman retained the services of third parties to make significant repairs and improvements in the property, disregarding the fact the property was optioned to Buyer in "As Is".

24. In the Complaint, at paragraph 24, Plaintiff, Goldman alleged that: "These additional repair and maintenance expenses were incurred by Mr. Goldman, while fully relying on Mr. Arias' representations and promises. The expenses incurred were in the sum of $212,900."

25. In the Complaint, at paragraph 26, Plaintiff, Goldman alleged that: "On March 24th, 2022, the Honorable Judge Delgado-Hernández, USDC-PR entered the "Memorandum and Order" in the case of Teal Peak Capital, LLC, Plaintiff v. Alan Bram Goldman, Defendant, Case No.: 20-1747 (PAD) that in its pertinent part reads as follows:

> "This is a breach-of-contract action... deceit or *dolus...* **defendant's motion must be denied. As discussed below, plaintiff is entitled to the remedies identified in Clause 15 of the contract. This includes recovery of the Option Fee and specific performance**...And here, there is an agreement that explicitly identifies what plaintiff shall be entitled to in case of the seller's default. This type of clause is known as a penal clause. Their two most important functions are to guarantee the performance of the obligation and to evaluate in advance the damages...As to damages, the penal clause "substitute[s] indemnity for damages and the payment of

interest… "eliminates all controversy"… the amount to be paid in damages…And that is what plaintiff bargained for, limiting the amount it could recover…**The concept of specific performance shares consanguinity with the permanent injunction, itself a creature of equity**. See, Axia Netmedia Corporation v. Massachusetts Technology Park, 889 F.3d 1, 8 (1st Cir. 2018)(**equating permanent injunction with order granting request for specific performance**); McDonald's Corp. v. Lebow Realty Tr., 888 F.2d 912, 913 (1st Cir. 1989)(**request for permanent injunction ordering specific performance of option agreement**); Bolin Farms v. American Cotton Ass'n, 370 F.Supp. 1353, 1369 (W.D. La. 1974)(**noting that no bond can be required where specific performance has been ordered in the form of a permanent injunction**).

That is why, as the Puerto Rico Supreme Court observed, "[**a]n injunction to restrain a breach of a contract often operates to all intents and purposes as a decree for its specific performance.**" San Juan Racing & Sporting Club v. Foote, 31 P.R.R. 154, 158 (1922)…. **And as such, it may be enforced by way of a permanent injunction mandating specific performance**. See, In Re: Medical Educational and Health Services, Inc., 2015 WL 903346, **1, 4-5 (Bkcy. D.P.R. Feb, 27, 2015) (**application for permanent injunction evaluated as one for specific performance and damages under Article 1077 of the Puerto Rico Civil Code**)…The debtor bears the burden of demonstrating lack of proportion between the breach and the penalty to justify the court's intervention…Still, defendant has challenged the principal obligation as being null and void. And that matter will be decided at trial."

26. In the Complaint, at paragraph 27, Plaintiff, Goldman alleged that: "McConnell Valdés and Mr. Arias, never provided to Mr. Goldman any copy of Judge Delgado-Hernández' adverse ruling in the "Memorandum and Order" dated March 24, 2022."

27. In the Complaint, at paragraph 28, Plaintiff, Goldman alleged that: "On October 31, 2022, the Joint Proposed Pre-Trial Order was filed in Civil

Case No. 3:20-civ-1747. Although Mr. Goldman's counsel acknowledged that "Mr. Goldman is not a lawyer and understood that the language and intent behind Clause 15 was for Mr. Goldman to have the right to retain the Property and opt out of the Option Agreement, -for whatever reason- before or after the option was exercised by the purchaser- by returning the Option Fee and paying any additional costs...", no efforts were made by Mr. Goldman's counsel to amend Mr. Goldman's previous pleadings as to try to protect his legal rights under the relevant Articles of the Puerto Rico Civil Code of 1930 and 2020."

28. In the Complaint, at paragraph 29, Plaintiff, Goldman alleged that: "On October 31, 2022, while the Buyer alleged damages that were being estimated to be in the sum of $8,160,000, for loss of rental income of $35,000 per month, Mr. Goldman's counsel alleged in the Joint Pre-Trial Proposed Order, that another neighbor, "Mr. Long then purchased the property next door for $2,500,000. Within a year, Mr. Long flipped the property and sold it to another purchaser for $10,500,000 for a multi-million dollars profit." Although Mr. Goldman's counsels were aware of such real estate prices in the same neighborhood in Dorado, Puerto Rico, Defendants failed to seek any legal remedies that were available under Articles 287, 290 of the Civil Code of Puerto Rico of 2020, or if applicable, under the previous Civil Code of Puerto Rico of 1930."

29. It was not until paragraph 30 of the Complaint that Plaintiff Goldman also alleged that: "In addition, Mr. Goldman's various medical conditions were alluded to, but no reference was made to Mr. Goldman's possible declined mental abilities, or to his possible mental state of confusion. No treating physicians were included in the witnesses' list, no medical experts were announced, and no medical records were marked as exhibits or as identifications."

30. In the Complaint, at paragraph 38, Plaintiff, Goldman alleged that: "Mr. Goldman employed McConnell Valdés as his legal counsel."

31. In the Complaint, at paragraph 40, Plaintiff, Goldman alleged that: "Mr. Arias is a well-known, practicing lawyer, admitted to practice law in Puerto Rico, and he acted on behalf of McConnell Valdés."

32. In the Complaint, at paragraph 41, Plaintiff, Goldman alleged that: "McConnell Valdés and Mr. Arias owed to Mr. Goldman their contractual duty of due care and were expected to provide competent legal representation to their clients, at a reasonable cost."

33. In the Complaint, at paragraph 43, Plaintiff, Goldman alleged that: "McConnell Valdés and Mr. Arias breached their duty, by providing incorrect, wrong, or wrongful legal advice, that led to unnecessary legal fees, costs, and expenses."

34. In the Complaint, at paragraph 44, Plaintiff, Goldman alleged that: "McConnell Valdés and Mr. Arias. wrongfully led their client, Mr. Goldman, to unnecessarily pay their law firm the sum of One Hundred Ninety-Five Thousand Eight Hundred Ninety-Three Dollars with Ninety Cents ($195,893.90) for unnecessary legal fees and expenses. McConnell Valdés is demanding an additional payment of $53,000."

35. In the Complaint, at paragraph 46, Plaintiff, Goldman alleged that: "In this case, McConnell Valdés and Mr. Arias unjustly enriched themselves by misappropriating the sum of $195,893.90 from Mr. Goldman. There is no basis in law or fact to exclude application of the unjust enrichment doctrine in this case."

36. In the Complaint, at paragraph 48, Plaintiff, Goldman alleged that: "McConnell Valdés' and Mr. Arias' actions or omissions were the proximate cause of Mr. Goldman's monetary losses."

37. In the Complaint, at paragraph 50, Plaintiff, Goldman also alleged that: "During the relevant time, Mr. Goldman mentioned to his lawyers from McConnell Valdés, including Mr. Arias, that Mr. Goldman may be suffering some diminished mental capacity, due to Mr. Goldman's repeated transient ischemic attacks ("TIA"), seizures and health conditions, that may have caused Mr. Goldman to be confused, disoriented and with limited cognizant capability."

38. In the Complaint, **at paragraph 51, Plaintiff, Goldman alleged that:** "Although McConnell Valdes' lawyers, including Mr. Arias, were informed that Mr. Goldman's ability to make some intelligent decisions may actually be compromised, McConnell Valdés' lawyer, Mr. Arias did not make any efforts to obtain or to review Mr. Goldman's medical records, including any Mr. Goldman's psychiatric evaluations."

39. In the Complaint, **at paragraph 53, Plaintiff, Goldman alleged that:** "On the other hand, Mr. Goldman's attorneys included averments, such as "…Mr. Goldman vehemently defends his position that he acted professionally and was willing to close within the exercise period…" Said allegation would contradict Mr. Goldman's concerns about his own mental state at the time that Mr. Goldman had agreed to sell his property for a ridiculous, extremely low price of $3,150,000, although everyone knew, or should have known, that purchase price was less than one half (50%) the then current market value of the Property."

40. In the Complaint, **at paragraph 54, Plaintiff, Goldman alleged that:** "By mistake, Mr. Goldman "agreed" to sell the property for $3,150,000."

41. In the Complaint, **at paragraph 55, Plaintiff, Goldman alleged that:** "McConnell, and Mr. Arias acknowledged that "By manipulating the competing offers TPC pressured Mr. Goldman to sell below the market price in Dorado Beach." "Based on current real estate market in Dorado Beach and the specific location of Mr. Goldman's Property, which is above

eighty-five (85) foot contour of the exclusive and original Dorado Beach Estate, Mr. Goldman estimates that had he closed caving under the pressure of TPC he would have failed to realize in excess of $3,000,000 in the sale". Please, see in Case No. 3:20-civ-01747, "Defendant's Answer to Complaint and Counterclaim", at page 13, par. 30, 32, Document 18, of April 7, 2021."

42. In the Complaint, **at paragraph 56, Plaintiff, Goldman alleged that:** "McConnell Valdés and Mr. Arias' willingness to completely disregard such relevant, important evidence, not only about their own client's potential diminished mental capacity, but of the Property's fair market value, should be appalling. Their indifference, their unconcerned conduct, constituted legal malpractice, particularly, in view of Mr. Goldman's eventual inability to amend his previous "Answer to the Amended Complaint" or the parties' "Joint Pre-Trial Conference Order", at the time that Mr. Goldman was finally able to retain new legal counsel."

43. In the Complaint, **at paragraph 63, Plaintiff, Goldman alleged that:** "McConnell Valdés and Mr. Arias owed to Mr. Goldman their duty to practice law in a reasonable, professional manner, and to provide their competent legal advice."

44. In the Complaint, **at paragraph 64, Plaintiff, Goldman alleged that:** "McConnell Valdés and Mr. Arias breached their contractual obligations to display the competence and proficiency that were expected from them, and

they breached the contractual duty they owed to Mr. Goldman as his legal counsel as described herein-above."

45. In the Complaint, at paragraph 65, Plaintiff, Goldman alleged that: "Their inadequate gathering of the essential information, their failure to perform reasonable legal research, their failure to take into consideration the applicable statutes and case law, led these Defendants to incur in legal malpractice."

46. In the Complaint, at paragraph 66, Plaintiff, Goldman alleged that: "Any competent lawyer would have provided to Mr. Goldman, very different legal advice in said case."

47. In the Complaint, at paragraph 67, Plaintiff, Goldman alleged that: "Any competent lawyer would have advised Mr. Goldman to assert his defenses based on his actual mistake of fact as to what should have been the Property's reasonable sales price."

48. In the Complaint, at paragraph 70, Plaintiff, Goldman alleged that: "McConnell Valdés' and Mr. Arias' incorrect, wrong, or wrongful advice, constituted breach of their contractual obligations, under their contract for professional services, and is now the reason why Defendants are jointly liable for the damages sought by Mr. Goldman."

49. In the Complaint, at paragraph 73, Plaintiff, Goldman alleged that: "Acting upon Mr. Arias' bad advice, Mr. Goldman also ended up spending $212,900 in totally unnecessary repairs and maintenance expenses."

50. In the Complaint, at paragraph 74, Plaintiff, Goldman alleged that: "McConnell Valdés' and Mr. Arias' fault and/or negligence, were incurred while Defendants were attempting to comply with their contractual obligations. Defendants' failure to provide adequate, competent legal services resulted in Mr. Goldman suffering additional economic and emotional damages, which, but for their own lack of proficiency and/or their combined negligence, Mr. Goldman would not have suffered."

51. In the Complaint, at paragraph 76, Plaintiff, Goldman alleged that: "McConnell and Mr. Arias did not advise Mr. Goldman about the legal remedies that were available to him under Articles 1258, 1259, 1260 of the Civil Code of Puerto Rico of 2020."

52. In the Complaint, at paragraph 77, Plaintiff, Goldman alleged that: "McConnell Valdés and Mr. Arias failed to seek adequate legal relief for their client, Mr. Goldman, such as rescission of the contract, or revision of the sales price that had been agreed upon in the contract, by requesting the trial court to provide an upward adjustment of the final purchase price."

53. In the Complaint, **at paragraph 78, Plaintiff, Goldman alleged that:** "It was obvious, or should have been obvious, that the Buyer was obtaining a huge, disproportionate financial advantage, by forcing Seller to transfer an asset that was worth more than twice as much, and probably three times as much, as the sales price that was agreed upon in the "Option to Purchase Agreement"."

54. In the Complaint, **at paragraph 79, Plaintiff, Goldman alleged that:** "Mr. Goldman was not adequately advised by Mr. Arias. McConnell Valdés failed to alert Mr. Goldman about these legal remedies. McConnell Valdés and its lawyers failed to protect their client, Mr. Goldman, by including these same allegations and by seeking these same legal remedies in the pleadings that they filed on behalf of Mr. Goldman."

55. In the Complaint, **at paragraph 81, Plaintiff, Goldman alleged that:** "In their Joint Proposed Pretrial Order, Document 136, of Civil Case Number 3:20-civ-1747, McConnell Valdés and Mr. Arias made references to Mr. Goldman's various medical conditions, such as seizures, PTSD. Yet, no treating physicians or any expert in the medical field were announced as Mr. Goldman's witnesses. No reference was made to Mr. Goldman's advanced age or to Puerto Rico's statutes addressing the need to protect our senior citizens."

56. In the Complaint, **at paragraph 82, Plaintiff, Goldman alleged that:** "McConnell Valdés and Mr. Arias made allegations that Mr. Goldman's

previous lawyers, Ferraiuoli, LLC, had "acquired inside information regarding the Property, such as its market value." Yet, no expert witnesses were called to prove the property's market value at the time that the Option to Purchase Agreement was signed."

57. In the Complaint, **at paragraph 83, Plaintiff, Goldman alleged that:** "These acts or omissions constitute legal malpractice. Mr. Arias and McConnell Valdés are liable for the adverse consequences that resulted from said errors or omissions."

58. In the Complaint, **at paragraph 84, Plaintiff, Goldman alleged that:** "Mr. Goldman's new lawyers were impeded from revisiting these defenses and legal explanations, as to obtain any legal remedy that would otherwise may have been available to Mr. Goldman under the law."

59. In the Complaint, **at paragraph 85, Plaintiff, Goldman alleged that:** "At the time that Mr. Goldman realized that Mr. Goldman had made a mistake by accepting to sell his property for the reduced purchase price of $3,150,000, his property was well over $6,500,000, and Articles 1258, 1259, 1260 the Civil Code of Puerto Rico of 2020, were already applicable to this case."

60. In the Complaint, **at paragraph 86, Plaintiff, Goldman alleged that:** "Mr. Arias and McConnell Valdés failed to seek any legal relief for their client, Mr. Goldman under Articles 1258, 1259, 1260 the Civil Code of Puerto Rico of 2020, such as rescission of the contract, or revision of the term, that is, for the sale price that had been agreed to in the contract, by

requesting judicial relief, such as the upward adjustment of the purchase price."

61. In the Complaint, **at paragraph 87, Plaintiff, Goldman also alleged that:** "In the Joint Proposed Pretrial Order, that was filed as docket entry 136 in Civil Case Number 3:20-civ-1747, Mr. Arias and McConnell Valdés referred to Mr. Goldman's various medical conditions, such as seizures, PTSD. Yet, no treating physicians or any expert in the medical field were announced as Mr. Goldman's witnesses."

62. **In his complaint, Mr. Goldman demanded "judgment in his favor and against Mr. Arias, Mrs. Beale and their conjugal partnership, McConnell Valdés, and Sompo International and/or Endurance American Specialty Insurance Company and/or Defendant, AIG Insurance Company-Puerto Rico, to cover the damages that were suffered by Mr. Goldman as the result of McConnell Valdés' and Mr. Arias' breach of their respective contractual obligations and duties of care, and/or as the result of McConnell Valdés' and Mr. Arias' joint fault and/or vicarious negligence and for the financial damages suffered by Mr. Goldman, as well as for Mr. Goldman's emotional damages and distress, with interest, costs, and such other relief this Court deems just and proper."**

63. In the Complaint, **at paragraph 90, Plaintiff, Goldman alleged that:** "Mr. Arias and McConnell Valdés are liable for their joint negligence, as would

be the case in any ordinary torts case. All that it is required is that Mr. Goldman establishes: (1) the existence of the damage; and (2) that the professional service provider did not act pursuant to the minimum standard of care required, in this case, to the legal profession, and (3) that causal relationship exists between the damage and the act or the omission of the lawyer. _Santiago Otero v. Méndez_, 94 JTS 38. See also, _Rodríguez Crespo v. Hernández_, 121 D.P.R. 639(1988); _Medina Santiago v. Vélez_, 120 D.P.R. 380, 385(1988)."

64. In the Complaint, at paragraph 91, Plaintiff, Goldman alleged that: "The breach of this duty was the proximate cause for Mr. Goldman's damages. Mr. Arias' and McConnell Valdés' acts and/or omissions were the proximate cause for the damage suffered by Mr. Goldman."

65. In the Complaint, at paragraph 92, Plaintiff, Goldman alleged that: "The inadequate gathering of essential information, and their failure to study applicable law would have led them, as to any other competent lawyer, to provide adequate legal advice to their client, Mr. Goldman."

66. In the Complaint, at paragraph 93, Plaintiff, Goldman alleged that: "That failure generated Mr. Arias' and McConnell Valdés' incorrect, wrong, or wrongful legal advice, and was the cause why Mr. Arias and McConnell Valdés incurred in their respective legal liability for the damages sought by Mr. Goldman."

67. In the Complaint, at paragraph 94, Plaintiff, Goldman alleged that: "Mr. Goldman not only did not obtain any relief for his unilateral mistakes as to the sales price and when he agreed to be liable for any "equitable remedies." Mr. Goldman ended up spending hundreds of thousands of dollars in unnecessary legal fees and ended up losing his property too."

68. In the Complaint, at paragraph 95, Plaintiff, Goldman alleged that: "Mr. Arias should not have relied on his own totally incorrect legal opinion about the applicable law in said previous action. This breach of legal duty of care by Mr. Arias was the direct cause of Mr. Goldman's additional resulting financial or economic, and mental damages."

69. In the Complaint, at paragraph 96, Plaintiff, Goldman alleged that: "Lawyers and law firms owe to their clients the duty of care required of any reasonable and prudent person. *Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 404-406 (1985).* The breach of this duty by Mr. Arias and McConnell Valdés was the adequate and/or proximate cause for Mr. Goldman's economic losses and mental pain and suffering."

70. In the Complaint, at paragraph 97, Plaintiff, Goldman alleged that: "In *Cabrera v. Asoc. De Señoras Damas, 96 D.P.R. 775 (1968),* the Supreme Court of Puerto Rico held that the hospital was liable in a tort action, when its employees made worse a condition in a patient's eye. This same

doctrine is applicable to any professional service provider. To wit, do not cause any damage to your client."

71. In the Complaint, at paragraph 98, Plaintiff, Goldman alleged that: "By having provided totally wrong, or wrongful legal advice, Mr. Arias and McConnell Valdés breached this legal duty."

72. In the Complaint, at paragraph 99, Plaintiff, Goldman alleged that: "The ensuing unnecessary litigation was the direct cause for Mr. Goldman's having to pay McConnell Valdés and later, to another law firm that came to his rescue, hundreds of thousands of dollars in additional fees and expenses. The law firm of Morell, Cartagena, Dapena were paid $153,000 by Mr. Goldman, so that said law firm could extract Mr. Goldman from the mess Mr. Goldman was in said litigation."

73. In the Complaint, at paragraph 101, Plaintiff, Goldman alleged that: "Lawyers have the duty of care and must take the foreseeable measures that a prudent and reasonable man would display under the circumstances that surround the legal situation that his/her client confronts."

74. In the Complaint, at paragraph 110, Plaintiff, Goldman alleged that: "Article 1540 of the Puerto Rico Civil Code of 2020 defines vicarious liability."

75. In the Complaint, at paragraph 111, Plaintiff, Goldman alleged that: "The courts in Puerto Rico extend vicarious liability for any professional malpractice, in situations where a client seeks professional services directly from any law firm, either as an employer or as partnership, such as McConnell Valdés, and the legal entity provides the services of one of its own lawyers, whether said lawyer is an employee or is a partner in the law firm."

76. In the Complaint, at paragraph 113, Plaintiff, Goldman also alleged that: "The breach of their legal duty to provide competent legal services is the real cause of Mr. Goldman's substantial economic losses, in addition to also having caused Mr. Goldman's significant, emotional, mental damages."

77. In the Complaint, at paragraph 114, Plaintiff, Goldman alleged that: "McConnell Valdés is liable for the negligent acts and/or the negligent omissions incurred by any of its employees and/or its agents, relating to their client, Mr. Goldman. This liability derives from the "respondeat superior" doctrine previously established under Article 1803 of the Puerto Rico Civil Code (1930) and under Article 1540 of the Civil Code of Puerto Rico (2020)."

78. In the Complaint, at paragraph 119, Plaintiff, Goldman alleged that: "Lawyers, like all professionals, make mistakes. They fail to conduct

appropriate factual investigations, draft inadequate documents but fail to disclose them to their clients."

79. In the Complaint, at **paragraph 120**, Plaintiff, **Goldman alleged that:** "Specifically, clients should be able to assert an independent breach of fiduciary duty claim seeking equitable remedies, including fee forfeiture, based on the lawyer's failure to self-report his error."

80. In the Complaint, at **paragraph 125**, Plaintiff, **Goldman alleged that:** "Thus, when a lawyer fails to report his own malpractice, clients should be able to assert an independent breach of fiduciary duty claim seeking equitable remedies, including fee forfeiture, based on that failure."

81. In the Complaint, at **paragraph 126**, Plaintiff, **Goldman alleged that:** "Defendant, Arias' failure to keep his client reasonably informed about the status of the matter and explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. This duty to inform it surely must include a requirement that a lawyer inform his client when the client may have a substantial malpractice claim against the lawyer, since this information is necessary to permit the client to make informed decisions regarding the representation. Those decisions include (1) whether the client has a viable malpractice claim arising out of the representation and, if so, whether to pursue it now or later; and (2) whether to have the lawyer continue to represent the client in the current matter. In this situation, where the

interests of the attorney and client may differ substantially, a high degree of disclosure is necessary."

82. In the Complaint, at paragraph 128, Plaintiff, Goldman alleged that: "This conflict is imputed to Defendant McConnell Valdés, LLC's entire law firm. Once a lawyer's conduct has given rise to a substantial malpractice claim by his client, his personal interests are adverse to their client's and the lawyer's law firm also incurs liability under the facts that are alleged in this amended complaint."

83. In the Complaint, at paragraph 130, Plaintiff, Goldman alleged that: "In short, a lawyer who fails to disclose his malpractice to his client is subject to discipline for violating Rules 1.4 and 1.7 of the Model Rules of Professional Conduct."

84. In the Complaint, at paragraph 131, Plaintiff, Goldman alleged that: "In addition, the lawyer's failure to disclose his own malpractice may also violate Rule 8.4(c)'s prohibition on conduct involving, among other things, "dishonesty" and "deceit." MODEL RULES OF PROF'L CONDUCT r. 8.4(c) that lawyers must "reveal all information that a reasonable client would attach importance to in determining the objectives of the representation…but if the mistake "has consequences that materially affect the client's matter, the fact of the mistake becomes material, and must be disclosed to the client."

85. In the Complaint, at paragraph 137, Plaintiff, Goldman alleged that: "Pursuant to the Puerto Rico Insurance Code a casualty or liability insurance carrier is independently liable in a direct action from the Mr. Goldman, in an action against the insured, and when joint complaint is filed against the insurer and the insured; for any negligence, fault or condition insured against, up to the merits of liability of the insurance contract."

86. In the Complaint, at paragraph 138, Plaintiff, Goldman alleged that: "As a direct and proximate result of the joint fault and/or negligence of Mr. Arias and McConnell Valdés, Mr. Goldman suffered emotional damages, resulting in mental pain and suffering, Mr. Goldman has suffered significant financial losses, including his payment in the sum of $195,893.90 to the law firm of McConnell Valdés, for the faulty or negligent services that Mr. Goldman received from McConnell Valdés, during the unnecessary, unsuccessful litigation that resulted from McConnell Valdés' wrong legal advice regarding Mr. Goldman's sale of his real estate property located in Dorado, Puerto Rico."

87. In the Complaint, at paragraph 142, Plaintiff, Goldman alleged that: "As a direct and proximate result of Mr. Arias' and McConnell Valdés' failure to comply with their legal and contractual obligations, and/or as the result of Mr. Arias and McConnell Valdés' fault and/or negligence, Mr. Goldman

suffered economic losses and also suffered emotional damages such as mental pain and suffering."

88. In the Complaint, at paragraph 143, Plaintiff, Goldman alleged that: "Mr. Goldman significant financial losses include his payment of $195,893.90 to cover the legal services of McConnell Valdés for its faulty, negligent professional services, the sum of $212,900 in repairs and maintenance, that were spent only as the result of Mr. Arias' bad advice, the sum of $153,000 that Mr. Goldman had to spend in additional legal fees to Morell, Cartagena and Dapena, plus the sum of $25,000 that Mr. Goldman shall be paying to his undersigned attorney in this case."

89. In the Complaint, at paragraph 144, Plaintiff, Goldman alleged that: "Mr. Goldman was induced by McConnell Valdés and by Mr. Arias to get involved in an unnecessary, unsuccessful litigation, that only resulted in an adverse transaction, due to McConnell Valdés' and Mr. Arias' incorrect, wrong, or wrongful legal advice regarding Mr. Goldman's forced sale of his deceased parents' real estate property in Dorado Beach, Puerto Rico."

90. In the Complaint, at paragraph 145, Plaintiff, Goldman alleged that: "Mr. Goldman still gets up every single day feeling extremely anxious due to his constant regret of having listened to Mr. Arias and McConnell Valdés' incorrect, wrong, or wrongful and inadequate legal advice."

91. In the Complaint, at paragraph 146, Plaintiff, Goldman alleged that: "As the result thereof, Mr. Goldman constantly worries about his present financial situation and about his own uncertain financial future."

92. In the Complaint, at paragraph 147, Plaintiff, Goldman alleged that: "Mr. Goldman claims that Mr. Goldman is entitled to recover those financial losses that were incurred by him after retaining Mr. Arias and McConnell Valdés' inadequate legal services, and the future loss of income that Mr. Goldman has been unable to generate, as the result of having to unnecessarily spend over $370,000 in legal fees, plus $212,900 that were spent in repairs and maintenance services on the real estate property, all because of incorrect, wrong, or wrongful legal advice."

93. In the Complaint, at paragraph 148, Plaintiff, Goldman alleged that: "Since at least June 8, 2021, Mr. Arias and McConnell Valdés insisted that the state of the applicable law in Puerto Rico was as follows:

> "Team: Patricia and I just briefed Mr. Goldman on the defense strategy moving forward mainly supported by careful review of both the option agreement and the draft escrow agreement… As per the amended complaint Teal Peak in addition to specific performance seeks damages based on its speculation that had it purchased the property in December 2020 it would have been ready to be exploited as a rental property by April 2021 for at least $35,000 a month or sold for over $8,000,000… Fifth, even if the buyer where to show by a preponderance of the evidence that the case was ready to close and it was the seller's fault, the only remedy it is entitled under the option agreement is the return of the deposit AND (not "or") any other equitable remedies under the law. That is not specific performance. Specific performance is not a **remedy available to the buyer. End of**

discussion. Furthermore, even if there was seller liability, which we dispute, all damages claims are not only illegal, they are all pure speculation. The lawsuit has been filed under the illegal premise that the buyer can compel the seller to close on the sale. Buyer is wrong, seller can walk away and he need only return the cash deposit and pay real expenses. … We can petition the court for immediate mediation to settle the remainder of what the buyer is entitled to which is "equitable remedies" in our view, reimbursement of their out-of-pocket expenses and attorney's fees."

94. In the Complaint, at paragraph 149, Plaintiff, Goldman alleged that:

"This incorrect, wrong, or wrongful advice constitutes professional malpractice. Mr. Goldman followed said incorrect, wrong, or wrongful advice. From that moment on, Mr. Goldman's lacked informed consent as to whether continue to litigate or not continue to litigate said case."

95. In the Complaint, at paragraph 150, Plaintiff, Goldman alleged that:

"Mr. Goldman unnecessarily suffered throughout those last two years, and respectfully avers that he is entitled to be compensated by Mr. Arias and McConnell Valdés and by John Doe, Mary Doe and/or by Sompo International and/or Endurance American Specialty Insurance Company and/or AIG Insurance Company-Puerto Rico, to cover the damages that were suffered by Mr. Goldman as the result of McConnell Valdés' and Mr. Arias' breach of their respective contractual obligations and duties of care, and/or as the result of McConnell Valdés' and Mr. Arias' joint fault and/or vicarious negligence and for the financial damages suffered by Mr. Goldman, as well as for Mr. Goldman's

emotional damages and distress, with interest, costs, and such other relief this Court deems just and proper, in an amount of not less than Six Million Dollars ($6,000,000).

### III. Legal Issues and Remedies Sought

96. Plaintiff, Goldman submits that Plaintiff, Goldman's prior or current physical and/or mental conditions were not, and are not, Plaintiff's main arguments in support of Plaintiff's causes of action against these Defendants.

97. In fact, assuming that Defendants are not able to perform these physical and/or mental examinations, it is respectfully suggested that an adequate remedy under the law would be to issue a Court's Order instructing Plaintiff Goldman that he shall not be allowed to present any evidence during trial in support to his allegations identified in paragraphs 50, 51, 53, 56, 81, 87, 113, 133, 142, 145, and 150 of Plaintiff's Verified Second Amended Complaint (Document Number 29).

98. If this Honorable Court determines that such a restrictive order would not be appropriate, then Plaintiff, Goldman will respectfully request reasonable modification of the Magistrate Judge's Order's compelling in-person appearance in Puerto Rico.

99. The current Order imposes an unrealistic burden on Plaintiff, Goldman, whose serious medical conditions render travel medically inadvisable,

unless Plaintiff, Goldman procures being properly vaccinated, it being anticipated that Plaintiff, Goldman would have to undergo some allergic reactions that may provoke some delay of his initial date of traveling.

100. In addition, Plaintiff Goldman is obligated to comply with some civic and statutory obligations that require his uninterrupted presence in Vermont during May 2025.

101. There are well documented and publicly scheduled local government meetings that would make such travel not only burdensome but unadvisable in view of Plaintiff, Goldman's commitments.  Please see: **Exhibits 1, 2, 3 and 4.**

102. This request for the issuance of a Court Order extending the period of time for said examinations, that would allow Plaintiff Goldman to travel instead to Puerto Rico during the month of June 2025, is made against a backdrop in which numerous pending matters remain unresolved by the Court. Specifically, Plaintiff, Goldman awaits the Court's rulings on:

(a) Plaintiff's Motion to Change Venue;

(b) Plaintiff's Motion for Leave to Amend the Complaint;

(c) Plaintiff's Motions to Compel discovery responses from Defendants Maria Beale, Antonio Arias, and McConnell Valdés, LLC, who have refused to respond to interrogatories propounded in September/October 2024 and January 2025, and who have failed to respond to each request for production of documents that were duly served under the Federal Rules of Civil Procedure.

103. Plaintiff, Goldman respectfully submits that he should not be compelled to travel to Puerto Rico for depositions and examinations, at great personal risk and hardship, while these core threshold matters remain undecided by the Court, and where Defendants have continued to willfully withhold any discovery, in contravention of their obligations.

104. Plaintiff, Goldman respectfully requests from this Honorable Court to be allowed to complete his already scheduled meetings with his Montpelier's city officials, and to be able to comply with his statutory requirements under Vermont Law with regards to Vermont's housing crisis, and to participate in the final stages of the Capital City of Vermont's planning and development, for which the Master Plan being discussed will control the Capital City's growth over the next eight (8) years.

105. Plaintiff, Goldman should be allowed to complete the needed medical appointments and pending medical procedures, as well as have his vaccines and immunizations prior to this extensive travel, that his medical professionals consider being forced to travel against their best medical advice, outside the continental United States.

106. The current Order imposes unrealistic and medically hazardous conditions on Plaintiff, Goldman by requiring extensive international travel in direct contravention of the advice of multiple treating physicians, and during statutorily mandated land use hearings in

Montpelier, Vermont, where Plaintiff, Goldman is required to be physically present.

107. Due to his severe and chronic medical conditions, including agoraphobia and panic disorder, Plaintiff, Goldman is medically advised not to travel. Preparation for any such travel requires extensive medical coordination, specialized transport, post-vaccination recovery time, and legal representation by lead counsel Francisco López-Romo, who shall be unavailable from May 28th, 2025, until June 12, 2025.

108. Plaintiff, Goldman respectfully requests from this Honorable Court to enter an Order modifying the current scheduling of the Rule 35 examination and deposition, to either June 16–20, 2025, or June 23–27, 2025, as these new dates would allow Plaintiff, Goldman to be able to comply with the Court's Order without violating his own medical guidance and civic obligations.

IV. Arguments and case law regarding remote participation via zoom or other tele-medicine and deposition:

109. Plaintiff Goldman is a 66-year-old immunocompromised cancer survivor who suffers from agoraphobia and PTSD. Requiring him to travel over 2,000 miles for in-person proceedings would impose significant physical and psychological harm, and possibly, directly contradict well-established legal standards and medical best practices, including widespread endorsement of telepsychiatry for elderly and medically fragile patients.

110. Plaintiff Goldman is medically certified as immunocompromised following multiple cancer diagnoses and treatments. His medical service providers have advised him that exposure to public travel environments and unfamiliar locations presents (1) severe infection risks, and (2) higher probabilities of triggering psychological distress.

111. Under F. R. Civ. P. 26(c), a party may seek a protective order when discovery would cause "undue burden or expense." F. R. Civ. P.35(a)(2)(B) likewise permits the Court to set the "manner, conditions, and scope" of any ordered examination.

112. Plaintiff, Goldman's medical conditions plainly meet these standards. Courts consistently recognize that Rule 35 must not be used punitively or intrusively. _Schlagenhauf v. Holder_, 379 U.S. 104 (1964); _Greenhorn v. Marriott Int'l_, 216 F.R.D. 649 (D. Kan. 2003).

113. Remote Video Deposition is reasonable, humane and routine: Under Fed. R. Civ. P. 30(B) (4), courts regularly permit depositions by remote means where a party faces health impairments or substantial burden. Plaintiff's PTSD and agoraphobia make in-person proceedings infeasible. This Honorable Court should authorize remote depositions to avoid unnecessary medical risk and emotional harm. Narayan v. Compass Grp., 2019 WL 265109 (E.D. Cal.); Usher v. Lakewood Eng'g, 158 F.R.D. 411 (N.D. Ill. 1994).

114. Telepsychiatry is the accepted standard for examining elderly and infirmed individuals: There is no credible dispute in modern psychiatric

or geriatric medicine that telepsychiatry is a medically sound, clinically validated, and widely adopted standard of care—especially for elderly, immunocompromised, or psychologically vulnerable patients. The American Psychiatric Association, Mayo Clinic, American Geriatrics Society, and University of Alabama at Birmingham all endorse telepsychiatry as a best practice.

115. Key peer-reviewed benefits include:

- Improved Access to Care: Remote psychiatric services eliminate geographic and mobility barriers, especially for patients like Mr. Goldman who cannot travel without medical risk. APA Geriatric Toolkit

- Reduced Risk of Infection: Remote sessions eliminate exposure to infectious agents, which is critical for immunocompromised cancer survivors. APA Toolkit

- Convenience and Comfort: Sessions conducted from home reduce stress and trauma for individuals with agoraphobia or PTSD. Mayo Clinic Systematic Review

- Continuity of Care: Telepsychiatry ensures seamless care and allows caregivers to be present, which is particularly important in geriatric cases. APA Support.

## V. Alternative Methods to Conduct Mental and Physical Examination and Taking of Depositions

116. Remote Depositions Under FRCP 30(b)(4) and Protective Order Standard - Federal Rule 30(b)(4) explicitly authorizes depositions by "telephone or other remote means" if the parties stipulate or the court orders. Courts in the First Circuit (including D.P.R.) have embraced this rule, especially during and after the COVID-19 pandemic. For example, in *Prado-Hernández v. R & B Power, Inc.* (D.P.R. 2017), the court noted that a video deposition would be far less burdensome and costly than requiring an out-of-state plaintiff to travel for an in-person deposition. The court cited Rule 30(b)(4) and refused to require physical travel, observing that any technical obstacles to videoconferencing (such as a witness lacking their own Zoom/Skype setup) could be overcome by hiring a provider, which "certainly [would] be less expensive than having to travel from Texas to Puerto Rico for a deposition". In other words, remote deposition technology was a readily available solution to avoid undue burden on the deponent.

117. Under Rule 26(c), courts have broad discretion to issue protective orders to prevent undue burden, and this extends to tailoring deposition logistics. Courts generally require the party opposing an in-person deposition to show "good cause" why remote testimony is necessary. Health-related concerns have been recognized as a good cause. Indeed, even *before* the pandemic, courts would consider a deponent's medical vulnerabilities when deciding whether to allow a

deposition by video or phone. During the pandemic, such accommodation became routine. As one court in D.P.R. observed, video conference depositions "became a necessity, not a convenience", and courts increasingly allowed recovery of Zoom platform costs as part of expenses, reflecting how normal and expected remote depositions had become. In _Wiscovitch-Barreras v. Cruz-Soto_, the District of Puerto Rico noted the shift: historically, courts treated videoconference fees as a luxury, but "during the pandemic, videoconferencing became a necessity, not a convenience, and thus courts have increasingly taxed video conference connection fees. This acknowledges that remote depositions are not only permitted by the rules but are often the prudent, appropriate, and effective way to proceed.

118. Several cases illustrate that judges will order remote depositions to protect medically fragile deponents. For instance, in _Sunstate Equip. Co. v. Equipment Share_ (D. Utah 2020), the court refused to delay depositions entirely for COVID-19, but did require that any deposition proceed with everyone using remote technology (to avoid one side gaining an advantage by being in-person). The court stressed that the pandemic is "not a golden ticket to get out of discovery obligations," and it expected counsel to be _creative_ in conducting depositions safely (i.e. via Zoom) rather than postponing them. Likewise, practitioners report that judges have compelled parties to go forward with Zoom depositions absent a "compelling reason" to delay. In sum, Rule 30(b)(4) provides

clear authority for remote depositions, and courts in Puerto Rico and the First Circuit have been willing to exercise their discretion under Rule 26(c) to order depositions by Zoom when needed to avoid undue hardship, such as when a deponent is elderly, immunocompromised, or suffering from severe anxiety about travel.

119. Example – Remote Deposition Ordered: In *Prado-Hernández*, the plaintiff's counsel insisted on a telephone-only deposition because the plaintiff (located in Texas) could not travel to Puerto Rico. The court noted Rule 30(b)(4) allows remote depositions and found the plaintiff's lack of video access a "weak excuse," since a videoconference could be arranged by a hired service. The court wanted the defendant to be able to observe the plaintiff's demeanor and ensure he wasn't being coached, so it ordered a video deposition rather than a mere phone call. This solution protected the plaintiff from travel and COVID exposure while still preserving the integrity of the testimony.

120. Remote Medical/Psychiatric Examinations Under FRCP 35(a) - Rule 35(a) allows a court to order a party to submit to a physical or mental examination by a suitable licensed examiner when the party's condition is "in controversy" and the movant shows "good cause." Courts have significant discretion in this area: the Supreme Court has emphasized that "Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or good cause has

adequately demonstrated the necessity". In practice, this means judges will balance the relevance of the requested exam against its intrusiveness or the availability of less onerous means to obtain the information.

121. Importantly, Rule 35 itself gives courts authority to set the "time, place, manner, conditions, and scope" of the examination. This flexibility encompasses ordering remote psychiatric or medical examinations when appropriate. Especially in recent years, courts have found that telemedicine (including telepsychiatry via videoconference) can be a reasonable way to conduct an evaluation, provided it does not unduly compromise the examiner's ability to assess the individual. In other words, a Rule 35 exam via Zoom can satisfy the rule so long as it is necessary and fair under the circumstances.

122. Several precedents from the First Circuit and D.P.R. demonstrate how courts handle requests for Rule 35 exams and accommodate vulnerable parties:

- Injury Clearly in Controversy: In *Flores-Febus v. MVM, Inc.*, 299 F.R.D. 338 (D.P.R. 2014), the plaintiff in an employment case claimed ongoing emotional injuries (including depression, anxiety, and insomnia) as part of her damages. The court found the plaintiff's mental state was squarely "in controversy," and it granted the defendant's motion for a psychiatric IME. The decision noted that factors like a plaintiff alleging a specific psychiatric disorder or

ongoing severe distress weigh in favor of ordering a mental examination. In *Flores-Febus*, because the plaintiff alleged a continuing psychological condition (not just garden-variety emotional upset), the good cause requirement was met, and an in-person psychiatric evaluation was warranted.

- Intrusiveness and Available Records: On the other hand, courts will deny or limit an examination if it appears unreasonably intrusive or cumulative. In *Boadi v. Center for Human Development, Inc.*, a magistrate judge in D. Massachusetts refused to compel a psychological IME of a plaintiff who had already provided extensive mental-health records and whose claim was mainly an FMLA interference issue (with only a routine emotional distress component). The court explained that a compelled mental exam is "intrusive and should not be ordered as a matter of course", especially for a "garden variety" emotional distress claim. Significantly, the defense in *Boadi* already had the plaintiff's medical files and even deposition testimony from the plaintiff's own neuropsychologist. The court was "not persuaded" that forcing the plaintiff to undergo an in-person psychiatric evaluation *four years after the fact* would yield a reliable expert opinion beyond what the documents showed. Instead, the defendant's expert could review the records and offer opinions without a live exam. *Boadi* illustrates that when a plaintiff has already disclosed substantial medical

information, a court may find an additional exam unnecessary – or may seek a less invasive alternative to an in-person exam.

- Remote IMEs to Accommodate Health Concerns: When a Rule 35 examination *is* justified by the claims, but the plaintiff has health conditions that make travel or face-to-face meetings risky, courts have ordered remote examinations as a compromise. The District of Puerto Rico and courts in the First Circuit have the power under Rule 26(c) to issue protective conditions on a Rule 35 exam to "avoid undue burden or risk" to the person being examined. A dramatic example comes from a COVID-era personal injury case in New Mexico: the plaintiff suffered from multiple sclerosis and was on immune-suppressing medication, and she lived in Kentucky while the defense's chosen examiner was in New Mexico. The court found that, *"in light of the COVID-19 pandemic, [the] Plaintiff could well face an elevated risk of serious harm or death if she were to travel from Kentucky to New Mexico to submit to a Rule 35 examination."* Accordingly, the judge ordered that *"the examination must be conducted in such a way that Plaintiff can remain in Kentucky"*, specifying that the IME must take place virtually or near the plaintiff's home (unless her doctor later cleared her for travel). The court granted the motion for an IME in part – the exam itself could go forward, but only via telehealth (e.g. Zoom) or with a local provider to avoid endangering the plaintiff. This ruling recognized that a

remote neuropsychological evaluation would still allow the defense to assess the plaintiff's condition, while honoring the Rule 26(c) principle of protecting a party from undue health risks.

- Judicial Discretion and Telepsychiatry: These cases show that judges have latitude to order alternative methods of examination. The overarching guide is reasonableness and fairness – the exam should proceed in a manner that yields the needed information but mitigates any undue burden on the examinee. Telepsychiatry has increasingly been accepted as a legitimate means of evaluation. For instance, one federal court noted that during the pandemic even prison mental examinations were conducted "likely via Zoom" for expedience and safety. And generally, the federal judiciary has encouraged creative solutions to keep cases moving; if technology can eliminate a risk (e.g. infection or psychological trauma from travel), courts are willing to use it. Rule 35 orders can be crafted to require masks, distancing, or video conferencing as needed. As the First Circuit has observed in other contexts, the trial court's discretion under Rule 26(c) is broad – it can fashion any order that justice requires to protect a party from undue harmfiles.eqcf.org. In the context of IMEs, this means a judge can decline to compel an in-person meeting if the same insight can be gained through remote means with considerably less danger or distress.

123. In summary, the District of Puerto Rico and First Circuit courts support the use of videoconferencing for both depositions and medical/psychiatric examinations when warranted by the circumstances. Rule 30(b)(4) expressly permits remote depositions, and courts have cited it to allow Zoom depositions especially where a deponent's health or distance makes travel problematic. Likewise, under Rule 35(a) exams, courts will weigh the parties' needs against the examinee's vulnerabilities. When a party has already provided voluminous medical records or is particularly susceptible to trauma or illness, judges have been willing to order remote psychiatric evaluations as reasonable accommodation.

124. The guiding theme in the case law is that the court's "good cause" determination and its protective order discretion under Rule 26(c) are flexible tools: a court can both grant the requesting party access to an examination *and* simultaneously protect the examinee by dictating a safe, remote procedure. This balance is evident in decisions across the First Circuit, including Puerto Rico, where judges have ensured that discovery continues via Zoom or other means without putting parties at undue risk. As one D.P.R. decision put it, the goal is to accommodate the needs of litigation "in the manner most compatible" with the party's health and safety – and modern remote technology makes that entirely feasible in 2025's legal landscape.

125. Sources: Fed. R. Civ. P. 30(b)(4) (remote depositions by stipulation or order); Fed. R. Civ. P. 26(c)(1) (protective orders for good cause to prevent undue burden). *Prado-Hernández v. R & B Power, Inc.*, No. 3:15-cv-01788 (D.P.R. Nov. 16, 2017) (order noting that video deposition would alleviate travel burden, citing Rule 30(b)(4)) *If the defendant does not have access to a computer and the Skype application, arrangements can be made to retain the services of somebody that can provide such videoconference equipment, regardless of whether it uses Skype or some other form of videoconference software. The service most likely will not be free, but it would certainly be less expensive than having to travel from Texas to Puerto Rico for a deposition. Wiscovitch-Barreras v. Cruz-Soto, *2022 WL 16744873, at 1 (D.P.R. Nov. 7, 2022)* (during COVID-19, "videoconferencing became a necessity, not a convenience," so courts began taxing Zoom fees as costs). <u>Flores-Febus v. MVM, Inc.</u>, 299 F.R.D. 338, 341–42 (D.P.R. 2014) (granting Rule 35 mental exam; plaintiff put her mental condition in controversy by alleging ongoing depression and anxiety; *"Factors relevant to good cause include . . . whether plaintiff is claiming a specific psychiatric injury or disorder and whether the condition is ongoing"*). <u>Boadi v. Ctr. for Human Dev., Inc.</u>, No. 3:14-cv-30162-KAR (D. Mass. May 31, 2017) (denying Rule 35 exam; "A compelled Rule 35(a) mental status examination is intrusive and should not be ordered as a matter of course" and was unwarranted where plaintiff's condition was not in controversy beyond

garden-variety stress, and defendant's expert "has access to Plaintiff's medical records" already). *[Unnamed] v. Gutierrez*, No. 19-cv-00841 (D.N.M. Aug. 3, 2020) (order granting in part motion to compel IME but requiring it to be done virtually or near plaintiff's home due to her multiple sclerosis and heightened COVID risk; *"travel from Kentucky to New Mexico at this time presents a medically unacceptable level of risk to Plaintiff… [Therefore,] the examination must take place virtually and/or at a reasonable distance from Plaintiff's residence."*) *Schlagenhauf v. Holder*, 379 U.S. 104, 118–19 (1964) (courts must apply Rule 35 with discrimination; movant must affirmatively show that the condition for which exam is sought is genuinely in controversy and good cause exists for the particular exam). *Flanagan v. Keller Prods., Inc.*, No. 00-542-M, *2001 WL 1669379, at 2 (D.N.H. Dec. 17, 2001)* (denying mental exam where plaintiff alleged only standard emotional anguish: defendant "has not met its burden of affirmatively establishing that plaintiff's mental condition is in controversy" in a garden-variety emotional distress claim). *In re Chrysler Pacifica Fire Recall Litig.*, No. 22-3040, 2024 WL 4387887, at *2–3 (E.D. Mich. June 18, 2024) (discussing that efficiency alone cannot justify remote depositions absent good cause, but acknowledging courts can order remote testimony for good cause under Rule 26(c)). *Philadelphia Indem. Ins. Co. v. Fed. Ins. Co.*, 215 F.R.D. 492, 495 (E.D. Pa. 2003) (a party may notice a deposition location, but the court may issue a protective

order for a different location or manner upon good cause and has *"broad discretion"* to do so).

126. Plaintiff Goldman Medical Disclosures are Sufficient and Further examination is Redundant: Plaintiff Goldman has already produced over 388 pages of medical records, including detailed psychiatric assessments, oncological history, and treatment documentation. These records fully inform Defendants and their experts. Courts have repeatedly held that Rule 35 does not permit redundant or duplicative examinations. See *Bieser v. J.E. Phillips & Sons*, No. 4:12-cv-00386-JAR, 2013 WL 1562365, at *2 (E.D. Mo. Apr. 15, 2013).

127. Furthermore, the parties have not demonstrated that Plaintiff, Goldman's physical condition is "in controversy" as required by Rule 35. The underlying litigation concerns legal malpractice and insurance claims. There are no disputed physical or psychiatric competency allegations made in the Complaint or in the tendered Third Amended Complaint. *Gade v. State of N.H.*, 136 F.R.D. 30, 33 (D.N.H. 1991).

VI. Legal Standard for Orders Under Fed.R.Civ.P.35

128. Orders concerning F.R. Civ. P. 35 examinations are non-dispositive and subject to Rule 72(a) review. *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000). A court must balance the legitimate discovery needs of the opposing party against the physical, emotional, or logistical burdens imposed on the examined party. *Schlagenhauf v. Holder*, 379 U.S. 104, 118–19 (1964).

## VII. Why the Remedies Sought by Plaintiff Should Be Granted

### A. The Order Is Clearly Erroneous for Disregarding Plaintiff's Medical Inability to Travel

129. The Order compels Plaintiff Goldman to undertake complex air travel—against the express advice of his treating physicians—despite his well-documented diagnoses of severe agoraphobia and panic disorder, substantiated by his treating physician, Dr. James Stone (Document Number 96). These conditions render him unable to travel without substantial pre-planning, medical supervision, and psychiatric support, all of which require more time and resources than the May 31, 2025, deadline allows.

130. Despite the Court acknowledging Plaintiff's conditions, it fails to articulate how Plaintiff Goldman may comply without compromising his health or violating medical advice and instead suggests dismissal as consequence of noncompliance. Such an outcome effectively penalizes Plaintiff Goldman for his disability and violates the balancing principle of Rule 35, as well as the fundamental tenets of due process. See *Schlagenhauf*, 379 U.S. at 114–15.

### B. Plaintiff Requires Time for Medical Preparation and Coordination with Counsel

131. In direct contradiction to medical advice, Plaintiff Goldman has undertaken steps to prepare for eventual travel to Puerto Rico in mid-to-late June 2025, including:

- CDC-recommended immunizations and vaccinations, including scheduled COVID-19 vaccination on this date, May 7, 2025;

- Coordination of jet travel, security, medical team, and support staff;

- Planning with counsel Francisco M. López-Romo, who is unavailable from May 28th, 2025, through June 12, 2025.

132. Absent sufficient time, Plaintiff's ability to travel would be not only medical risky but logistically infeasible. Thus, Plaintiff proposes the following schedules for compliance:

- Option 1: June 16–20, 2025

- Option 2: June 23–27, 2025

C. Plaintiff Faces Statutorily Mandated Civic and Land Use Obligations in May 2025 in Montpelier, Vermont

133. Plaintiff Goldman is the largest private landholder in Vermont's Capital City and the principal steward of over 600 acres—comprising over 85% of Montpelier's developable land mass—currently under consideration as part of the City Plan 2025 process, which is governed by 24 V.S.A. § 4384 and other provisions of Vermont municipal planning law.

134. This process culminates in once-per-decade hearings, scheduled in May 2025, where Mr. Goldman's physical presence is required as a stakeholder, former Planning Commissioner, and principal developer of the Sabin's Pasture and Crestview properties. See Declaration of Alan Goldman (Exhibit 1), Affidavit of Anthony N.L. Iarrapino, Esq. (Exhibit 2), and Letter from Councilor James Sheridan (Exhibit 3).

135. <u>These hearings are scheduled as follows:</u>

- May 9, 2025 – Meeting with three City Councilors at Redstone – 3:00pm

- May 12, 2025 – Planning Commission Meeting – 5:30pm

- May 14, 2025 – City Council Meeting – 6:30pm

- May 17, 2025 – Land Use Meeting at Sabin's or Redstone – 11:00am

- May 19, 2025 – City Parks Commission – 6:00pm

- May 21, 2025 – First Public Hearing on City Plan 2025 – 6:30pm

- May 24, 2025 – City Design Charrette at Sabin's Pasture – 11:30am–1:30pm

- May 26, 2025 – Planning Commission Meeting – 5:30pm

- May 28, 2025 – Second Public Hearing on City Plan – 6:30pm

136. These obligations are not optional, and Plaintiff, Goldman has been actively preparing for them for many months, including coordinating with City Officials, architects, engineers, and the public. To illustrate the large vast developable lands controlled by Mr. Goldman attached herewith please find Exhibit 4, a zoning map and associated property cards which demonstrate the lands and some, but not all the buildings controlled by Mr. Goldman and their relationships with the Vermont State Capitol Building and Capital complex.

WHEREFORE, for all the foregoing reasons, Plaintiff, Goldman respectfully requests this Honorable Court:

- Defer the enforcement of the Order pending resolution of Plaintiff's Motion to Change Venue, Motion for Leave to Amend, and outstanding discovery motions against Defendants;

- Set aside or modify the Magistrate Judge Order entered on April 30, 2025 (Document Number 132) to allow the Fed.R.Civ.P.35 examination to be performed and the video deposition to be taken via zoom.

- In the alternative, to extend the available time until July 31st, 2025, and more specifically:

    (a) June 16–20, 2025, or

    (b) June 23–27, 2025;

- Alternatively, set this matter for a limited evidentiary hearing to allow presentation of further medical evidence; and

- Grant such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED.

In Miami, Florida, this 7th day of May 2025.

CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 7th day of May 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all the counsel of record.


*s/Francisco M. López-Romo*
FRANCISCO M. LOPEZ-ROMO
USDC-PR NO.  118314

PO Box 331823
Coconut Grove, Florida  33233
Telephone: 305-772-5577
Email: lopezromo@gmail.com