IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ALAN GOLDMAN | * | CIVIL NO.: 24CV01136 |
| | * | |
|    Plaintiff | * | |
| | * | |
| V | * | |
| | * | |
| McCONNELL VALDES, LLC; | * | |
| ANTONIO A. ARIAS-LARCADA, ET AL | * | |
| | * | |
|    Defendants | * | |

**PLAINTIFF, ALAN GOLDMAN'S STATEMENT UNDER PENALTY OF PERJURY
IN SUPPORT OF MOTION IN COMPLIANCE WITH COURT'S ORDER**

**I, Alan Bram Goldman, under penalty of perjury, declare and state as follows:**

BACKGROUND AND ATTENDANCE

1. I am the Plaintiff in the above-captioned matter and submit this statement under penalty of perjury concerning the purported Rule 35 medical examination that I participated in on June 26th and 27th, 2025.

FAILURE TO CONDUCT MEDICAL EXAMINATION

2. Over the course of two days, no physical medical examination was conducted.

3. At no time were my vital signs measured—no blood pressure, pulse, height, weight, temperature, or oxygenation were recorded.

4. No medical history was taken, no questions were asked regarding my current health condition, symptoms, or any physical or emotional impairments.

5. I was seated at a boardroom-style table, and no examination equipment was present. No stethoscope, diagnostic tools, or even basic assessment protocols were used.

6. The absence of any physical evaluation stands in direct contradiction to the representations made by defense counsel Mr. Manuel San Juan to the Court, which suggested an in-person clinical/physical evaluation was indispensable. Contrary Mr. San Juan's representations, Dr. Franceschini later provided a written statement expressly confirming: **"I am willing to continue the evaluation by telemedicine."** See Dr. Franceschini's letter dated June 27, 2025, attached as Exhibit A to Document Number 155 that was submitted by Mr. San Juan. This letter directly contradicts the asserted need to compel my physical presence in Puerto Rico. As the Court can observe, Dr. Franceschini has reduced to writing that he was "willing to continue the evaluation by telemedicine," directly undermining the rationale for compelling my physical presence in Puerto Rico.

## IMPROPER INTERROGATION AND UNAUTHORIZED DEPOSITION

7. On June 27th, 2025, during the second day, the first part of the meeting seemed like a typical medical examination. Then Dr. Franceschini started asking me questions about facts, legal opinions, and strategy—stuff that's still being argued about in the case. I felt like those were questions meant for lawyers or law professors, not me. I'm not trained in the law and have no expertise in that area, so I didn't think I should be answering them, as instructed by my counsel.

8. On June 27th, 2025, during the second day, the examination devolved into a prolonged, unrecorded deposition—wholly unrelated to any legitimate medical evaluation. Dr. Franceschini posed questions about the factual underpinnings of the lawsuit, including specifics of my real estate transaction, legal relationships, and business decisions.

9. Dr. Franceschini asked me about the construction of the family home, any alleged breaches by legal counsel, and about my legal positions asserted in the complaint. I repeatedly stated that I was not qualified to opine on legal issues and was instructed by my counsel not to do so.

10. Dr. Franceschini also questioned me as to the "crux" of the lawsuit, which I answered generally as legal malpractice. When asked to elaborate, I stated that legal experts and law professors had issued formal legal opinions. The Doctor asked what type or kind of malpractice, then stating medical malpractice, to which I responded that it was legal malpractice and not medical malpractice.

11. During said evaluation, I was also asked to, and I recounted highly emotional and traumatic events surrounding the historical exclusion of Jewish families from the Dorado Beach Club, the destruction of my family's home, and betrayals I believe I suffered during legal representation.

12. During my examination, Dr. Franceschini initiated his telephone call to Mr. San Juan.

13. Mr. San Juan's voice was clearly audible though Dr. Franceschini's cellular phone. Mr. San Juan spoke to the physician in Spanish, a language I do not understand, and at times directly addressed me in English, thus creating a false and coercive environment.

14. When I told Mr. San Juan that I was refusing to answer certain legal questions being posed by Dr. Franceschini, Mr. San Juan threatened that I would be "brought back to Puerto Rico for depositions," further compounding the stress and intimidation I felt.

15. Throughout this process, my own counsel was not present—neither in person nor remotely—whereas the opposing counsel was actively engaged. This imbalance

created a fundamentally unfair and I believe unconstitutional setting perhaps violating my rights.

16. I believe Mr. San Juan used his presence via said telephone call to strategize, instruct, and direct the flow of the examination, creating a coercive environment.

### REQUEST TO RECORD AND PRIVACY ISSUES

17. I had brought a recording device and asked for permission to record the examination. Dr. Franceschini refused, stating that court authorization was required.

18. I believe it is inappropriate that I was denied the opportunity to create a record of a process where opposing counsel eventually intervened and where no physical medical examination occurred.

19. Given the dual-language communications, and the doctor's admitted coordination with Mr. San Juan, I believe that all phone records, text messages, metadata, and communication logs on Dr. Franceschini's and Mr. San Juan's cellular telephone should be discoverable.

20. The Court's order clearly allowed for a medical exam, and I did my best to take part in good faith. I answered the doctor's questions as best I could. But when the questions started turning into things about legal matters—like specific facts from the case, contract issues, legal opinions, and even malpractice—I didn't feel qualified to answer. I also got concerned because my lawyer wasn't available, while the other side's lawyer was available and involved.

21. The proceeding was not medical in nature, but a pretextual legal ambush designed to extract litigation strategy and privileged information from me without the protection of my counsel.

22. The Court's order was clear in permitting a medical examination, not a deposition conducted by the opposing expert witness's physician.

23. This abuse of process violates both Rule 35 and the foundational fairness guaranteed by the Constitution.

### FULL COMPLIANCE, AVAILABILITY, AND DEPOSITION-LIKE INTERROGATION

24. I traveled to Puerto Rico from the mainland United States with logistical support personnel, utilizing multiple scheduled flight service providers and pre-planned travel schedules.

25. I arrived in Puerto Rico on Wednesday, June 25th, 2025, and had all day on Thursday, June 26th, 2025, and all-day Friday, June 27th, 2025, reserved exclusively for the Rule 35 medical examination.

26. During the second day, I said I was willing to finish the medical exam any time in the afternoon on June 27, 2025. My lawyer's paralegal, whose name is Irmarilis Torres Falcón, who was nearby, even came to Dr. Franceschini's office to help clear up any issues and she then suggested that my evaluation should continue. I also let them know I was available any time that afternoon or the next day. But Dr. Franceschini said he had personal plans that afternoon. I repeated that I was ready and available whenever worked best, either later that day or the following day. The Doctor told me that he had to leave for a social engagement by 12 noon.

27. To ensure full compliance, I voluntarily extended my travel and made myself available for medical examination all day Saturday, June 28th, 2025, and did not return to the mainland until midday Sunday, June 29th, 2025, thereby ensuring over three full days of availability.

28. Again, on June 27th, 2025, my examination deteriorated again into improper interrogation. I was asked what I thought were highly inappropriate legal questions, including:

- Why did I sign the real estate agreement?
- What were the terms of the agreement?
- How was the price determined?
- Did my attorney advise me to close the deal?
- "What did the defendant do that violated the law?"
- "Do you believe they intended to harm you?"
- "What policy or statute do you think they broke?"

29. These questions felt more like something you'd ask during a legal deposition, not a medical exam. They were trying to get me to talk about things that are still being argued over in the case—like facts, legal plans, and what people meant in a contract—which didn't seem to have anything to do with my health or a real medical reason.

30. These questions are deposition questions, not medical inquiries. They seek to elicit testimony on disputed facts, legal strategy, and contractual intent and have no legitimate clinical relevance.

31. When I declined to answer, Dr. Franceschini proceeded to ask even more intrusive questions:

- Why did I file this lawsuit?
- What outcome was I hoping to achieve?
- Was I seeking to recover my family property?

- What damages was I seeking?

32. To me, it felt like those questions were totally over the line. They were digging into stuff I've only talked about with my lawyer, like legal plans and behind-the-scenes strategy. That's sacred space and definitely, not what I was told by my counsel that a medical or mental examination is supposed to be about under Rule 35.

33. It seemed way out of bounds, so I wanted to get advice from my lawyer, and asked the doctor to write down the questions and move on to other question(s).

34. It is my opinion that these questions invade the attorney–client privilege, probe into litigation strategy, and fall entirely outside the permissible bounds of a Rule 35 medical exam.

35. I was feeling really pressured, so I tried to get in touch with my lawyer and even to my assistant multiple times. At the same time, Mr. Manuel San Juan started talking directly to me—even though my lawyer wasn't there. Mr. Manuel San-Juan even told me straight up that he probably shouldn't be speaking to me but did it anyway. That made me even more nervous and unsure about what was going on without my lawyer present or available via phone to help.

36. I felt like I was being pressured and intimidated, and it was clear things had shifted. What was supposed to be a mental and physical examination started to feel more like a legal trap, like they were trying to question me for their case instead of checking my health like I was told. I was subjected to a coercive, intimidating environment, and it became evident that the examination had devolved into a tactical deposition—not a legitimate clinical assessment.

37. I made it clear that I needed my lawyer with me at that point—especially since Mr. Manuel San-Juan was available via phone and even said he probably shouldn't be

Alan Goldman - Statement Under Penalty of Perjury
24cv01136

talking to me but continued anyway. I just didn't feel okay answering those kinds of questions without talking to my lawyer first.

38. I continually emphasized as soon as I could get guidance on the boundaries of the interrogation I was available all day as I was told to have both days totally available for nothing but the medical exam.

39. In my opinion, any questions of mental capacity must be evaluated based on objective clinical criteria, not speculative legal hypotheticals or attempts to validate contract terms through psychiatric means.

**I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

**Dated:** 7-24-2025
[Date]

**Signature:** _____
Alan Bram Goldman