```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF PUERTO RICO
 2     -----------------------------------------------------------------

 3     ALAN GOLDMAN,                     CASE NO.: 24-CV-1136-SCC

 4          PLAINTIFF,                   HATO REY, PUERTO RICO

 5        V.                             SEPTEMBER 26, 2025

 6     MCCONNELL VALDES, LLC,            FRIDAY - 1:45 P.M.
       ANTONIO A. ARIAS-LARCADA,
 7     SOMPO INTERNATIONAL,              PAGES 1-68

 8          DEFENDANTS.
       -----------------------------------------------------------------
 9
                          EVIDENTIARY HEARING
10            BEFORE THE HON. JUDGE SILVIA L. CARRENO-COLL
           UNITED STATES DISTRICT COURT JUDGE OF PUERTO RICO
11     -----------------------------------------------------------------

12     APPEARANCES

13     ON BEHALF OF THE PLAINTIFF:

14     ATTORNEY FRANCISCO M. LOPEZ-ROMO
       431 PONCE DE LEON AVE.
15     NATIONAL PLAZA SUITE 1500
       SAN JUAN, PR  00917
16     EMAIL:  LOPEZROMO@GMAIL.COM

17     ON BEHALF OF THE DEFENDANT MCCONNELL VALDES, LLC:

18     ATTORNEY MANUEL SAN-JUAN-DEMARTINO
       MANUEL SAN JUAN LAW OFFICE
19     P.O. BOX 9023587
       SAN JUAN, PR 00902-3587
20     EMAIL: SANJUANM@MICROJURIS.COM

21     ON BEHALF OF THE DEFENDANT SOMPO INTERNATIONAL:

22     ATTORNEY FRANCISCO E. COLON-RAMIREZ
       COLON RAMIREZ LC
23     P.O. BOX 361920
       SAN JUAN, PR 00936-1920
24     EMAIL:  FECOLON@COLONRAMIREZ.COM

25
```

I N D E X

WITNESS:                                                          PAGE

### DOCTOR JOSE FRANCICHINI

DIRECT-EXAMINATION BY MR. LOPEZ-ROMO ........................4
CROSS-EXAMINATION BY MR. SAN JUAN .........................11
REDIRECT-EXAMINATION BY MR. LOPEZ-ROMO ....................15


### ALAN GOLDMAN

DIRECT-EXAMINATION BY MR. LOPEZ-ROMO ........................16
CROSS-EXAMINATION BY MR. SAN JUAN .........................23

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Please be seated.                      1:45
 3          COURTROOM DEPUTY:  Civil Case 24-1136, Alan Goldman 1:46
 4   v. McConnel Valdes, LLC for Evidentiary Hearing.          1:46
 5          On behalf of the Plaintiff is Attorney Francisco   1:46
 6   Lopez-Romo.                                               1:46
 7          On behalf of the Defendant is Attorney Manuel      1:46
 8   San-Juan-DeMartino.                                       1:46
 9          THE COURT:  Mr. San Juan, good afternoon.          1:46
10          MR. SAN-JUAN-DEMARTINO:  Good afternoon, Your Honor. 1:46
11          THE COURT:  Doctor Francichini, is he here?        1:46
12          MR. SAN-JUAN-DEMARTINO:  Yes, actually.            1:46
13          THE COURT:  Mr. Lopez-Romo, do you have any        1:46
14   preference in terms of the order because I would like to hear 1:46
15   from Mr. Goldman and I don't have a problem in terms of the 1:47
16   order.                                                    1:47
17          MR. LOPEZ-ROMO:  Your Honor, we don't have any     1:47
18   objections with the Doctor being called first as a witness. 1:47
19          THE COURT:  Mr. San Juan?                          1:47
20          MR. SAN JUAN:  It seems to me, Your Honor, that    1:47
21   because there is an Order to Show Cause in this case against 1:47
22   Mr. Goldman that the order be that he should go forward   1:47
23   because it is his burden to show cause.                   1:47
24          THE COURT:  It is his burden to show cause.  The   1:47
25   reason why this hearing was scheduled is because there are 1:47
```

| | | |
|---|---|---|
| 1 | contradictory versions of what transpired during that | 1:47 |
| 2 | examination, but I tend to agree.  It doesn't really make a | 1:47 |
| 3 | difference, so Mr. Goldman can go first. | 1:47 |
| 4 | **MR. LOPEZ-ROMO:**  I would call Doctor Francichini to | 1:47 |
| 5 | the stand as my first witness, Your Honor. | 1:47 |
| 6 | **THE COURT:**  I'm sorry? | 1:48 |
| 7 | **MR. LOPEZ-ROMO:**  I would call Doctor Francichini to | 1:47 |
| 8 | the stand. | 1:47 |
| 9 | **THE COURT:**  Oh, all right.  Let's go ahead. | 1:48 |
| 10 | Doctor, can you please approach to be placed under | 1:48 |
| 11 | oath. | 1:48 |
| 12 | **COURTROOM DEPUTY:**  Please raise your right hand. | 1:48 |
| 13 | Do you solemnly swear that all the testimony you are | 1:48 |
| 14 | about to give will be the truth, the whole truth and nothing | 1:48 |
| 15 | but the truth? | 1:48 |
| 16 | **THE WITNESS:**  I swear. | 1:48 |
| 17 | THEREUPON, | 1:48 |
| 18 | (Doctor Jose Francichini) | 1:48 |
| 19 | having been first duly sworn or affirmed, was examined and | 1:48 |
| 20 | testified as follows: | 1:48 |
| 21 | **MR. LOPEZ-ROMO:**  May I proceed, Your Honor? | 1:48 |
| 22 | **THE COURT:**  You may. | 1:48 |
| 23 | DIRECT EXAMINATION | 1:48 |
| 24 | BY MR. LOPEZ-ROMO: | 1:48 |
| 25 | Q.   Doctor, please state your name for the record. | 1:48 |

```
 1    A.    Jose Francichini.                                    1:48

 2    Q.    Doctor, have you met Mr. Alan Goldman before?        1:48

 3    A.    Yes, I met him.                                      1:48

 4    Q.    When was the date that you met him?                  1:48

 5    A.    The date, I would have to look for but it was June 26 1:48

 6    and June 27.                                               1:49

 7    Q.    What were the dates again?                           1:49

 8    A.    June 26 and June 27.                                 1:49

 9    Q.    Going to June 26, Doctor, can you tell us what happened 1:49

10    that day.                                                  1:49

11    A.    That day, I asked Mr. Goldman a lot of questions without 1:49

12    going into the details of the case.  I asked him about his 1:49

13    history of work.  I asked him about his legal status.  I   1:49

14    asked him about his actual work.  I asked him about his    1:49

15    psychiatric history.  I asked him about the treatment that he 1:49

16    received and his psychiatric history; history of           1:49

17    hospitalization.                                           1:50

18          I asked him about his medical history, who is the    1:50

19    doctor, what kind of different doctors.  He has three or four 1:50

20    doctors.  I asked him about his disease.  He told me he had 1:50

21    kidney cancer, cancer to the bladder, and cancer to the    1:50

22    prostate.  I asked him about the medication he was taking.  I 1:50

23    asked him about hospitalizations for his medical problems.  1:50

24          I asked him about his family, his parents, if they   1:50

25    had any kind of history, psychiatric history; one of them had 1:50
```

Direct - Francichini                                                          6

```
 1   Alzheimer.                                                        1:50

 2          I asked him about his childhood.  I asked him about        1:50

 3   his adolescent life.  I asked him about his adult life.  I        1:50

 4   did a mental status exam.  Basically, that was the first day.     1:51

 5   Q.   Doctor, we are noticing that you are reviewing your          1:51

 6   notes from that examination.  Was Mr. Goldman cooperative        1:51

 7   that day?                                                         1:51

 8   A.   Totally cooperative.                                         1:51

 9   Q.   Did you have any problems with his responses, any           1:51

10   difficulties in obtaining the information that you were           1:51

11   informing about?                                                  1:51

12   A.   I didn't have any problem, but he elaborates a lot.  He      1:51

13   talks a lot.  He was basically very spontaneous and telling       1:51

14   me many details.                                                  1:51

15   Q.   As far as his cooperation, would you say he was totally      1:51

16   cooperative that day?                                             1:51

17   A.   That first day, yes.                                         1:51

18   Q.   How long did that interview last?                            1:51

19   A.   Maybe about two hours.                                       1:51

20   Q.   What was the reason it was stopped after two hours?          1:51

21   A.   What was the reason what?                                    1:52

22   Q.   For stopping after two hours?                                1:52

23   A.   I typically divide it in two.  It would take me about        1:52

24   four hours, the whole thing.                                      1:52

25          THE COURT:  Excuse me, Mr. Lopez-Romo.                     1:52
```

```
1          So a typical evaluation of this kind would take      1:52

2   approximately three or four hours?                           1:52

3          THE WITNESS:  More or less.                           1:52

4          THE COURT:  And you divide it into two sessions?      1:52

5          THE WITNESS:  Into two sessions.                      1:52

6   BY MR. LOPEZ-ROMO:                                           1:52

7   Q.   Was he there on time?                                   1:52

8   A.   Yeah, I think so.                                       1:52

9   Q.   Let's go to the second day.                             1:52

10         What time did the interview start?                    1:52

11  A.   I think it was at 10:00 in the morning.  I don't        1:52

12  remember clearly, because I typically see people at 10:30 in 1:52

13  the morning.                                                 1:52

14  Q.   Was Mr. Goldman there on time?                          1:52

15  A.   Yes.                                                    1:52

16  Q.   It commenced at ten and it lasted until when?           1:52

17  A.   No, that one didn't last too long because of the issue  1:53

18  that he told me that you told me that he cannot answer my    1:53

19  questions about the case --                                  1:53

20  Q.   Okay, we'll get to that --                              1:53

21         THE COURT:  Let him finish.  Let me be able to        1:53

22  listen and follow.  Let him finish so I can follow.          1:53

23         THE WITNESS:  The second day, I go into the case and  1:53

24  I ask what we call open-ended questions.  Tell me -- I do    1:53

25  these questions to everybody.  You may have many complaints  1:53
```

```
1   about the situation.  What is your chief complaint about this    1:53
2   situation that has us today here.  He immediately told me,       1:53
3   "I'm not going to answer that because my lawyer told me I        1:53
4   should not answer that."                                         1:54
5   BY MR. LOPEZ-ROMO:                                               1:54
6   Q.  Let's go to your notes, Doctor.  Looking at your notes,      1:54
7   what was the first question you asked?                           1:54
8   A.  I already answered.  That was his chief complaint.           1:54
9   Q.  The first question you asked is -- what exactly was the      1:54
10  question?                                                        1:54
11  A.  You may have many different complaints.  What is your        1:54
12  chief complaint?                                                 1:54
13  Q.  What did he say?                                             1:54
14  A.  He said that he is not going to answer any kind of           1:54
15  questions regarding the case because his lawyer told him not     1:54
16  to answer any questions regarding the case.                      1:54
17  Q.  So that was the only question that you made to him that      1:54
18  day?                                                             1:54
19  A.  Then I tried to call you because I think that's the          1:54
20  wrong advice.  I have been doing this for over 30 years and I    1:54
21  think that's the wrong advice from your lawyer.  Let's talk      1:54
22  to your lawyer to see if that is right.  He tried to call you    1:54
23  many, many times.  No answer.  He even tried to call somebody    1:55
24  else using my phone because he could not open his phone.  He     1:55
25  also called someone that a recording came out and he said, "I    1:55
```

Direct - Francichini

| | | |
|---|---|---|
| 1 | am trying to get my lawyer.  Please try to get him to come." | 1:55 |
| 2 | We waited for a while to see if you would answer his | 1:55 |
| 3 | call.  After I realized that we were not going to get an | 1:55 |
| 4 | answer from you, I called the lawyer that hired me for this | 1:55 |
| 5 | case. | 1:55 |
| 6 | Q.    Do you remember what time you called Mr. San Juan? | 1:55 |
| 7 | A.    If it started at 10, that would be 10:30, more or less. | 1:55 |
| 8 | Then I told Mr. San Juan what was happening and I gave the | 1:56 |
| 9 | phone to Mr. Goldman and Attorney San Juan told him "you need | 1:56 |
| 10 | to answer the question" or something like that because I was | 1:56 |
| 11 | not hearing completely what he was saying. | 1:56 |
| 12 | Basically, we tried to call you again and, after you | 1:56 |
| 13 | didn't answer and he didn't want to answer any question, I | 1:56 |
| 14 | said, well, we have to stop here. | 1:56 |
| 15 | Q.    Did anyone show up at that time or any time during that | 1:56 |
| 16 | morning other than Mr. Goldman? | 1:56 |
| 17 | A.    Show what? | 1:56 |
| 18 | Q.    Did you ever meet a lady named Amarilis (Phonetic) | 1:56 |
| 19 | Torres? | 1:57 |
| 20 | A.    She was not in the room. | 1:57 |
| 21 | Q.    Did she come in the room at some point in time? | 1:57 |
| 22 | A.    when we finished, he went out to get her. | 1:57 |
| 23 | Q.    Did she come in and talked to you? | 1:57 |
| 24 | A.    No, no. | 1:57 |
| 25 | Q.    She never addressed you at all? | 1:57 |

1   A.   No, no, no.                                           1:57

2   Q.   No one mentioned that Mr. Goldman was going to be     1:57

3   available that same afternoon if you were interested in    1:57

4   continuing the examination on that day?                    1:57

5   A.   No, no.                                               1:57

6   Q.   Did you have an appointment or something else scheduled   1:57

7   that same afternoon that you needed to be someplace else?  1:57

8   A.   I am very occupied so probably I had something I have to   1:57

9   do.                                                        1:57

10  Q.   Was there an appointment in time when you said no, I can   1:57

11  not continue with the examination today; where you needed to   1:57

12  reschedule for a different day?                            1:57

13  A.   No, no, I said I have the time now.  I have the       1:57

14  two-hours now.  If we are out of those two-hours, I have many   1:57

15  other things to do.  I am the Chairman in the Department in   1:58

16  the Medical School and I have a lot of work.  I told him, you   1:58

17  know, if you don't want to answer and, at one moment, he was   1:58

18  going to answer.  He would say, okay, I'm going to, but then   1:58

19  he started to say no, no, no, I'm not going to answer.     1:58

20  Q.   Your testimony is you do not recall meeting with      1:58

21  Mr. Goldman and a lady whose name is Amarilis Torres, who   1:58

22  offered to continue the examination that morning or to bring   1:58

23  Mr. Goldman back that same afternoon --                    1:58

24  A.   No, no.  That is totally -- I am sure that didn't     1:58

25  happen.  I don't say that I don't recall.  I'm saying that   1:58

| | | |
|---|---|---|
| 1 | didn't happen. | 1:58 |
| 2 | Q.   You are saying also, in Ms. Amarilis Torres' presence, | 1:58 |
| 3 | she offered to bring Mr. Goldman back on Saturday, and you | 1:59 |
| 4 | were told that Mr. Goldman was going to remain in San Juan | 1:59 |
| 5 | and you could continue the interview that same Saturday.  Are | 1:59 |
| 6 | you saying that never happened? | 1:59 |
| 7 | A.   That never happened. | 1:59 |
| 8 | MR. LOPEZ-ROMO:  No more questions, Your Honor. | 1:59 |
| 9 | THE COURT:  Counsel. | 1:59 |
| 10 | MR. SAN JUAN:  May it please the Court. | 1:59 |
| 11 | THE COURT:  You may. | 1:59 |
| 12 | CROSS-EXAMINATION | 1:59 |
| 13 | BY MR. SAN JUAN: | 1:59 |
| 14 | Q.   Doctor Francichini, please tell the Judge in simple | 1:59 |
| 15 | terms, what is your educational and professional background. | 1:59 |
| 16 | A.   I am a doctor.  I'm a physician.  I am a neurologist, | 1:59 |
| 17 | and a psychiatrist, and I am a geriatric psychologist, and I | 1:59 |
| 18 | am Board Certified in psychiatry, neurology and geriatric | 1:59 |
| 19 | psychiatry. | 1:59 |
| 20 | I have been the Chairman of the Department of | 1:59 |
| 21 | Psychiatry for 34 years at the University de Caribe.  I have | 2:00 |
| 22 | been doing forensic psychiatry for 34 years.  I have been in | 2:00 |
| 23 | all courts in Puerto Rico.  I have been doing this, at least, | 2:00 |
| 24 | for 34 years, maybe 700 to 1,000 times total. | 2:00 |
| 25 | I consider myself an expert forensic psychiatrist. | 2:00 |

| | | |
|---|---|---|
| 1 | **MR. SAN JUAN:** Okay, Doctor. The record should | 2:00 |
| 2 | reflect the presence of Brother Counsel Francisco | 2:00 |
| 3 | Colon-Ramirez. | 2:00 |
| 4 | **THE COURT:** Good afternoon, Mr. Colon. | 2:00 |
| 5 | Go ahead, Mr. San Juan. | 2:00 |
| 6 | BY MR. SAN JUAN: | 2:01 |
| 7 | Q. Sir, regarding the incident that you described on | 2:01 |
| 8 | June 27 of this year, I want to ask you if you asked any of | 2:01 |
| 9 | the following questions of Mr. Goldman during that episode. | 2:01 |
| 10 | Did you ask him: What outcome are you hoping for in | 2:01 |
| 11 | court? | 2:01 |
| 12 | A. Totally wrong. I never asked that. | 2:01 |
| 13 | Q. Did you ask him: Did your attorney advise you to sign | 2:01 |
| 14 | the real estate contract? | 2:01 |
| 15 | A. I didn't ask that. | 2:01 |
| 16 | Q. Did you ask him: Were you tricked into selling the | 2:01 |
| 17 | house? | 2:01 |
| 18 | A. No. | 2:01 |
| 19 | Q. Did you ask him: What did the defendant do that | 2:01 |
| 20 | violated the law? | 2:01 |
| 21 | A. No. | 2:01 |
| 22 | Q. Did you ask him: Did you believe they intended to harm | 2:01 |
| 23 | you? | 2:01 |
| 24 | A. No. | 2:02 |
| 25 | Q. Did you ask him: What policy or statute do you believe | 2:02 |

1    they broke?                                                    2:02

2    A.    No.                                                      2:02

3    Q.    Did you ask:  What were the terms of the agreement?      2:02

4    A.    No.                                                      2:02

5    Q.    Did you ask:  How was the price determined?              2:02

6    A.    No.                                                      2:02

7    Q.    Did you ask:  Did your attorney advise you to close the  2:02

8    deal?                                                          2:02

9    A.    No.                                                      2:02

10   Q.    Did you ask:  Are you seeking to recover the family      2:02

11   property?                                                      2:02

12   A.    No.                                                      2:02

13   Q.    According to your testimony, the question that you asked 2:02

14   was:  What is your chief complaint.                            2:02

15   A.    Yes.                                                     2:02

16   Q.    After that, did you ask any further questions of         2:02

17   Mr. Goldman?                                                   2:02

18   A.    No because we stopped there basically.                  2:02

19   Q.    Now, you described the telephone conversation that you   2:02

20   had with me.  In what language was that telephone             2:02

21   conversation?                                                  2:02

22   A.    In Spanish.                                              2:02

23   Q.    Do you know anything -- did Mr. Goldman tell you         2:02

24   anything about his understanding or knowledge of the Spanish  2:02

25   language?                                                      2:02

| | | |
|---|---|---|
| 1 | A.   He told me that he could understand Spanish. | 2:02 |
| 2 | **THE COURT:**  However, the interview was in English. | 2:03 |
| 3 | **THE WITNESS:**  Was in English, totally in English. | 2:03 |
| 4 | BY MR. SAN JUAN: | 2:03 |
| 5 | Q.   Did he explain why he could understand Spanish? | 2:03 |
| 6 | A.   Because he had lived in Puerto Rico, basically, every | 2:03 |
| 7 | summer and he lived here.  He knew about the food in Puerto | 2:03 |
| 8 | Rico.  He loved it.  He is a talker.  I asked him about | 2:03 |
| 9 | childhood and he will give me a whole, you know, history of | 2:03 |
| 10 | when he came to Puerto Rico and he was living in the States | 2:03 |
| 11 | and he loves it here and whatever. | 2:03 |
| 12 | Q.   After that conversation that you say occurred -- | 2:03 |
| 13 | telephonic conversation with me, was there any further | 2:03 |
| 14 | attempts to continue the evaluation after that? | 2:03 |
| 15 | A.   Yes, we attempted to call again the lawyer and, you | 2:03 |
| 16 | know, we waited for a few minutes or whatever and, you know, | 2:04 |
| 17 | I told him again that I needed him to answer me my question | 2:04 |
| 18 | about his chief complaint, and he initially thought about it. | 2:04 |
| 19 | He then told me that this was a malpractice legal case, that | 2:04 |
| 20 | he had some investigation, some professors or whatever. | 2:04 |
| 21 | After that, he said no, I'm not going to answer. | 2:04 |
| 22 | So he was not answering me the chief complaint.  He | 2:04 |
| 23 | was telling me that the case is a legal malpractice because | 2:04 |
| 24 | two professors told him that. | 2:04 |
| 25 | **MR. SAN JUAN:**  Thank you, Doctor. | 2:04 |

| | | |
|---|---|---|
| 1 | Nothing further from us, Your Honor. | 2:04 |
| 2 | **THE COURT:** I have a question. | 2:05 |
| 3 | Doctor Francichini, did you receive a call from | 2:05 |
| 4 | Attorney Lopez-Romo that afternoon? | 2:05 |
| 5 | **THE WITNESS:** Not at all. | 2:05 |
| 6 | **THE COURT:** Or anyone saying let's reschedule this; | 2:05 |
| 7 | anyone on behalf of Mr. Goldman or Mr. Lopez-Romo? | 2:05 |
| 8 | **THE DEFENDANT:** No. | 2:05 |
| 9 | **THE COURT:** So that was the end of the | 2:05 |
| 10 | communication? | 2:05 |
| 11 | **THE WITNESS:** That was the end of the communication. | 2:05 |
| 12 | **THE COURT:** Go ahead. | 2:05 |
| 13 | REDIRECT EXAMINATION | 2:05 |
| 14 | BY MR. LOPEZ-ROMO: | 3:41 |
| 15 | Q. Did Mr. Goldman bring a tape recorder to the | 3:41 |
| 16 | examination? | 2:05 |
| 17 | A. He asked me and I said I don't know how to tape record | 2:05 |
| 18 | unless the Court allows us to tape record and that recording | 2:05 |
| 19 | will go to an attorney that will keep it. If there is a | 2:05 |
| 20 | conflict between what I say and he said or whatever, then we | 2:05 |
| 21 | will open it in court. | 2:05 |
| 22 | As a matter of fact, he gave me the tape recorder. | 2:05 |
| 23 | All the time he was praising me. He would say, "oh, my | 2:06 |
| 24 | brother is a psychiatrist. I know you so well." I don't | 2:06 |
| 25 | know his brother, but "everybody is talking to me so good | 2:06 |

1   about you."  You know, he was praising me all the time.  Then                2:06

2   he said, "this is a gift from me to you."  Typically, I don't                2:06

3   accept gifts from anybody, but he left it in the room.  When                 2:06

4   he left, the people who clean the room told me, "hey, this is                2:06

5   left for you."                                                               2:06

6   Q.   If that interview, or that examination would have been                  2:06

7   recorded, today we wouldn't be discussing who said what,                     2:06

8   correct?                                                                     2:06

9   A.   It would have been great to record it because that would                2:06

10  clarify very clearly what happened.                                          2:06

11          **MR. LOPEZ-ROMO:**  Very well, thank you.                           2:06

12          **THE COURT:**  Any recross?                                         2:06

13          **MR. SAN JUAN:**  Nothing further, Your Honor.                      2:07

14          **MR. LOPEZ-ROMO:**  I am calling Mr. Goldman, *por*                 2:07

15  *favor*.                                                                     2:07

16          **THE COURT:**  Yes.                                                 2:07

17          **COURTROOM DEPUTY:**  Do you solemnly swear that all                2:07

18  the testimony you are about to give will be the truth, the                   2:07

19  whole truth and nothing but the truth?                                       2:07

20          **THE WITNESS:**  I do.                                              2:07

21  THEREUPON,                                                                   2:07

22                          (ALAN GOLDMAN)                                       2:07

23  having been first duly sworn or affirmed, was examined and                   2:07

24  testified as follows:                                                        2:07

25

Direct - GOLDMAN

|  |  |  |
|---|---|---|
| 1 | DIRECT EXAMINATION | 2:07 |
| 2 | BY MR. LOPEZ-ROMO: | 2:07 |
| 3 | Q.   State your full name. | 2:07 |
| 4 | A.   Alan Goldman. | 2:07 |
| 5 | Q.   Now, sir, you heard Doctor Francichini's testimony | 2:07 |
| 6 | regarding the first day of your examination.  Can you tell us | 2:07 |
| 7 | your recollection of what happened that first day of the | 2:07 |
| 8 | examination. | 2:07 |
| 9 | A.   Yes, to the best of my memory, it was pretty open and | 2:07 |
| 10 | loose, as he described.  It was very friendly.  We talked | 2:08 |
| 11 | about his life, my life.  He was a great surfer.  He told me | 2:08 |
| 12 | he suffered at the Caribe Hilton.  I talked to him about my | 2:08 |
| 13 | earlier experiences, and I mentioned to him I don't speak any | 2:08 |
| 14 | Spanish. Never learned any Spanish in my life. | 2:08 |
| 15 | Q.   Regarding your medical history, did he inquire from you | 2:08 |
| 16 | your life's medical history? | 2:08 |
| 17 | A.   On the first day, sir, or the second? | 2:08 |
| 18 | Q.   I cannot hear you. | 2:08 |
| 19 | A.   On the second or first day? | 2:08 |
| 20 | Q.   On the first day. | 2:08 |
| 21 | A.   No. | 2:08 |
| 22 | Q.   Basically, what were the questions that he asked, if you | 2:08 |
| 23 | recall? | 2:08 |
| 24 | A.   Open-ended questions. | 2:08 |
| 25 | Q.   Regarding your medical history? | 2:08 |

| | | |
|---|---|---|
| 1 | A.   Very limited on the first day, very limited.  It was | 2:08 |
| 2 | very limited on the first day.  It was mostly just general | 2:09 |
| 3 | conversations about life and my enjoyment of coming here in | 2:09 |
| 4 | the early '60s. | 2:09 |
| 5 | Q.   Everything went fine on that first day, is that your | 2:09 |
| 6 | opinion? | 2:09 |
| 7 | A.   Yes. | 2:09 |
| 8 | Q.   What happened on the second day? | 2:09 |
| 9 | A.   The second day was very different. | 2:09 |
| 10 | Q.   What happened? | 2:09 |
| 11 | A.   Should I start from the beginning? | 2:09 |
| 12 |      Well, first of all, Amarilis picked me up and | 2:09 |
| 13 | brought me over. | 2:09 |
| 14 | Q.   Who is Amarilis? | 2:09 |
| 15 | A.   Amarilis, I believe, is your paralegal, sir.  She kindly | 2:09 |
| 16 | helped me because I don't know my way around Puerto Rico.  I | 2:09 |
| 17 | did not want to be late. | 2:09 |
| 18 | Q.   Okay, so what happened? | 2:09 |
| 19 | A.   Well, we actually had her go to the site the day before | 2:09 |
| 20 | to make sure she knew how to get there.  She picked me up and | 2:09 |
| 21 | brought me to the Doctor's office.  There was like a | 2:09 |
| 22 | conference room.  We waited in there until the Doctor came | 2:09 |
| 23 | in. | 2:10 |
| 24 | Q.   The second day, what happened? | 2:10 |
| 25 | A.   Very similar.  She brought me over.  She brought me | 2:10 |

1    inside.  We waited and got there a little early and we waited    2:10

2    for the Doctor to come.    2:10

3    Q.    Can you recall what questions, if any were asked of you    2:10

4    that second day by Doctor Francichini.    2:10

5    A.    Yes, I can.    2:10

6    Q.    Can you tell the Court.    2:10

7    A.    Yes, I will try to recount most of them.  He asked me    2:10

8    some simple questions then started to go out of the scope of    2:10

9    a medical exam.  He asked me about the basis of the case.    2:10

10   Q.    Did you answer?    2:10

11   A.    I did.    2:10

12   Q.    What was his question and what was your response?    2:10

13   A.    He asked me the basis of the case.  I said malpractice.    2:10

14         Then he said "medical malpractice" and I said, "no,    2:10

15   sir.  It's legal malpractice."    2:10

16   Q.    Okay.    2:10

17   A.    He asked me how I arrived at that.  I was getting a    2:10

18   little nervous.    2:10

19   Q.    What did you answer?    2:10

20   A.    Could you repeat the question please.    2:10

21   Q.    What was your answer to that second question?    2:10

22   A.    Could you please repeat the second question.    2:11

23   Q.    What was your answer to the second question?    2:11

24   A.    Please repeat the second question.    2:11

25   Q.    You mentioned that it was a legal malpractice case.    2:11

```
 1   Then what did he ask you?                                    2:11

 2   A.   He asked me how we arrived at that.                     2:11

 3   Q.   What was your answer?                                   2:11

 4   A.   I told him that we had hired two law professors and they 2:11

 5   came up with a legal argument why legal malpractice had      2:11

 6   happened.                                                    2:11

 7   Q.   Was there any other questions from the Doctor?          2:11

 8   A.   Yes.                                                    2:11

 9   Q.   What did he ask you?                                    2:11

10   A.   He asked me about the values.  How did I get there.     2:11

11   Q.   What values are you talking about?                      2:11

12   A.   The house, the lawsuit, the value today.                2:11

13   Q.   Did you answer that question?                           2:11

14   A.   I did.                                                  2:11

15   Q.   Do you remember what you answered?                      2:11

16   A.   Yes.  I told him that we had hired a CPA and appraisers 2:11

17   to try to come up with the values.                           2:11

18   Q.   Any other questions that day?                           2:11

19   A.   There were other questions, yes.                        2:11

20   Q.   Do you remember what those questions were?              2:11

21   A.   Very similar.  We kept going down that path.  One of the 2:12

22   things that he did not mention is Amarilis was there to      2:12

23   assist me, and I was allowed to use Mr. San Juan's phone to  2:12

24   reach out to folks.  I could not reach anybody.             2:12

25   Q.   Before we get to you trying to reach out, were there any 2:12
```

Direct - GOLDMAN

1    other questions that were made to you by Doctor Francichini    2:12

2    during that second evaluation?    2:12

3    A.   Yes.  So we talked more about the case.  We talked a    2:12

4    little bit as he described.  It was not just the first    2:12

5    question.  We went into pretty much detail about the basis of    2:12

6    the case and I felt it was going beyond the scope of the    2:12

7    medical examination although I'm not a pro.    2:12

8    Q.   What did you do as a result of you feeling that it was    2:12

9    going out of the scope of the examination; did you do    2:12

10   anything?    2:12

11   A.   Yes, sir.    2:12

12   Q.   What did you do?    2:12

13   A.   I first tried to use the phone I had borrowed and I    2:12

14   could not remember the code to login.  I asked him if I may    2:13

15   use his phone to try to reach out to you, sir.  And to try to    2:13

16   reach out to our team to get some answers where the scope    2:13

17   begins and where I am getting into private parts of our case.    2:13

18   Q.   What happened?    2:13

19   A.   He was very kind.  He let me use the phone several    2:13

20   times.  I tried dialing different people.  Then, when I    2:13

21   couldn't get through, I asked him may I please leave the room    2:13

22   and look for Amarilis.  He said yes.  When she wasn't there,    2:13

23   I went back in and politely said, sir, could I go out in the    2:13

24   parking lost to look for Amarilis.  He said yes.  I went out    2:13

25   there and, unfortunately, I could not find her.  She had    2:13

| | | |
|---|---|---|
| 1 | moved the car.  I came back in and I said to the Doctor, | 2:13 |
| 2 | please, I am trying to cooperate as best I can.  Would you | 2:13 |
| 3 | please be willing to write down any questions that you feel I | 2:13 |
| 4 | should answer, once I gain some council.  I don't want to get | 2:13 |
| 5 | into privileged areas, that I would be happy to do it, and I | 2:13 |
| 6 | would be pleased to proceed because I am here the next couple | 2:14 |
| 7 | of days. | 2:14 |
| 8 | Q.   And what had happened next? | 2:14 |
| 9 | A.   I tried to call you again, sir, other people couldn't | 2:14 |
| 10 | reach people.  Mr. San Juan spoke with the Doctor.  No, I do | 2:14 |
| 11 | not speak any Spanish other than basic currency. | 2:14 |
| 12 | Unfortunately, my mom made me take French. | 2:14 |
| 13 |         So I asked again, may I please go look for her.  He | 2:14 |
| 14 | would open and close his yellow pad and keep writing.  I said | 2:14 |
| 15 | let's try again.  I would love to cooperate and finish this | 2:14 |
| 16 | and I couldn't find her.  I did it at least two times.  Each | 2:14 |
| 17 | time I asked his permission, may I please leave the building | 2:14 |
| 18 | to go look for her. | 2:14 |
| 19 | Q.   Did she ever appear? | 2:14 |
| 20 | A.   She did. | 2:14 |
| 21 | Q.   When? | 2:14 |
| 22 | A.   I am guesstimating maybe 11:30 or so. | 2:14 |
| 23 | Q.   How did she appear?  Did you go out and get her or did | 2:14 |
| 24 | she walk in? | 2:15 |
| 25 | A.   No, she eventually came in.  I did not find her outside. | 2:15 |

| | | |
|---|---|---|
| 1 | Q.   What happened when she came in? | 2:15 |
| 2 | A.   She came in and she was most cooperative.  The Doctor | 2:15 |
| 3 | said there wasn't enough time to finish the two hours.  We | 2:15 |
| 4 | asked can I please come this afternoon at any time.  I would | 2:15 |
| 5 | love to cooperate.  Amarilis agreed to take me.  I suggested | 2:15 |
| 6 | I am here for the weekend. If you would like to see me on | 2:15 |
| 7 | Saturday, I am completely available.  I asked Amarilis if she | 2:15 |
| 8 | would be able to take me on Saturday and she said yes. | 2:15 |
| 9 | Q.   What is Doctor Francichini's response then, if any? | 2:15 |
| 10 | A.   At the time, he was pretty loose.  He said maybe we | 2:15 |
| 11 | could finish by TeleDoc.  He said he could not meet in the | 2:15 |
| 12 | afternoon.  He was dressed in playing sports clothes.  He | 2:15 |
| 13 | told me he was a great athlete and that he had social | 2:15 |
| 14 | engagements and he could not meet with us either Friday | 2:16 |
| 15 | afternoon or Saturday. | 2:16 |
| 16 | Q.   Did you tell Doctor Francichini that you were refusing | 2:16 |
| 17 | to provide answers because your lawyer had instructed you not | 2:16 |
| 18 | to answer any question regarding the damages of your case? | 2:16 |
| 19 | A.   No. | 2:16 |
| 20 | **MR. LOPEZ-ROMO:**  I don't have any other questions, | 2:16 |
| 21 | Your Honor. | 2:16 |
| 22 | **THE COURT:**  Cross? | 2:16 |
| 23 | CROSS-EXAMINATION | 2:16 |
| 24 | BY MR. SAN JUAN: | 2:16 |
| 25 | Q.   Good afternoon, Mr. Goldman. | 2:16 |

Cross - Goldman

| | | |
|---|---|---|
| 1 | A.   Good afternoon, sir. | 2:16 |
| 2 | Q.   I have a few questions for you.  If the question calls | 2:16 |
| 3 | for a yes or no answer, if you don't mind, answer yes or no. | 2:16 |
| 4 | If you think that you can't answer yes or no, please let me | 2:16 |
| 5 | know, okay. | 2:16 |
| 6 | A.   Thank you, sir. | 2:16 |
| 7 | Q.   Mr. Goldman, to your knowledge, have you ever suffered | 2:16 |
| 8 | any psychological malady, or disorder, or condition, or | 2:16 |
| 9 | illness? | 2:16 |
| 10 | A.   Yes. | 2:17 |
| 11 | Q.   You have been diagnosed with. | 2:17 |
| 12 | A.   For many illnesses. | 2:17 |
| 13 | Q.   What are those illnesses? | 2:17 |
| 14 | A.   How far back should we start? | 2:17 |
| 15 | Q.   Well, as far as you want.  You tell me. | 2:17 |
| 16 | A.   You tell me, sir. I am following your lead. | 2:17 |
| 17 | Q.   I am asking you the question. | 2:17 |
| 18 |        What psychological illnesses have you been diagnosed | 2:17 |
| 19 | with over the course of your life? | 2:17 |
| 20 | A.   Psychological? | 2:17 |
| 21 | Q.   Yes. | 2:17 |
| 22 | A.   We were talking more about the present at certain | 2:17 |
| 23 | points; I have had some difficulties.  We talked about that I | 2:17 |
| 24 | was a cancer patient at one point and I am suffering from | 2:17 |
| 25 | changes as an older man. | 2:17 |

```
 1   Q.   Can you give me a diagnosis of some condition you have     2:17

 2   been diagnosed with, a psychological condition, like, for       2:17

 3   example, borderline personality disorder, or depression,        2:17

 4   anxiety, something like that.                                   2:17

 5   A.   I have suffered from some depression, yes.                 2:18

 6   Q.   Anything else?                                             2:18

 7   A.   Loneliness.  I have a lot of medical problems.  I have     2:18

 8   been heavily isolated now for five years.  Finally, I am just   2:18

 9   getting out.                                                    2:18

10   Q.   Currently, you feel that you are suffering from some       2:18

11   psychological condition today?                                  2:18

12   A.   No.                                                        2:18

13   Q.   No.  Today you don't feel that you have any sort of        2:18

14   psychological condition that is affecting you?                  2:18

15   A.   At this point, no, sir.                                    2:18

16   Q.   Okay.  Have you ever used any mind-altering controlled     2:18

17   substances like marijuana?                                      2:18

18   A.   I have.                                                    2:18

19   Q.   In fact, you smoke marijuana regularly?                    2:18

20   A.   I don't smoke it regularly.  It is legal in Vermont and    2:18

21   it is prescribed.                                               2:18

22   Q.   Prescribed by your Doctor?                                 2:18

23   A.   Yes.                                                       2:18

24   Q.   For what condition?                                        2:18

25   A.   PTSD.                                                      2:19
```

Cross - Goldman

| | | |
|---|---|---|
| 1 | Q.    Is your PTSD better?  Are you still suffering from it? | 2:19 |
| 2 | A.    I'm not a doctor, but I don't think it ever goes away | 2:19 |
| 3 | and I manage it. | 2:19 |
| 4 | Q.    Are you on any medication today, sir, as we speak? | 2:19 |
| 5 | A.    Ambien to sleep, but nothing during the day. | 2:19 |
| 6 | Q.    According to your medical records, you have complained | 2:19 |
| 7 | to your doctor about memory impairment and visual impairment; | 2:19 |
| 8 | is that right? | 2:19 |
| 9 | A.    Correct. | 2:19 |
| 10 | Q.    July 14th of last year, I looked in your medical records | 2:19 |
| 11 | and there is a physician who saw you for memory impairment; | 2:19 |
| 12 | do you remember that? | 2:19 |
| 13 | A.    I do, sir. | 2:19 |
| 14 | Q.    It was attributed to age-related ischemic changes, does | 2:19 |
| 15 | that make sense? | 2:19 |
| 16 | A.    I can't do the doctor's part but I believe you. | 2:19 |
| 17 | Q.    In other words, what the doctor is saying is that your | 2:19 |
| 18 | memory problems is related to your age? | 2:19 |
| 19 | A.    Yes. | 2:20 |
| 20 | Q.    How old are you? | 2:20 |
| 21 | A.    I am almost 68.  Hopefully, I will get there. | 2:20 |
| 22 | Q.    Good.  Now, in your complaint that you filed against Mr. | 2:20 |
| 23 | Antonio Arias and McConnell Valdes, you say you have been | 2:20 |
| 24 | diagnosed with transient ischemic attacks; do you remember | 2:20 |
| 25 | that? | 2:20 |

```
 1   A.    Yes, sir.                                              2:20

 2   Q.    Do you know what those are?                            2:20

 3   A.    I do, sir.                                             2:20

 4   Q.    When were you diagnosed; if you remember?             2:20

 5   A.    I am doing my best because you know my medical records 2:20

 6   are pretty extensive.                                       2:20

 7   Q.    Yes.                                                   2:20

 8   A.    Probably '94, '95.  I couldn't give you an exact date 2:20

 9   when we really came up with an exact diagnosis.             2:20

10   Q.    Who was the doctor that diagnosed you with transient  2:20

11   ischemic attacks?                                           2:20

12   A.    Both my GP and Doctor Flynn at CVH, Doctor Waheed, who 2:20

13   is the head of Neurology at UVM, and some other analysts who 2:21

14   process this kind of information.                           2:21

15         Oh, excuse me, I left out one doctor; my oncologist,  2:21

16   Doctor Ospina, David Ospina.                                2:21

17   Q.    Your testimony is that all of those doctors, at some  2:21

18   point, have diagnosed you with TIA, transient ischemic      2:21

19   attacks?                                                    2:21

20   A.    Yes.                                                   2:21

21   Q.    You also told the Court in your filings that you suffer 2:21

22   from agoraphobia?                                           2:21

23   A.    I can, yes.                                            2:21

24   Q.    That's the fear of being in wide-open places?         2:21

25   A.    Much more of the crowded spaces because I am so        2:21
```

```
 1   immune-compromised.                                           2:21

 2   Q.   Of crowds?                                               2:21

 3   A.   Yes, if you are not protected, wearing masks, I am       2:21

 4   immune-compromised.                                           2:22

 5   Q.   In your complaint, you say that due to the medical and   2:22

 6   psychological conditions that you were suffering in October   2:22

 7   of 2020, that you were not exactly of sound mind.  You were   2:22

 8   suffering from some degree of diminished mental capacity when 2:22

 9   you signed a contract to sell your property here in Dorado,   2:22

10   Puerto Rico; is that correct?                                 2:22

11   A.   No.                                                      2:22

12   Q.   That is not correct.  Let me show you your complaint.    2:22

13   Did you read the complaint before it was filed in this case?  2:22

14   A.   Yes, sir.                                                2:22

15   Q.   Do you recall stating in your complaint, and I quote,    2:22

16   Mr. Goldman's various medical conditions were alluded to in   2:22

17   the proposed pre-trial order but no reference was made to Mr. 2:22

18   Goldman's possible declined mental abilities or to his        2:22

19   possible mental state of confusion.                           2:23

20        I am quoting from docket 27 at paragraph 30.  Do you     2:23

21   recall that?                                                  2:23

22   A.   You have to refresh me, sir, by showing it to me.        2:23

23   Q.   All right, I will.                                       2:23

24        MR. SAN JUAN:  I was quoting from docket number 29.      2:24

25   This is the corrected verified Second Amended Complaint; do   2:24
```

```
 1    you see that?                                                    2:24

 2            THE WITNESS:  Yes, I do.                                 2:24

 3    BY MR. SAN JUAN:                                                 2:24

 4    Q.    Referring now to paragraph 30, at the bottom of the       2:24

 5    page, can you read that?                                        2:24

 6    A.    Excuse me.                                                 2:24

 7    Q.    Can you read that?                                         2:24

 8    A.    Personally or out loud?                                    2:24

 9    Q.    Personally, can you read it?                               2:24

10    A.    Should I read it out loud?                                 2:24

11    Q.    No.  Does that refresh your memory?                       2:24

12    A.    If I read it.  Can I read it?                              2:24

13    Q.    Sure.                                                      2:24

14    A.    Can I please see the preceding paragraph so I understand  2:24

15    its context.                                                    2:24

16    Q.    Of course.                                                 2:24

17            Going back to go paragraph 30, what you alleged in      2:24

18    your complaint is that your various medical conditions were     2:25

19    alluded to in the proposed Pre-trial Order but no reference     2:25

20    was made to your possible declined mental abilities and         2:25

21    possible mental state of confusion.  That's what you allege     2:25

22    there, right?                                                   2:25

23    A.    I'm not sure unless I see it in the complete context.     2:25

24    Q.    All right.  Let me show you another paragraph from this   2:25

25    same document.                                                  2:25
```

| | | |
|---|---|---|
| 1 | I am showing you paragraph 50.  It states; during | 2:26 |
| 2 | the relevant time Mr. Goldman mentioned to his lawyers from | 2:26 |
| 3 | McConnell Valdes, including Mr. Arias, who is the Defendant | 2:26 |
| 4 | in this case, my client, that Mr. Goldman may be suffering | 2:26 |
| 5 | some diminished mental capacity due to Mr. Goldman's repeated | 2:26 |
| 6 | transient ischemic attacks, seizures, and health conditions | 2:26 |
| 7 | that may have caused Mr. Goldman to be confused, disoriented | 2:26 |
| 8 | and with limited cognizant capability."  Is that what it says | 2:26 |
| 9 | at paragraph 50? | 2:26 |
| 10 | A.   Yes. | 2:26 |
| 11 | Q.   do you reiterate that today, before this Court, under | 2:26 |
| 12 | oath? | 2:26 |
| 13 | A.   Let me just read it very carefully. | 2:26 |
| 14 | It's correct, yes. | 2:26 |
| 15 | Q.   If you look at the next paragraph, 51, it says, | 2:26 |
| 16 | "Although McConnell Valdes' lawyers, including Mr. Arias, | 2:26 |
| 17 | were informed that Mr. Goldman's ability to make some | 2:27 |
| 18 | intelligent decisions may actually be compromised, McConnell | 2:27 |
| 19 | Valdes' lawyer, Mr. Arias, did not make any efforts to obtain | 2:27 |
| 20 | or to review Mr. Goldman's medical records including any of | 2:27 |
| 21 | Mr. Goldman's psychiatric evaluations," correct? | 2:27 |
| 22 | A.   Correct, he did not ask me. | 2:27 |
| 23 | Q.   So am I to understand then, what you were alleging is | 2:27 |
| 24 | malpractice on the part of Mr. Arias and McConnell Valdes is | 2:27 |
| 25 | that, among other things, they knew that you had suffered | 2:27 |

```
 1  from some diminished mental capacity and, yet, they didn't      2:27

 2  use that to defend you in a case that was brought against you    2:27

 3  by the buyer of the property; is that correct?                   2:27

 4  A.   Correct, yes.                                               2:27

 5  Q.   Mr. Arias denies that he committed malpractice in this      2:27

 6  case, right?                                                     2:28

 7  A.   I can't tell you, sir.                                      2:28

 8  Q.   You don't know.  But you would accept that the question     2:28

 9  of when you signed the contract to sell your property whether    2:28

10  you had some diminished mental capacity, you will accept that    2:28

11  is an issue in this case?                                        2:28

12  A.   No.                                                         2:28

13  Q.   Don't you allege that, because you were suffering from      2:28

14  some diminished mental capacity, that Mr. Arias should have      2:28

15  raised that as a defense in order to invalidate the contract     2:28

16  that you signed?  Isn't that what you said in your complaint?    2:28

17  A.   Could I see that part again please to refresh it.           2:28

18  Q.   All right, I will show it to you again, sir.                2:28

19  A.   I apologize, sir.                                           2:28

20  Q.   Paragraph 51:  Although McConnell Valdes' lawyers,          2:28

21  including Mr. Arias, were informed that Mr. Goldman's ability    2:28

22  to make some intelligent decisions may actually be              2:28

23  compromised, McConnell Valdes' lawyer, Mr. Arias, did not        2:28

24  make any efforts to obtain or to review Mr. Goldman's medical    2:28

25  records including any of Mr. Goldman's psychiatric               2:28
```

| | | |
|---|---|---|
| 1 | evaluations. | 2:28 |
| 2 | A.    That is correct. | 2:29 |
| 3 | Q.    What you're saying is that this was legal malpractice on | 2:29 |
| 4 | the part of Mr. Arias, right? | 2:29 |
| 5 | A.    I'm not saying that, sir.  This is the law professors. | 2:29 |
| 6 | Q.    This is the complaint that was filed by you, correct? | 2:29 |
| 7 | A.    It's filed by my attorney, sir, yes. | 2:29 |
| 8 | Q.    On your behalf? | 2:29 |
| 9 | A.    Yes, sir. | 2:29 |
| 10 | Q.    All right.  Now, let me just see if I understand. | 2:29 |
| 11 | Are you telling the Court, under oath today, that | 2:29 |
| 12 | when you signed the contract to sell your property, in | 2:29 |
| 13 | October of 2020, that you were not of sound mind?  You were | 2:29 |
| 14 | suffering from diminished capacity at the time? | 2:29 |
| 15 | A.    I was suffering from something but I didn't know what it | 2:30 |
| 16 | was. | 2:30 |
| 17 | Q.    Okay, but it was some sort of diminished capacity, | 2:30 |
| 18 | right? | 2:30 |
| 19 | A.    I believe so.  I got COVID bad. I believe I had COVID | 2:30 |
| 20 | fog. | 2:30 |
| 21 | Q.    So you would agree with me that your mental status, at | 2:30 |
| 22 | the time in October 2020, when you signed this contract, that | 2:30 |
| 23 | is something that is at issue in this case; would you agree? | 2:30 |
| 24 | A.    Agreed. | 2:30 |
| 25 | Q.    Okay, good. | 2:30 |

 1            Now, you also claimed in your complaint that, as a

 2    result of Mr. Arias and McConnell Valdés' legal malpractice,

 3    you suffered some damages, right?

 4    A.    Yes.

 5    Q.    Among those damages, you claim that you suffered mental

 6    and emotional suffering, correct?

 7    A.    Yes.

 8    Q.    You would agree with me that this allegation of mental

 9    and emotional suffering as a result of the actions or

10    omissions of Mr. Arias and McConnell Valdés is also at issue

11    in the case?

12    A.    Yes.

13    Q.    Okay, good.

14            Now, in this case, the Court issued an order to show

15    cause and in response to that, you and your attorney

16    submitted a motion in compliance with an order.  Do you

17    remember that?

18    A.    You would have to refresh me with a document, sir.

19    Q.    All right, I will do so.

20            This is document number 159 entitled *Plaintiff's*

21    *Motion in Compliance with Order and Response in Opposition to*

22    *Defendant's Informative Motion.*  Let me just show you page 6

23    of that document.

24            Do you recognize the signature at the bottom of the

25    page?

| | | |
|---|---|---|
| 1 | A.   Yes, sir. | 2:31 |
| 2 | Q.   Is that your signature? | 2:31 |
| 3 | A.   Yes, sir. | 2:32 |
| 4 | Q.   You are affirming, by your signature, under penalty of | 2:32 |
| 5 | perjury, that the foregoing is true and correct to the best | 2:32 |
| 6 | of your knowledge and belief, correct? | 2:32 |
| 7 | A.   Yes, to the best of my knowledge. | 2:32 |
| 8 | Q.   And you did so on July 24 of 2025, correct? | 2:32 |
| 9 | A.   Yes, sir. | 2:32 |
| 10 | Q.   That is the sixth page of this seven-page document. | 2:32 |
| 11 |       In this document, you stated, and I am referring | 2:32 |
| 12 | here to paragraph 9 of docket number 159, "In this case, | 2:32 |
| 13 | Plaintiff avers that Doctor Francichini asked questions such | 2:32 |
| 14 | as" and then there are a number of questions.  Do you recall | 2:32 |
| 15 | that? | 2:32 |
| 16 | A.   Yes, sir. | 2:32 |
| 17 | Q.   First question:  What outcome are you hoping for in | 2:32 |
| 18 | court.  Do you see that on the screen? | 2:32 |
| 19 | A.   Yes, sir. | 2:32 |
| 20 | Q.   Your testimony, under oath, is that it Doctor | 2:32 |
| 21 | Francichini asked you that question during the examination. | 2:33 |
| 22 | A.   Yes, sir. | 2:33 |
| 23 | Q.   Turning to the next page, we have nine other questions. | 2:33 |
| 24 | I won't go through them all but is it your testimony here, | 2:33 |
| 25 | under oath, that Doctor Francichini asked you each of these | 2:33 |

```
1   nine questions that are on the screen?                2:33
2   A.   May I please refresh myself?                     2:33
3   Q.   Yes, of course.                                  2:33
4   A.   If there are some that are different, can we approach  2:33
5   them?                                                 2:33
6   Q.   Sure.  But let me ask you about the first one.   2:33
7        Did your attorney advise you to sign the real estate  2:33
8   contract.  Did Doctor Francichini ask you that question  2:33
9   during the interview that he had with you?            2:33
10  A.   Yes.                                             2:33
11  Q.   What was your response?                          2:33
12  A.   Yes.  Oh, oh, I apologize.  To sign the real estate  2:33
13  contract of 2020, sir?  I'm not sure which date you are  2:33
14  talking about, sir.                                   2:33
15  Q.   Well, you're saying, in this motion that you signed,  2:33
16  you're saying in this case Plaintiff avers that Doctor  2:34
17  Francichini asked questions such as, and one of those  2:34
18  questions is; did your attorney advise you to sign the real  2:34
19  estate contract?  You said yes, he asked you that question.  2:34
20  I asked you what was your response.                   2:34
21  A.   I believe I told him no because I was not represented by  2:34
22  counsel in 2020.                                      2:34
23  Q.   So this is not one of those questions that you refused  2:34
24  to answer because your attorney had given you advice that you  2:34
25  shouldn't answer?                                     2:34
```

```
 1   A.    It's a compound question but could you repeat it again,      2:34

 2   please.                                                             2:34

 3   Q.    The question:  Did your attorney advise you to sign the       2:34

 4   real estate contract which you say that Doctor Francichini          2:34

 5   asked you during the interview; this is not one of the             2:34

 6   questions that you refused to answer?                               2:34

 7   A.    I did not refuse because I did not have counsel.              2:34

 8   Q.    Next question:  Were you tricked into selling the house?     2:34

 9   A.    Yes.                                                          2:35

10   Q.    Did Doctor Francichini ask you that question?                2:35

11   A.    Yes, to the best of my knowledge.                            2:35

12   Q.    Did you say to him that you weren't going to answer that     2:35

13   question?                                                          2:35

14   A.    No.                                                          2:35

15   Q.    You answered that question?                                  2:35

16   A.    Yes.                                                          2:35

17   Q.    Were you tricked into selling the house?                     2:35

18   A.    Yes.                                                          2:35

19   Q.    Okay, who tricked you?                                       2:35

20   A.    A lot of people.                                             2:35

21   Q.    Who tricked you into selling the house?                      2:35

22   A.    A lot of people.                                             2:35

23   Q.    Who?  Tell me.                                               2:35

24   A.    There were many brokers involved.  It was COVID.  I was      2:35

25   getting a lot of misinformation.                                   2:35
```

```
 1   Q.    Can you give me a name?                            2:35

 2   A.    Anna Dumar. (phonetic.)                            2:35

 3   Q.    Who is that?                                       2:35

 4   A.    She is a broker.                                   2:35

 5   Q.    She is one of the people you say tricked you into  2:35

 6   selling your house?                                      2:35

 7   A.    She played a role, yes.                            2:35

 8   Q.    Did you tell that to Doctor Francichini when he asked 2:35

 9   you that question?                                       2:35

10   A.    I honestly can't remember.                         2:35

11   Q.    You don't remember?                                2:35

12   A.    Not that specific part.                            2:35

13   Q.    Let's go to the next question.                     2:36

14         What did the Defendant do that violated the law?   2:36

15   Did Doctor Francichini ask you that question?            2:36

16   A.    Yes.                                               2:36

17   Q.    Did you answer it?                                 2:36

18   A.    I did.                                             2:36

19   Q.    What did you tell him?                             2:36

20   A.    I told him malpractice.  He asked me, medical      2:36

21   malpractice?  I said no, legal malpractice.             2:36

22   Q.    So you answered that question, what did the Defendant do 2:36

23   to violate the law?                                      2:36

24   A.    Yes, sir.                                          2:36

25   Q.    Next question:  Do you believe they intended to harm 2:36
```

1    you?                                                      2:36

2    A.    Yes.                                                2:36

3    Q.    Did Doctor Francichini ask you at that question?    2:36

4    A.    Yes.                                                2:36

5    Q.    What did you answer?                                2:36

6    A.    I answered that I felt at some point Mr. Arias did not    2:36

7    have my best interest at heart.  I was quite concerned and    2:36

8    that I had to go seek additional counsel because of some of    2:36

9    the events that had taken place that troubled me deeply.    2:36

10   Q.    So this was not one of those questions that you refused    2:36

11   to answer because it was calling for something that you felt    2:36

12   you weren't qualified to answer?                         2:37

13   A.    I didn't say that, sir.  Could you repeat.         2:37

14   Q.    The question:  do you believe they intended to harm you    2:37

15   was not one of those that you refused to answer during the    2:37

16   interview?                                               2:37

17   A.    No.                                                2:37

18   Q.    Next question:  What policy or statute do you think they    2:37

19   broke?  Was that a question that Doctor Francichini asked you    2:37

20   during the interview?                                    2:37

21   A.    Yes.                                               2:37

22   Q.    Did you answer it?                                 2:37

23   A.    I answered to the best of my ability that I am not an    2:37

24   attorney but that we had hired two law professors who are    2:37

25   supposed to be experts at what they do and they are the ones    2:37

| | | |
|---|---|---|
| 1 | that found the legal malpractice that Mr. Arias had missed. | 2:37 |
| 2 | Q.   So you didn't object to this particular question? | 2:37 |
| 3 | A.   No, sir. | 2:37 |
| 4 | Q.   Next question:  What were the terms of the agreement? | 2:37 |
| 5 | Did Doctor Francichini ask you that question during the | 2:37 |
| 6 | interview? | 2:37 |
| 7 | A.   Yes. | 2:37 |
| 8 | Q.   Did you answer? | 2:37 |
| 9 | A.   I did. | 2:37 |
| 10 | Q.   What did you tell him? | 2:37 |
| 11 | A.   I just want to make sure.  Are we referencing the 2020 | 2:37 |
| 12 | or are we talking about other agreements that came forward? | 2:37 |
| 13 | Q.   I don't know.  You were the one at the interview.  I | 2:38 |
| 14 | wasn't there, Mr. Goldman. | 2:38 |
| 15 | You tell the Court, what was your answer when Doctor | 2:38 |
| 16 | Francichini asked you:  What were the terms of your | 2:38 |
| 17 | agreement? | 2:38 |
| 18 | A.   Yes. | 2:38 |
| 19 | Q.   What was your answer? | 2:38 |
| 20 | A.   I tried to answer within -- I didn't want to step out of | 2:38 |
| 21 | the scope of the medical exam.  I tried to answer some of the | 2:38 |
| 22 | questions to be cooperative. | 2:38 |
| 23 | Q.   So what was your answer? | 2:38 |
| 24 | A.   Are we on what terms of the agreement, sir? | 2:38 |
| 25 | Q.   Yes. | 2:38 |

```
 1   A.   He asked me about the basis of the case, how he got      2:38

 2   there.                                                        2:38

 3   Q.   You have testified here that you answered this question. 2:38

 4   How did you answer that?                                      2:38

 5   A.   To the best of my memory, I believe I answered exactly   2:38

 6   the facts of what happened.                                   2:38

 7   Q.   Which is what?                                           2:38

 8   A.   That the terms of the agreement, from 2020, were not     2:38

 9   great and that, when Mr. Arias was going through this case,   2:39

10   he missed a very important from the Judge that was not        2:39

11   disclosed to us, and I was very concerned that witnesses kept 2:39

12   going on and off of the list of witnesses that were very,     2:39

13   very concerning.                                              2:39

14   Q.   So this is what you told Doctor Francichini in answer to 2:39

15   this question?                                                2:39

16   A.   Sir, I am doing the best I can.  I can't give you the    2:39

17   exact but I do my best to answer every question you ask me.   2:39

18   Q.   That's all we can ask is the best you can.               2:39

19        The next question:  How was the price determined?       2:39

20   Is that a question that Doctor Francichini asked you in the   2:39

21   interview?                                                    2:39

22   A.   Absolutely.                                              2:39

23   Q.   Did you answer?                                          2:39

24   A.   Yes, sir.                                                2:39

25   Q.   What did you answer?                                     2:39
```

```
1    A.    He was asking about the price of where we are today.  I            2:39

2    told him that we had hired two law professors who showed us              2:39

3    the legal malpractice, that we hired a CPA and an appraiser              2:39

4    to come up with these answers.                                          2:40

5    Q.    All right.  Next question is:  Did my attorney advise me           2:40

6    to close the deal?                                                      2:40

7          Did Doctor Francichini ask you that question on the               2:40

8    examination of the 27th?                                                2:40

9    A.    I believe so, yes.                                                2:40

10   Q.    Do you remember if you answered that question?                    2:40

11   A.    I do.                                                             2:40

12   Q.    What did you answer?                                              2:40

13   A.    I told him that I was being pressured to close the deal.          2:40

14   I felt extremely pressured.                                            2:40

15   Q.    Pressured by whom?                                                2:40

16   A.    Arias and his assistant Jose.                                     2:40

17   Q.    Pressured by Arias and his assistant Jose to close which          2:40

18   deal?                                                                  2:40

19   A.    To accept moving forward with this offer of 3.15, stop           2:40

20   the lawsuit, and I'm going to lose the case otherwise.                 2:40

21   Q.    Well, in fact, you ended up being paid more than 3.15,           2:40

22   right, after you switched lawyers, right?                              2:40

23   A.    That's correct.                                                  2:40

24   Q.    You ended up getting paid $650,000 more than you had             2:40

25   originally agreed to in the contract you signed?                       2:41
```

1    A.    Yes, sir.    2:41

2    Q.    The next question is:  Was I seeking to recover my    2:41

3    family's property?    2:41

4          Do you recall that question being asked by Doctor    2:41

5    Francichini?    2:41

6    A.    I do, sir.    2:41

7    Q.    Did you answer?    2:41

8    A.    Yes.    2:41

9    Q.    What did you answer?    2:41

10   A.    I would love to recover my family's property.    2:41

11   Q.    Okay, but you sold it?    2:41

12   A.    I goofed up.  I got very bad advice in my opinion.    2:41

13   Q.    You sold it because you got bad advice, okay.    2:41

14   A.    Yes, we had not closed.    2:41

15   Q.    Alright.  In the next paragraph you say:  These are    2:41

16   classic deposition questions not medically relevant inquiries    2:41

17   and their use during the Rule 35 examination constitutes    2:41

18   procedural abuse.    2:41

19          Is that what you said in this motion?    2:41

20   A.    Yes.    2:42

21   Q.    Okay.  I take it then that all of these questions that    2:42

22   you say Doctor Francichini asked you, you answered them,    2:42

23   right?    2:42

24   A.    The strong majority.    2:42

25   Q.    So what was the question that Doctor Francichini asked    2:42

1   you that you refused to answer.  Were there any questions?        2:42

2   A.    There were a few.  He would have to speak to that.          2:42

3   Q.    You don't remember?                                         2:42

4   A.    I am doing the best I can.  I offered numerous times to     2:42

5   please write whatever question down you would like to go back     2:42

6   to and please continue to take advantage of the Court's time.     2:42

7   Q.    The questions that you refused to answer were none of       2:42

8   these that I have read to you.  All of these you have             2:42

9   answered as you have told us here under oath.                     2:42

10  A.    Yes, to the best of my knowledge.                           2:42

11  Q.    Then was some other question that resulted in the           2:42

12  stopping of the interview; can you remember what that             2:42

13  question was or questions?                                        2:42

14  A.    Well, we were going out of, in my opinion, the scope of     2:42

15  the medical exam --                                               2:42

16  Q.    I understand, I understand.                                 2:42

17        Just tell me what was the question that you thought         2:42

18  was outside of the scope of the medical exam that caused you      2:43

19  to say, "I can't answer the question."                           2:43

20  A.    It wasn't one.  It was I felt led.  It was going through    2:43

21  the basis of the case.  I regret now that I probably said         2:43

22  things that I shouldn't have said, that the legal professors      2:43

23  were given us their opinion and everybody else.                   2:43

24  Q.    Let me see if I understand.  You decided that you           2:43

25  weren't going to answer anymore questions when Doctor             2:43

1    Francichini started asking you about the basis of the case;          2:43

2    is that correct?                                                     2:43

3    A.    That is not correct, no.                                       2:43

4    Q.    Who decided not to ask anymore questions?                      2:43

5    A.    Not anymore questions, a few questions that I asked the        2:43

6    Doctor to please continue so that we could make use of his          2:43

7    time.                                                                2:43

8    Q.    To be clear, there were a number of questions that            2:43

9    Doctor Francichini asked you that you said, "I am not going         2:43

10   to answer;" is that right?                                          2:43

11   A.    I did not say that.  I said I need to gain council so I        2:43

12   don't lose privilege.  I need to, under Rule 26(c), I have          2:43

13   the right under the examination of Rule 35 to gain counsel.         2:44

14   Q.    Okay, but your lawyer was not answering the phone.            2:44

15   A.    I can't speak for him, sir.                                    2:44

16   Q.    You tried to call him?                                         2:44

17   A.    I did, sir.                                                    2:44

18   Q.    But you can't remember right now which were the question      2:44

19   or questions that you told Doctor Francichini, "I can't             2:44

20   answer that until I speak to my counsel."  You can't remember       2:44

21   those questions right now?                                          2:44

22   A.    I can't remember them exactly.  Again, I felt led and         2:44

23   they seem to be cumulative.  But I would ask the Doctor to          2:44

24   come up with other questions.                                       2:44

25         **THE COURT:**  I need clarification regarding what you       2:44

1    mean when you said, "I felt led and they seem to be                2:44

2    cumulative."  Can you tell me what you mean by that.                2:44

3          THE WITNESS:  Sorry, Judge.                                    2:44

4          The questions he kept asking me seemed to be out of           2:44

5    the scope of a medical exam.  I am no expert in anything but        2:44

6    I have had so many medical exams because of my health, I am         2:45

7    pretty use to what those questions were or are.  We keep seem       2:45

8    to be going down the basis of the case.  I was getting very         2:45

9    concerned, Your Honor, that he seemed to be diving into the         2:45

10   essence of the case and I don't have that capability.               2:45

11         THE COURT:  What do you mean you felt led.  Led to a          2:45

12   path that you were not feeling comfortable with?                    2:45

13         THE WITNESS:  Yes, I felt led that these were adding          2:45

14   up to many questions that didn't seem to be within the scope        2:45

15   of the medical exam.                                                2:45

16         THE COURT:  It has been your testimony this                    2:45

17   afternoon that you had answered most of the questions posed         2:45

18   to you.  When did this medical interview end?                       2:45

19         THE WITNESS:  Yes, ma'am.  Doctor Francichini was            2:45

20   frustrated with me and he closed his yellow bad.  I said may        2:45

21   I please go seek Ms. Amarilis' advice.  She wasn't in the           2:46

22   hallway.  I wouldn't leave the building without asking the          2:46

23   gentleman, so I asked, may I please go to the parking lot to        2:46

24   look for her.  So we did this two or three times at least.          2:46

25   So we're starting and stopping, starting and stopping.              2:46

1          **THE COURT:**  You just said that you were looking for          2:46

2    her for advice?  Is that what you just said?                           2:46

3          **THE WITNESS:**  Yes, she is my assistant counsel to           2:46

4    guide me so I don't cross the line of privilege.                       2:46

5          **THE COURT:**  But she is not a lawyer.                         2:46

6          **THE WITNESS:**  She was presented to me as my                 2:46

7    paralegal.                                                             2:46

8          **THE COURT:**  Alright.  Go ahead, Mr. San Juan.               2:46

9    BY MR. SAN JUAN:                                                       2:46

10   Q.   Mr. Goldman, at some point after you tried                        2:46

11   unsuccessfully to reach your attorney and you called several           2:47

12   times; is that right?                                                  2:47

13   A.   I did.  I believe I used your phone.                              2:47

14   Q.   You didn't use my phone, no.                                      2:47

15   A.   Excuse me, it was the Doctor's phone but you were the             2:47

16   one that called back.                                                  2:47

17   Q.   At some point, Doctor Francichini spoke to me, right?            2:47

18   A.   Yes.                                                              2:47

19   Q.   You knew because of the context that was going on, that          2:47

20   he was calling me to advise me that you were not answering             2:47

21   questions until you spoke to your lawyer.                              2:47

22   A.   Sir, I do not speak Spanish. I just said that.  I do not          2:47

23   know what was said.                                                    2:47

24   Q.   Let me ask you, you live in Puerto Rico as a young man,           2:47

25   as a child?                                                            2:47

Cross - Goldman

| | | |
|---|---|---|
| 1 | A.   No, sir.  You've got that wrong too.  I have never lived | 2:47 |
| 2 | here in the summer in my life, ever. | 2:47 |
| 3 | Q.   Alright.  This house that your parents had, did you ever | 2:47 |
| 4 | spend some time there? | 2:47 |
| 5 | A.   Vacations, yes. | 2:47 |
| 6 | Q.   This is when you were a young man? | 2:47 |
| 7 | A.   No, it was at a much older age.  I lived in San Juan | 2:47 |
| 8 | before that. | 2:47 |
| 9 | Q.   You were able to isolate yourself from any | 2:48 |
| 10 | Spanish-speaking people by living over in Dorado because you | 2:48 |
| 11 | never learned Spanish; is that your testimony? | 2:48 |
| 12 | A.   I learned the basics.  My mother forced me to take | 2:48 |
| 13 | French.  (Speaks in the French language.) | 2:48 |
| 14 | Q.   The interview stopped, and he was frustrated, as you | 2:48 |
| 15 | say.  You knew why he was calling me.  He was calling me to | 2:48 |
| 16 | tell me that you were refusing to answer his questions, isn't | 2:48 |
| 17 | that right? | 2:48 |
| 18 | A.   I can't tell you what you spoke in Spanish, sir.  I have | 2:48 |
| 19 | no idea. | 2:48 |
| 20 | Q.   Alright, that's your answer? | 2:48 |
| 21 | A.   I don't speak Spanish. | 2:48 |
| 22 | Q.   The context was not important to you? | 2:48 |
| 23 | A.   I assume the context but I had no idea what you folks | 2:48 |
| 24 | were saying. | 2:48 |
| 25 | Q.   You assumed the context. | 2:48 |

1          Let me ask you this:  In your motion, you added a

2    statement to your motion and I'm going to show it to you

3    here.  This is paragraph 16 of your motion and you signed it,

4    right.  I showed you your signature.  Do I need to show you

5    your signature again?

6    A.    I trust you.  Let me read it.

7    Q.    You wrote, "I believe, Mr. San Juan used his presence

8    via said telephone call to strategize, instruct and direct

9    the flow of the examination creating a coercive environment,"

10   is that what you said?

11   A.    Yes.

12   Q.    How could you possibly know that if you don't know

13   Spanish, sir?

14   A.    Because he refused to meet with us after 12 p.m.  We

15   were there for the whole day.  He was wearing sports attire.

16   He told me he had social engagements.

17   Q.    How does that have anything to do with me?

18   A.    I don't know, sir, but we offered --

19   Q.    This thing that you say at paragraph 16, that's purely

20   speculation on your part.  I'm asking you this because you

21   used my name.  "I believe Mr. San Juan used his presence via

22   telephone call to strategize, instruct, and direct the flow

23   of the examination creating a coercive environment."  That's

24   the statement that you wrote?

25   A.    That's the feeling I had, sir.

2:48
2:48
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:49
2:50
2:50
2:50
2:50
2:50
2:50
2:50
2:50

```
1   Q.   That's the feeling you had, but it's not based on any          2:50

2   knowledge of Spanish you had?                                       2:50

3   A.   Not Spanish, but based on the fact that he was                 2:50

4   completely uncooperative to meet any time on Friday afternoon       2:50

5   or Saturday, and I came here for four days.                         2:50

6   Q.   Understood.  You knew now that the exam was supposed to        2:50

7   take place over the course of two days, right?                      2:50

8   A.   Right, sir.                                                    2:50

9   Q.   And you can't blame him for having other appointments          2:50

10  and other responsibilities, can you?                                2:50

11  A.   I can't blame him, sir, but he did not say that's what         2:51

12  it was.                                                             2:51

13  Q.   The answer is you can't blame him.                             2:51

14  A.   I can't blame him for having social engagements, that's        2:51

15  correct.  But I would have asked him to make time while I am        2:51

16  here, sir, because I'm here.                                        2:51

17           THE COURT:  Let me ask.                                    2:51

18           Mr. Goldman, at which point after the conclusion of        2:51

19  the exchange or evaluation that Doctor Francichini was doing        2:51

20  of you did you get to talk to your attorney?                        2:51

21  A.   Excuse me.                                                     2:51

22  Q.   At which point in the afternoon did you talk to your           2:51

23  attorney?                                                           2:51

24  A.   When I first got into Amarilis' car.                           2:51

25  Q.   Basically as soon as you left the area where you had           2:51
```

```
 1   been evaluated?                                           2:51

 2   A.   Yes, ma'am.                                          2:51

 3   Q.   To the best of your knowledge, did your lawyer reach out  2:51

 4   to Doctor Francichini or Mr. San Juan to state your ability   2:51

 5   for the afternoon or for the following day?               2:51

 6   A.   I can't speak to that.  It was Amarilis' who made that  2:51

 7   offer.                                                    2:51

 8   BY MR. SAN JUAN:                                          2:52

 9   Q.   On that subject of Amarilis -- now, in this case, you  2:52

10   wanted to call Amarilis Falcon-Torres as a witness, right?  2:52

11   A.   Yes.                                                 2:52

12   Q.   And you submitted a motion requesting that this hearing  2:52

13   be postponed so that she could attend, right?             2:52

14   A.   My attorney did, yes.                                2:52

15   Q.   That's at docket number 171 for the record.          2:52

16   A.   I will take your word, sir.                          2:52

17   Q.   In that motion, did your attorney say that she received  2:52

18   a call from Mr. Lopez-Romo around noon asking where she was  2:53

19   because you were looking for her?                         2:53

20   A.   Say that one more time.                              2:53

21   Q.   Did you say in that motion, through your lawyer, that  2:53

22   Amarilis Falcon was in her car when she received a call   2:53

23   saying from Mr. Lopez-Romo saying, "where are you,        2:53

24   Mr. Goldman's looking for you?"                           2:53

25   A.   I wasn't first party but I believe that's what happened,  2:53
```

```
 1   sir, yes.                                              2:53

 2   Q.   You had spoken to your lawyer before Amarilis showed up,   2:53

 3   isn't that right?                                      2:53

 4   A.   Are you talking about during the 10 to 12, sir?   2:53

 5   Q.   Yes.                                              2:53

 6   A.   No, I did not.                                    2:53

 7   Q.   How was it that your lawyer knew that you were looking   2:53

 8   for Amarilis?                                          2:53

 9   A.   I left messages using the Doctor's phone.  I have his   2:53

10   number memorized, (305)772-5577.                      2:53

11   Q.   Okay, alright.  So your testimony is that your lawyer   2:53

12   must have heard one of those messages and then figured out   2:54

13   that you were looking for Amarilis?                    2:54

14   A.   I believe so, sir.                                2:54

15   Q.   Okay.  You say, once again in your motion in compliance,   2:54

16   and again, this was signed by you.  You say that you told me,   2:54

17   Mr. San Juan, that you were refusing to answer certain legal   2:54

18   questions being posed by Doctor Francichini and that I   2:54

19   threatened you that you would be brought back to Puerto Rico   2:54

20   for depositions, further compounding the stress and   2:54

21   intimidation.  Is that what you said there in paragraph 13   2:54

22   and 14?                                               2:54

23   A.   That's correct.                                   2:54

24   Q.   I threatened you that you would be brought back for   2:54

25   depositions?                                          2:55
```

Cross - Goldman

```
1   A.   I don't know if it was a threat, but you said we'd have      2:55

2   to continue, this was not going to end.  I don't know how you     2:55

3   interpret it, sir.                                                 2:55

4   Q.   You don't know if it's a threat, but you said here that      2:55

5   I threatened you.                                                  2:55

6   A.   I take it back then, that it's a threat, sir.  I'm doing     2:55

7   my best.                                                           2:55

8   Q.   This is depositions.  We weren't talking about               2:55

9   depositions.  We were talking about the examination.             2:55

10          Is it possible you were confused there between            2:55

11  deposition and the examination that Doctor Francichini was        2:55

12  conducting?                                                        2:55

13  A.   I can tell you it felt like a medical exam under scope       2:55

14  that became a deposition, sir, yes.                               2:55

15  Q.   It wasn't a deposition.  It was an examination, right?       2:55

16  A.   That's why I was so concerned that it went out of the        2:55

17  scope.                                                             2:55

18  Q.   Alright.  Now, in paragraph 15 you say, throughout this      2:55

19  process, my own counsel was not present, neither in person        2:55

20  nor remotely, whereas the opposing counsel was actively           2:55

21  engaged.                                                          2:55

22          Are you saying I was actively engaged?  Is that what      2:55

23  you are saying there?                                             2:55

24  A.   Yes, sir.                                                    2:55

25  Q.   But the truth is I wasn't present at any part of that        2:55
```

```
1   examination.  I wasn't physically present.  I wasn't present    2:56

2   over the phone; isn't that right?                               2:56

3   A.   You were present over the phone.                           2:56

4   Q.   At that point, the examination had ended, had it not?      2:56

5   A.   No, it had not.  I used the Doctor's phone but no, you      2:56

6   had talked to him --                                            2:56

7   Q.   Was there any question that was asked of you after that    2:56

8   conversation?                                                   2:56

9   A.   I believe so.  Then I did go out again to try to find      2:56

10  Amarilis.                                                       2:56

11  Q.   What was the question that was asked of you?               2:56

12  A.   I couldn't tell.  There were so many questions.  But it    2:56

13  had not ended abruptly like that.                              2:56

14  Q.   Okay.  You say here; This imbalance -- paragraph 15 --     2:56

15  created a fundamentally unfair and I believe unconstitutional   2:56

16  setting perhaps violating my rights.                           2:56

17       This is what you said, right?                             2:56

18  A.   Yes, sir.                                                  2:56

19  Q.   You have some training in constitutional law I take it?   2:56

20  A.   I do not.                                                  2:57

21  Q.   Yet, you believe that this setting was unconstitutional?  2:57

22  A.   I asked counsel afterwards to create this.  I am not an   2:57

23  attorney.                                                       2:57

24  Q.   This was created by your counsel?                          2:57

25  A.   This was created by our team.                              2:57
```

1    Q.   By your team, which includes you?                    2:57

2    A.   Yes, sir.                                            2:57

3    Q.   And you signed it?                                   2:57

4    A.   I did, sir.                                          2:57

5    Q.   You signed saying that you believe this was an       2:57

6    unconstitutional setting.                                 2:57

7    A.   Yes, sir.                                            2:57

8    Q.   And you have no training in constitutional law, so how  2:57

9    could you possibly tell if this was an unconstitutional   2:57

10   setting?                                                  2:57

11   A.   Because I was advised that.                          2:57

12   Q.   oh, okay, alright.                                   2:57

13   A.   Just as I did not know what Rule 3526(c) until I was 2:57

14   advised.                                                  2:57

15   Q.   You know, interestingly enough, this document 159, there  2:57

16   was another document that was filed, and I am referring to  2:57

17   document 168 on the docket, which is titled, *Plaintiff Alan*  2:58

18   *Goldman's Motion to Correct Scrivener's Error and to Request*  2:58

19   *Permission to File Corrected Plaintiff's Motion in Compliant*  2:58

20   *with Order.*  Are you familiar with that?                2:58

21   A.   Yes.                                                 2:58

22   Q.   So in this document that was filed according to the  2:58

23   docket, on September 9 of 2025.  You submitted a corrected  2:58

24   version of the docket number 159 that I have shown you    2:58

25   before; is that right?                                    2:58

```
 1   A.   I can't tell, sir, until you show it to me.        2:58

 2   Q.   Take a look.  This is docket number 159 and then --  2:58

 3   A.   I couldn't read it, sir.                           2:58

 4   Q.   Okay, I'll show it to you again.  This is docket number  2:59

 5   159, Plaintiff's Motion in Compliance with order.      2:59

 6   A.   I can't see what it says.                          2:59

 7   Q.   You filed docket 168-1 which is Plaintiff's corrected  2:59

 8   motion in compliance with order, document 168, and response  2:59

 9   in opposition to Defendant's informative motion.       2:59

10        This is the corrected version, right?             2:59

11   A.   I can't tell until I see it, sir.                  2:59

12   Q.   I am showing it to you.  This is the original one,  2:59

13   document 159, right?                                    2:59

14   A.   Could I please see the content?                    2:59

15   Q.   And the other one is docket 168.                   2:59

16   A.   I believe so, sir, but I would like to see what it says  3:00

17   please.                                                 3:00

18   Q.   Well, I will tell you that the difference between docket  3:00

19   159 and docket 168-1 have to do with this paragraph number 7,  3:00

20   Favale v. Roman Catholic Diocese of Bridgeport; are you  3:00

21   familiar with that?                                     3:00

22   A.   No, sir.                                           3:00

23   Q.   In this document 168, that whole paragraph was     3:00

24   eliminated, as you can see.  Do you have an explanation for  3:00

25   that?                                                   3:00
```

| | | |
|---|---|---|
| 1 | A.   I followed whatever counsel -- I don't at this moment. I | 3:00 |
| 2 | would have to -- | 3:00 |
| 3 | Q.   You don't have an explanation? | 3:00 |
| 4 | A.   I am trying. | 3:00 |
| 5 | Q.   Did you use AI to create this document? | 3:00 |
| 6 | A.   I did not, sir. | 3:00 |
| 7 | Q.   Actually, the signature that you submitted with docket | 3:00 |
| 8 | 168-1 was the same signature that you had submitted, the | 3:01 |
| 9 | bottom of the page, that's the same page that you signed back | 3:01 |
| 10 | in July 24 of 2025, right? | 3:01 |
| 11 | A.   I can't tell, sir. | 3:01 |
| 12 | Q.   Is that your signature? | 3:01 |
| 13 | A.   It is.  It looks like my messy handwriting. | 3:01 |
| 14 | Q.   Alright.  I am almost done.  I know that I am taking a | 3:01 |
| 15 | long time with the Court and I know that the Court has other | 3:01 |
| 16 | things. | 3:01 |
| 17 |      Your mental condition, in October of 2020, is at | 3:01 |
| 18 | issue in this case, you admit that? | 3:01 |
| 19 | A.   Yes, sir. | 3:01 |
| 20 | Q.   The question of your damages, the emotional and mental | 3:01 |
| 21 | damages that you claim were caused by my client, that's also | 3:01 |
| 22 | at issue in this case; isn't that right? | 3:02 |
| 23 | A.   Yes, sir. | 3:02 |
| 24 |      **MR. SAN JUAN:**  That's all I have.  Thank you very | 3:02 |
| 25 | much, sir. | 3:02 |

| | | |
|---|---|---|
| 1 | **THE COURT:** Thank you, you are excused from the | 3:02 |
| 2 | stand. | 3:02 |
| 3 | Any brief argument? | 3:02 |
| 4 | **MR. SAN JUAN:** Yes, Your Honor, I am happy to go | 3:02 |
| 5 | first very briefly, Your Honor. | 3:02 |
| 6 | You are faced here with a Plaintiff who has | 3:02 |
| 7 | repeatedly demonstrated a lack of cooperation with the | 3:02 |
| 8 | process that we are going through and this is something that | 3:02 |
| 9 | was found -- | 3:02 |
| 10 | **THE COURT:** Counsel, please sit down while he | 3:02 |
| 11 | argues. Thank you. | 3:03 |
| 12 | **MR. SAN JUAN:** This was a finding by Magistrate | 3:03 |
| 13 | Judge Marshall Morgan when he granted a Motion to Compel. | 3:03 |
| 14 | For over a year, Mr. Goldman has resisted the order of the | 3:03 |
| 15 | Court for him to come and submit to this evaluation by Doctor | 3:03 |
| 16 | Francichini. He just candidly admitted that there is no | 3:03 |
| 17 | question that his mental status is at issue in this case. | 3:03 |
| 18 | His mental status is at issue because he claims | 3:03 |
| 19 | that, in October of 2020, he was suffering from diminished | 3:03 |
| 20 | capacity and that he was tricked into signing the contract to | 3:03 |
| 21 | sell his property. He didn't show up for the closing. He | 3:03 |
| 22 | was later then sued and that's where Mr. Arias came in to | 3:03 |
| 23 | represent him. He said Mr. Arias committed legal malpractice | 3:03 |
| 24 | because he didn't raise the question of whether he had | 3:04 |
| 25 | diminished capacity in 2020. | 3:04 |

| 1 | Clearly, the question of his mental capacity, in | 3:04 |

1     Clearly, the question of his mental capacity, in     3:04

2     October of 2020, is at issue, and clearly Doctor Francichini     3:04

3     should be able to ask questions about that and probe that     3:04

4     particular question during the examination that he is     3:04

5     conducting.     3:04

6          To say I am not going to answer questions about the     3:04

7     case and to do so supposedly under advice of counsel, but not     3:04

8     because counsel was there telling him don't answer the     3:04

9     question.  It was his own decision here to decide not to     3:04

10    answer any further questions.     3:04

11         As you saw, he is not a lawyer but he has some     3:04

12    pretty strong ideas about things such as constitutional law     3:04

13    and such as a scope of a medical examination.  That's not for     3:04

14    Mr. Goldman to decide, Your Honor, and that's the pattern     3:05

15    that you have seen in this case over, and over, and over     3:05

16    again, where he has taken upon himself to resist the orders     3:05

17    of this Court, to resist this process, and simply put, to     3:05

18    torpedo all of the efforts that we have made to defend     3:05

19    ourselves in this case, the Defendants.     3:05

20         This is only the latest example of numerous other     3:05

21    incidents that are clear on the record.  In this particular     3:05

22    example, you've heard his testimony.  It's very hard to     3:05

23    follow.  It's very hard to understand.  On the one hand, he     3:05

24    has filed an order to show cause, a motion in compliance     3:05

25    where he says Doctor Francichini asked me all of these     3:05

```
1   questions that were improper and, sure, I refused to answer    3:05
2   them.  Here in court, he says he answered them.  It is very    3:05
3   confusing.                                                      3:05
4        THE COURT:  Can you explain to me, if you                 3:06
5   understood, and then I will ask Mr. Lopez-Romo the same        3:06
6   question.                                                      3:06
7        If Mr. Goldman answered all of these questions and        3:06
8   the examination continued, why the need for the calls to Mr.   3:06
9   Lopez-Romo and to you?  I don't have a clear timeline in       3:06
10  terms of what happened.                                        3:06
11       What I do know is that the paralegal left with            3:06
12  Mr. Goldman at some point near noontime and that there was     3:06
13  never a contact on the part of Mr. Goldman or Mr. Lopez-Romo   3:06
14  to try to reschedule.  At this point in the proceedings, they  3:06
15  had been warned and they were aware that the Court was very    3:06
16  concerned and had given more than one admonishment in terms    3:06
17  of their duty to submit themselves to discovery.               3:06
18       Do you have any further information in terms of the       3:07
19  timeline or any efforts or contacts?  Did Mr. Lopez-Romo call  3:07
20  you that evening and say, listen, we need to finish.  The      3:07
21  Court isn't happy?  Did anything else happen that I don't      3:07
22  know about?                                                    3:07
23       MR. SAN JUAN:  Not that day, Judge.  It wasn't until      3:07
24  the following week that Mr. Lopez-Romo and I had an email      3:07
25  exchange which is actually part of the record.                 3:07
```

| 1 | **THE COURT:** Can you point to me the docket number | 3:07 |
| 2 | please. | 3:07 |
| 3 | **MR. SAN JUAN:** I can try. I can try. It was before | 3:07 |
| 4 | document number 159 because document 159 contains some of | 3:07 |
| 5 | those email exchanges. | 3:07 |
| 6 | **THE COURT:** Before the Motion in Compliance? | 3:08 |
| 7 | **MR. SAN JUAN:** It's between June 27 when this | 3:08 |
| 8 | happened and the Motion in Compliance filed July 24, I | 3:08 |
| 9 | believe. | 3:08 |
| 10 | **THE COURT:** 155 you filed an informative motion | 3:08 |
| 11 | stating that the psychiatric evaluation was not completed. | 3:08 |
| 12 | **MR. SAN JUAN:** Right, right. | 3:08 |
| 13 | **THE COURT:** That one has an attachment. | 3:08 |
| 14 | **MR. SAN JUAN:** And I did say to the Court that I was | 3:08 |
| 15 | going to try to see if there was some way we could work this | 3:08 |
| 16 | out. I do recall that, once I spoke to Doctor Francichini, | 3:08 |
| 17 | and you see that there are two very sharply contrasting | 3:08 |
| 18 | versions of what occurred, when Doctor Francichini just asked | 3:08 |
| 19 | him, what is your principal complaint. And he said, I can't | 3:08 |
| 20 | answer that. I'm not going to answer any questions. | 3:08 |
| 21 | So given that sharp contrast, I tried to suggest to | 3:08 |
| 22 | Brother Counsel that this needed to continue. Brother | 3:09 |
| 23 | Counsel indicated to me that Doctor Francichini was exceeding | 3:09 |
| 24 | the scope of what was appropriate. He then filed a Motion in | 3:09 |
| 25 | Compliance, and you will see the arguments there to that | 3:09 |

| | |
|---|---|
| 1 | effect. | 3:09 |
| 2 | But to answer your question, if we go by what | 3:09 |
| 3 | Mr. Goldman is saying, what actually transpired, your guess | 3:09 |
| 4 | is as good as mine because it's not clear.  That suggests to | 3:09 |
| 5 | me that Mr. Goldman is not being entirely candid with the | 3:09 |
| 6 | Court during his testimony. | 3:09 |
| 7 | Reiterating, Your Honor, this is not the first time. | 3:09 |
| 8 | This is a pattern of conduct that has gone on for more than a | 3:09 |
| 9 | year.  Here we are, Judge, it's been a year and we have | 3:09 |
| 10 | progressed not at all.  It seems to me that the Court needs | 3:09 |
| 11 | to take action in that respect.  Thank you. | 3:09 |
| 12 | **THE COURT:**  Okay, Mr. Lopez-Romo. | 3:09 |
| 13 | **MR. LOPEZ-ROMO:**  There were several email | 3:10 |
| 14 | transmissions confirming telephone conversation that I had | 3:10 |
| 15 | with Mr. San Juan.  I do not recall exactly the dates, but I | 3:10 |
| 16 | can tell Your Honor that the tenor of Mr. San Juan's | 3:10 |
| 17 | communications, including when he first notified the Court | 3:10 |
| 18 | that the examination had not been completed, was that we were | 3:10 |
| 19 | going work it out. | 3:10 |
| 20 | As a matter of fact, I exchanged a very interesting | 3:10 |
| 21 | article which I sent to counsel the link about the parameters | 3:10 |
| 22 | of Rule 35 Mental Examination that has lists of cases in | 3:10 |
| 23 | favor and against each of our positions including that in | 3:10 |
| 24 | some jurisdictions -- | 3:10 |
| 25 | **THE COURT:**  This is not an issue of different | 3:10 |

| 1 | positions.  This is an issue that -- Mr. San Juan notifies | 3:10 |
| 2 | the Court that the examination was not concluded because the | 3:11 |
| 3 | Plaintiff failed or declined to answer questions. | 3:11 |
| 4 | Now, I issued the order to show cause and you filed | 3:11 |
| 5 | this motion in compliance, and in this motion, you list a | 3:11 |
| 6 | number of questions that you label as legal questions or | 3:11 |
| 7 | questions of a legal nature, and you explain to me, or to the | 3:11 |
| 8 | Court, that your client refused to answer the questions | 3:11 |
| 9 | because they were legal until nature. | 3:11 |
| 10 | Now today, I have your client here.  Plaintiff is | 3:11 |
| 11 | testifying, under oath, and he tells me that he answered | 3:11 |
| 12 | these questions, that some of them were answered, some of | 3:11 |
| 13 | them were not, and then we have Doctor Francichini's | 3:11 |
| 14 | testimony that these questions were not posed. | 3:11 |
| 15 | This is not a matter of different legal standards. | 3:12 |
| 16 | This is a matter of understanding or believing if your client | 3:12 |
| 17 | did or did not answer these questions or if these questions | 3:12 |
| 18 | were posed to him. | 3:12 |
| 19 | **MR. LOPEZ-ROMO:**  Your Honor, I am looking at my | 3:12 |
| 20 | motion, paragraph 28, 29, 30, it's not until 31 in which we | 3:12 |
| 21 | had made the mention for the first time that there were | 3:12 |
| 22 | questions that Mr. Goldman had refused to answer. | 3:12 |
| 23 | **THE COURT:**  Are you talking about docket 159 | 3:12 |
| 24 | Plaintiff's Motion in Compliance, the list of questions | 3:12 |
| 25 | beginning page 2 at paragraph 9. | 3:12 |

| | | |
|---|---|---|
| 1 | **MR. LOPEZ-ROMO:**  I am looking at page 6, Your Honor. | 3:12 |
| 2 | **THE COURT:**  But these questions were, again, posed | 3:12 |
| 3 | to your client and he said, yes, that he did answer those | 3:12 |
| 4 | questions.  But Doctor Francichini said, "I never asked those | 3:13 |
| 5 | questions."  Because he said I don't care what outcome you're | 3:13 |
| 6 | hoping for.  The question was what is your main complaint. | 3:13 |
| 7 | To me, that question is what is your complaint of suffering? | 3:13 |
| 8 | Where do you ache?  What do you claim happened to you?  This | 3:13 |
| 9 | is how I understand a question is posed by a psychiatrist in | 3:13 |
| 10 | terms of what is your main complaint. | 3:13 |
| 11 | So questions in your Motion in Compliance with the | 3:13 |
| 12 | order of the Court at docket 159, like, "did your attorney | 3:13 |
| 13 | advise you not to sign the real state contract?"  I don't | 3:13 |
| 14 | believe that Doctor Francichini asked that question.  I | 3:13 |
| 15 | really don't.  You tell me in your motion that that's why | 3:13 |
| 16 | your client ended the evaluation. | 3:13 |
| 17 | **MR. LOPEZ-ROMO:**  The line of questioning got | 3:13 |
| 18 | involved what my client thought were legal issues that were | 3:13 |
| 19 | not proper for a mental examination and he requested the | 3:13 |
| 20 | opportunity to consult with counsel and, unfortunately, that | 3:14 |
| 21 | did not happen.  But that does not mean he was not willing to | 3:14 |
| 22 | continue with the deposition immediately upon talking to him. | 3:14 |
| 23 | Once I was able to reach -- let's not forget, this was a | 3:14 |
| 24 | Friday and the doctor mentioned he was not going to be | 3:14 |
| 25 | available.  Period.  That was the end as of that date. | 3:14 |

```
 1            If I recall correctly, Mr. San Juan was traveling at      3:14
 2   that time and he came back around the 12th of July and, in        3:14
 3   the meantime, we did exchange email transmissions.  But up        3:14
 4   until that point, nobody had said we are not going back.          3:14
 5   Nobody had said, we don't want to come back to Puerto Rico.       3:14
 6        THE COURT:  In your motion, you have an actual list          3:15
 7   of questions that you say Doctor Francichini asked of             3:15
 8   Mr. Goldman.  Now you tell me that there were questions of        3:15
 9   legal nature, that the evaluation was turning into a              3:15
10   questioning of matters beyond the scope of the medical.          3:15
11        MR. LOPEZ-ROMO:  Exactly.                                    3:15
12        THE COURT:  Okay, it's not this list.  It's                  3:15
13   questions of a legal nature, and furthermore, when repeatedly     3:15
14   asked:  What was that key question, that you say, well, this      3:15
15   is getting to the point that I can not answer, your client        3:15
16   couldn't answer.                                                  3:15
17        MR. LOPEZ-ROMO:  No, he cannot answer what specific          3:15
18   question that triggered, but the whole line of questions,         3:15
19   including the ones that he had answered, were all getting         3:15
20   into legal matters that were not the subject-matter of a          3:15
21   mental examination.  That is not the purpose of a Rule 35         3:15
22   examination, to conduct an inquiry.                               3:16
23        THE COURT:  If in fact that happened, I would agree          3:16
24   with you but I don't think that happened.                         3:16
25        MR. LOPEZ-ROMO:  That is why, counsel recommended            3:16
```

Cross - Goldman

1   that, if the Court allows, a continuance that it be set,   3:16

2   recorded, video recorded so that it be preserved so there are   3:16

3   no issues or questions.   3:16

4         **THE COURT:**  If this was the first instance in this   3:16

5   case, I would be more flexible or more willing to consider   3:16

6   additional options but this has been a struggle to get your   3:16

7   client to be evaluated, to get your client to come to Puerto   3:16

8   Rico.  It has been a struggle.  There is a record where   3:16

9   Motions to Compel have to be followed.  Orders to Show Cause.   3:16

10         You chose to file this action in the District of   3:16

11   Puerto Rico, now you have to pursue your claim in the   3:17

12   district that you chose, which I believe is the correct venue   3:17

13   and that's why I ruled on your motion to transfer venue.   3:17

14         I have to agree with the Defendants.  It's a pattern   3:17

15   now, I don't want to pursue my claim.  I don't want to be   3:17

16   interviewed.  I don't want to be bothered.  I can't travel.   3:17

17   I am not well.   3:17

18         I mean, that's where we are right now.   3:17

19         **MR. LOPEZ-ROMO:**  The allegation regarding the mental   3:17

20   condition is one of many different grounds for the lawsuit.   3:17

21   If you look at the complaint, document number 29 that counsel   3:17

22   was referring to, it goes to the issues the differences and   3:17

23   articles under the new civil code of Puerto Rico were not   3:17

24   raised.  So this is not simply a torts case alleging pain and   3:17

25   suffering resulting from negligence.  We are talking about   3:18

| | | |
|---|---|---|
| 1 | breach of contract.  I mean, saying that the case is going to | 3:18 |
| 2 | be dismissed because the Plaintiff did not answer some | 3:18 |
| 3 | questions in a medical examination -- | 3:18 |
| 4 | **THE COURT:**  That is simplifying the issue.  This is | 3:18 |
| 5 | saying acknowledge to your client that further obstructions | 3:18 |
| 6 | to discovery would result in the ultimate sanction which is | 3:18 |
| 7 | dismissal. | 3:18 |
| 8 | Let me ask Mr. San Juan, the purpose of this medical | 3:18 |
| 9 | evaluation was to try to understand his claim regarding | 3:18 |
| 10 | diminished capacity because he has an allegation in his | 3:18 |
| 11 | verified amended complaint that his law firm, his lawyer | 3:18 |
| 12 | should have alleged diminished capacity or mental problems | 3:19 |
| 13 | and that he should have been defended in the lawsuit which | 3:19 |
| 14 | underlies his claim against his lawyer and the law firm, that | 3:19 |
| 15 | that allegation should have been pursued and it was not.  So | 3:19 |
| 16 | what was the purpose of this legal evaluation? | 3:19 |
| 17 | To determine if there is any basis substantively for | 3:19 |
| 18 | that claim or to see if, indeed, he suffered damages as a | 3:19 |
| 19 | result of the actions or inactions of the law firm? | 3:19 |
| 20 | **MR. SAN JUAN:**  It is both, Your Honor.  It is both. | 3:19 |
| 21 | As you correctly point out, one of the fundamental | 3:19 |
| 22 | allegations of legal malpractice is that Mr. Arias and | 3:19 |
| 23 | McConnell Valdes, they did not list any medical records in | 3:19 |
| 24 | the proposed Pre-trial Order.  They did not list any doctors | 3:19 |
| 25 | in the proposed Pre-trial Order.  They did not request any | 3:20 |

1    medical records in their evaluation of the case.                    3:20

2            What the Plaintiff is saying is; you should have            3:20

3    defended me by saying I had diminished capacity when I signed       3:20

4    that contract; therefore, that contract was null and void          3:20

5    and; therefore, I don't have to pay any money.                      3:20

6            The purpose of the medical examination was, first of       3:20

7    all, to test that.  Number two, because there is an                 3:20

8    allegation in the complaint that, as a result of the alleged        3:20

9    malpractice, and he admitted it on the stand as well, that he       3:20

10   suffered emotional distress, mental anguish to test that as         3:20

11   well.  So it's twofold, as the Court pointed out.                   3:20

12           **THE COURT:**  Are you still moving the Court for          3:20

13   dismissal?                                                          3:20

14           **MR. SAN JUAN:**  I am, Your Honor.                        3:20

15           **THE COURT:**  I will take it under abeyance.  I will      3:20

16   rule on this matter.                                                3:20

17           Let's take a short recess and move on to the next           3:20

18   case.                                                               3:21

19           (Whereupon, proceedings adjourn at 3:21 p.m.)               3:21

20                                                                       3:21

21                                                                       3:21

22                                                                       3:21

23                                                                       3:21

24                                                                       3:21

25                                                                       3:21

```
 1  UNITED STATES DISTRICT COURT )                              3:21
    DISTRICT   OF    PUERTO RICO )                              3:21
 2                                                             3:21

 3                                                             3:21

 4                    REPORTER'S CERTIFICATE                    3:21

 5                                                             3:21

 6        I, Robin Marie Dispenzieri, Official Court Reporter  3:21

 7  for the United States District Court for the District of   3:21

 8  Puerto Rico, appointed pursuant to the provisions of Title 3:21

 9  28, United States Code, Section 753, do hereby certify that 3:21

10  the foregoing is a true and correct computer-aided transcript 3:21

11  of proceedings had in the numbered cause on the date herein 3:21

12  set forth; and I do further certify that the foregoing      3:21

13  transcript has been prepared by me or under my direction.   3:21

14                                                             3:21

15        Dated this 14th day of October 2025.                 3:21

16                                                             3:21

17                                                             3:21

18        /s/ Robin Marie Dispenzieri                         3:21

19                                                             3:21
          _____                    3:21
20        Robin Marie Dispenzieri, RPR                        3:21
          Official Court Reporter                             3:21
          U.S. District of Puerto Rico                        3:21
21        150 Av. Carlos E. Chardón                           3:21
          San Juan, Puerto Rico  00918                        3:21
22        Email: Rdispenzieri@gmail.com                       3:21

23

24

25
```